TREG R. TAYLOR
ATTORNEY GENERAL

Jessica Moats Alloway
Christopher Orman
Assistant Attorneys General
Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: jessie.alloway@alaska.gov
         christopher.orman@alaska.gov

Attorneys for the State of Alaska

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>    Plaintiff,<br><br>v.<br><br>BRYAN NEWLAND, in his official capacity as Assistant Secretary, Indian Affairs, U.S. Department of the Interior; and U.S. DEPARTMENT OF THE INTERIOR,<br><br>    Defendants. | Civil Action No.:<br><br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      The State of Alaska challenges a decision of the Assistant Secretary, Indian

Affairs, acting through the U.S. Department of the Interior (collectively "Defendants"), to

grant an application submitted by the Central Council of Tlingit and Haida Indian Tribes

of Alaska ("Central Council" or "the Tribe") to accept a parcel of land located in downtown Juneau in trust by the United States on behalf of the Tribe and to proclaim this land a reservation. The Assistant Secretary's decision limits the State's sovereign jurisdiction in Alaska and undermines key terms of the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §§ 1601–1629h.

2.     Through ANCSA, Congress authorized the transfer of $962.5 million and 44 million acres of land in exchange for the extinguishment of aboriginal title and any claims based on that title. 43 U.S.C. §§ 1603, 1605, 1611. Congress sought to "maximize participation by Natives in decisions affecting their rights and property . . . without creating a reservation system or lengthy wardship or trusteeship." *Id.* § 1601(b). To further that objective, Congress expressly revoked the few reserves that had been created in Alaska (except for the Annette Island Reserve), *id.* § 1618(a), and provided for the creation of more than 200 state-chartered village and regional corporations, owned and operated by Natives as for-profit businesses subject to state law. *Id.* §§ 1606, 1607.

3.     For 46 years following the passage of ANCSA, under the guidance of multiple Secretaries of the Interior, the Department declined to take lands into trust on behalf of Alaska Natives. That changed in 2017, when the Department, for the first time, accepted lands into trust in Alaska post-ANCSA. And now, after nearly 50 years of certainty, the State and Alaska Natives have entered a period of uncertainty. Between 2017 and 2022, the Department of the Interior has issued five Solicitor Opinions addressing the Secretary's authority to take lands into trust in Alaska. Two have concluded that the

*State of Alaska v. Newland, et al.*                                      Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                                      Page 2 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 2 of 25

Secretary retains the authority to place Alaska Natives' lands into trust, two have withdrawn prior opinions, and one has agreed—consistent with Solicitor Opinions issued in 1978 and 1993, that the Secretary lacks the authority, post-ANSCA, to take lands into trust.

4.      The extent of the State of Alaska's sovereignty over lands within its borders should not be determined by the political whims of federal officials. Only the courts can conclusively decide whether the Secretary's authority to take lands into trust for Alaska Natives, other than the members of the Metlakatla Indian Community, survived the passage of ANCSA, and if it did, the extent of that authority.

5.      Through this lawsuit, the State seeks to finally resolve this issue. It asks the Court to enforce the settlement terms of ANCSA and requests a declaration that the Assistant Secretary's act to take lands into trust in Alaska exceeded the Secretary's authority and was an abuse of direction.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331. This action challenges a final agency action and is brought under the Administrative Procedure Act, 5 U.S.C. §§ 701–706. The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, authorizes the requested declaratory and injunctive relief.

7.      The federal government waived its sovereign immunity for suits challenging final agency actions. 5 U.S.C. § 702; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216-17 (2012).

*State of Alaska v. Newland, et al.*
Complaint For Declaratory Judgment and Injunctive Relief
Civil Action No.: _____
Page 3 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 3 of 25

8.   The State challenges a final agency action under 5 U.S.C. § 704.

9.   An actual, justiciable controversy now exists between the State and Defendants, and the requested relief is proper.

10.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this action is brought against an officer of an agency of the United States in his official capacity and against a federal agency. The subject land is located within the District of Alaska. The land in trust status immunizes the land from state and local taxation, protects land against alienation, establishes tribal sovereignty over the land, sets up potential intra-Alaskan conflicts between different territorial sovereigns within Alaska, and thereby implicates considerable local economic and political interests.

## PARTIES

11.   Alaska is a sovereign state, with a compelling interest in maintaining its jurisdiction over land owned by federally recognized tribes in the state. Alaska also maintains an interest in enforcing the terms of ANCSA.

12.   Defendant Bryan Newland is the Assistant Secretary for Indian Affairs within the U.S. Department of the Interior and is being sued in his official capacity. The Assistant Secretary is the federal official with delegated authority to review and grant an application to take land into trust under the implementing regulations contained in 25 C.F.R. Part 151.

13.   Defendant Department of the Interior is an agency of the United States and is charged with primary supervision of Indian Affairs for the federal government.

*State of Alaska v. Newland, et al.*                           Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                           Page 4 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 4 of 25

**STANDING**

14.     A decision by the Defendants to take land into trust under 25 U.S.C. § 5108 jeopardizes the State's rights to tax and to enforce land use, natural resource management, environmental, and public safety regulations on that trust land. The loss of sovereignty over land within its jurisdiction is a legally protectable interest. *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6 (D.D.C. 2008); *cf. Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991) (finding legal interest in a tribe's status as "the exclusive governing authority of the reservation").

15.     The State also has an interest in maintaining the terms of the settlement reached in ANCSA. Congress passed ANCSA in 1971 to settle claims of aboriginal title, to promote economic development, and to "maxim[ize] participation by Natives in decisions affecting their rights and property . . . without establishing a reservation system or lengthy wardship or trusteeship." 43 U.S.C. § 1601(a) & (b). As consideration for this settlement, the State relinquished its land selection priorities under the Alaska Statehood Act and provided half of the monetary settlement ($500 million). *Id.* §§ 1605, 1608, 1610.

16.     For the first 46 years following the passage of ANCSA, the Department of the Interior complied with the settlement's terms, declining to take lands into trust in Alaska. The Department's first action to undermine this settlement occurred in 2017, when then-Assistant Secretary, Lawrence S. Roberts, granted the Craig Tribal Association's

*State of Alaska v. Newland, et al.*                          Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                          Page 5 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 5 of 25

application to place approximately 1.08 acres within the downtown area of the City of Craig into trust. Land Acquisitions; Craig Tribal Association, 82 Fed. Reg. 4,915 (January 10, 2017). The Department most recently undermined the settlement on November 17, 2022, when it granted the Central Council's application to accept a 787 square foot parcel in downtown Juneau into trust and then proclaim that parcel an Indian reservation

17.     The harm to the State's sovereignty—something Congress specifically preserved in ANCSA—is actual and occurred immediately upon the Defendants' grant of the Central Council's application. Moreover, the Central Council has four additional applications pending before the Department, and the agency has also received applications from the Ninilchik Traditional Council and the Native Village of Fort Yukon. These pending applications, coupled with the Department's current position regarding the extent of its authority under 25 U.S.C. § 5108, as articulated in the most recent Solicitor Opinion, further jeopardize the State of Alaska's sovereign authority. *See* Robert T. Anderson, Solicitor Opinion M-37076, "*The Secretary's Land into Trust Authority for Alaska Natives and Alaska Tribes*" (Nov. 16, 2022).

## LEGAL AND FACTUAL BACKGROUND

### I.      Historical Background

18.     When Russian explorers "discovered" Alaska in 1741, they came upon a land of abundant natural resources and a diverse Native population, subsisting in small villages or groups along the thousands of miles of coastline and in the mountainous

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 6 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 6 of 25

inland regions of the future state. In 1867, when the United States purchased Alaska from Russia, most of these communities remained intact. *See* Robert D. Arnold, *Alaska Native Land Claims* 1-26 (1975). Today, there are 227 federally recognized tribes in Alaska. *See* 88 Fed. Reg. 2112 (Jan. 12, 2023).

19.     By the time the United States had acquired the Alaskan territory, most Indians in the contiguous United States had been displaced from their aboriginal lands by war or treaty, and confined to federally established territories or reservations. Although these reservations were created expressly for the use and occupancy of Indians, Indians did not own or control the land. Rather, the land was held in "trust" for them by the federal government, and any action concerning the land was subject to exclusive federal control. At the same time, because their means of subsistence had fallen prey to westward expansion, reservation Indians were almost entirely dependent upon the federal government for food, clothing, and protection, and were often perceived as "dead[ly] enemies" of the States. *United States v. Kagama*, 118 U.S. 375, 383-84 (1886). *See* Arnold, *Alaska Native Land Claims,* at 28-36; Felix S. Cohen, *Handbook of Federal Indian Law*, at 28-29, 74-92, 121-125 (1982 ed.).

20.     In Alaska there is no history of Indian wars or treaties, and from purchase to statehood "the federal government was involved only minimally with Alaska Natives." Felix S. Cohen, *Handbook of Federal Indian Law*, at 739 (1982 ed.). Moreover, "[t]here was never an attempt in Alaska to isolate Indians on reservations," and "[v]ery few were ever created." *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 51 (1962). Indeed,

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 7 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 7 of 25

"Alaskans, both Native and non-Native, opposed creation of reservations on the grounds that reservations were socially divisive and tended to perpetuate a wardship rather than equality for the Natives." *United States v. Atlantic Richfield Co.*, 436 F. Supp. 1009, 1015 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir.), *cert. denied*, 449 U.S. 888 (1980).

21.     Prior to the enactment of the Indian Reorganization Act (IRA) in 1934, Congress established one reserve—the Annette Island Reserve, or Metlakatla. Act of Mar. 3, 1891, ch. 561, § 15, 26 Stat. 1101. Metlakatla is distinct in that its members are not Alaska Natives, but rather nineteenth century emigrants from British Columbia. *See Egan*, 369 U.S. at 48. Prior to ANCSA, there were nineteen other reserves in Alaska that were established by the executive branch. Cohen's Handbook of Federal Indian Law § 4.07[3][b][iii] (Nell Jessup ed., 2012); Federal Field Committee For Development Planning in Alaska, Alaska Natives and the Land 443-446 (1968).

22.     Alaska Natives, from the organization of Alaska's first civil government in 1884 forward, have been subject to the same laws as non-Natives, including the criminal code, taxes, and civil laws governing matters such as hunting and fishing, employment, and even domestic issues. *See, e.g., Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d 32, 35 (Alaska 1988) (state laws and taxes); *United States v. Sitarangok*, 4 Alaska 667 (D. Alaska 1913) (territorial public works laws); *United States v. Doo–Noch–Keen*, 2 Alaska 624 (D. Alaska 1905) (territorial fishing laws). The same was true even with respect to the few reservations that existed in Alaska, *see Egan*, 369 U.S. at 51, despite the fact that reservation Indians in the lower 48 States were

generally not subject to state or territorial laws, but instead a special body of federal and tribal law reserved for such "Indian country." *See* Cohen, *Handbook of Federal Indian Law*, at 27 (1982 ed.). While the terms "reserve" and "reservation" are often used interchangeably today, the reserves that were established in Alaska were established for various public purposes, such as education of Alaska Natives, but were not "Indian country" like Lower 48 reservations. David Case & David Voluck, *Alaska Natives and American Laws*, pp. 66-67 (2nd ed, University of Alaska - Fairbanks Press 2002).

23.     On occasion, Alaska Natives attempted to avoid application of state or territorial law, or to take advantage of federal Indian law, on the ground that a particular offense or activity occurred in Indian country. These efforts, however, were consistently rejected by the courts, which held that, because of "the anomalous condition of Alaska," Indian country did not exist there. *Kie v. United States*, 27 F. 351, 353 (D. Or. 1886). *Accord United States v. Booth*, 161 F. Supp. 269 (D. Alaska 1958); *In re Sah Quah*, 31 F. 327 (D. Alaska 1886); *United States v. Seveloff*, 27 F. Cas. 1021 (D. Or.1872); *cf. Egan*, 369 U.S. at 51–52 (discussing how historically even the Annette Island Reserve is "not 'Indian country' "). Federal officials and others responsible for governing the Alaska Territory early on formed the same view. *See, e.g.*, DOI, *Opinion Regarding Legal Status of Alaska Natives*, 19 Pub. Lands Dec. 323, 325 (1894) ("Alaska is not Indian country").

## II.     The Indian Reorganization Act

24.     Congress enacted the IRA in 1934 to "establish machinery whereby Indian tribes would be able to assume a greater degree of-self-government, both politically and

*State of Alaska v. Newland, et al.*                          Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                          Page 9 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 9 of 25

economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1974). More specifically, the purposes of the Act were to stop and reverse the effects of alienation of Indian lands in the Lower 48, to create chartered businesses or organizations, to authorize tribes to incorporate, to provide funding and federal loans for those corporations, to provide education opportunities to "Indians," and to provide hiring preferences to "Indians" in the Bureau of Indian Affairs. S. Rep. 73-1080 (1934). Like many other federal statutory schemes, when it came to applying the IRA to Alaska, "Alaska [was] the exception, not the rule." *Sturgeon v. Frost*, 577 U.S. 424, 440 (2016); *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2438 (2021) (same). As enacted in 1934, only some of the provisions in the IRA applied to Alaska. 48 Stat. 984, Sec. 13 (1934), 25 U.S.C. § 5118. The sections that applied provided "Indians" with education opportunities and hiring preferences, allowed reservation tribes to organize under the IRA and create constitutions and bylaws, and authorized Indian chartered corporations to receive funding and federal loans. *Id.* ("The provisions of this Act shall not apply to any of the Territories, colonies, or insular possessions of the United States, except that sections 9, 10, 11, 12, and 16 [25 U.S.C. §§ 5112, 5113, 5115, 5116, and 5123], shall apply to the Territory of Alaska.").

25.     The IRA defines "Indian" and "tribe." 25 U.S.C. § 5129. Under the IRA, the term "Indian" includes three categories of people: (1) "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction"; (2) "all persons who are descendants of such members who were, on June 1, 1934, residing

*State of Alaska v. Newland, et al.*                    Civil Action No.:  _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 10 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 10 of 25

within the present boundaries of any Indian reservation"; and (3) "all other persons of one-half or more Indian blood." 25 U.S.C. § 5129. In 1934, it was disputed whether certain groups of Alaska Natives such as "Eskimos" were considered "Indian," *see, e.g.*, 78 Cong. Rec. 1183 (1934), and Congress clarified that, for the purposes of the IRA, "Eskimos and other aboriginal peoples of Alaska shall be considered Indians." 25 U.S.C. § 5129. The Supreme Court interpreted the first category of the IRA's definition of "Indian" to mean members of tribes that were under federal jurisdiction back in 1934 when the IRA was enacted. *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009). The IRA defines "tribe" as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." 25 U.S.C. § 5129.

26.     The 1934 Act was "largely inoperative" in Alaska due to an oversight when drafting. S. Rep. 74-1831 (1936). Although section 10's financial assistance for IRA-chartered corporations applied in Alaska, the 1934 Act inadvertently failed to authorize the creation of any IRA-chartered corporations in Alaska. *Id.* Plus, sections 16 (§ 5123) and 17 (§ 5124), which allowed "tribes" to organize and incorporate, referred to tribes *on reservations*, and there were not many Indian reserves/reservations in Alaska.

27.     In 1936, Congress passed the Alaska IRA ("AIRA") to rectify these problems. Act of May 1, 1936, ch. 254, 49 Stat. 1250. Section 1 of the AIRA extended section 17 of the IRA to Alaska, allowing tribes to incorporate and thereby receive federal funding for economic projects. Act of May 1, 1936, ch. 254, § 1 (codified as amended at 25 U.S.C. § 5124). And section 1 of the AIRA also allowed non-reservation groups of Indians who

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 11 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 11 of 25

were not yet recognized as tribes under federal jurisdiction to use sections 16 (§ 5123), 17 (§ 5124), and 10 (§ 5113) of the Act (i.e., to organize and adopt IRA constitutions, to incorporate, and to receive federal loans). Separately in section 1, the AIRA made additional provisions of the IRA narrowly applicable in Alaska—this includes the Secretary's authority to acquire and take lands into trust for "Indians" as defined by the IRA, and to use those lands to proclaim new Indian reservations or add lands to existing reservations. *See* Act of May 1, 1936, ch. 254, § 1 (codified as amended at 25 U.S.C. §§ 5108, 5110, and 5119). Section 2 of the AIRA authorized the Secretary to establish reservations on any area of land which had been reserved for the use and occupancy of Alaska Natives and any other public lands occupied by them or adjacent thereto. Act of May 1, 1936, ch. 254, § 2, 49 Stat. 1250, repealed by Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (1976).

28.     The Secretary's authority to take lands into trust for Indians is codified at 25 U.S.C. § 5108. That statute provides that the Secretary "is authorized, in [her] discretion, to acquire . . . any interest in lands, water rights, or surface rights to land . . . for the purpose of providing lands for Indians." The statute further provides that "[t]itle to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." *Id.*

29.     Although various native villages filed petitions, the Secretary incorporated only six reserves prior to the passage of ANCSA and all of those reserves were reserved

under AIRA, § 2. *See* S. Rpt. 92-405 at 92. Prior to 2017, the Secretary had never invoked the authority granted under AIRA, § 1 (codified as amended at 25 U.S.C. § 5110) to proclaim new Indian reservations or to expand reservations in Alaska.

30.     Between 1948 and 1950, under the AIRA generally, three different parcels were conveyed to the United States to be held in trust for the Organized Village of Kake, the Angoon Community Association, and the Klawock Cooperative Association. Thomas Sansonetti, Solicitor Opinion M-36975, "*Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers*," 112 fn. 277 (1993). All three were for cannery sites to compete with the Annette Island Reserve's economically successful cannery.  David Case & David Voluck, Alaska Natives and American Laws, pp. 86, 205, 387 (University of Alaska Fairbanks Press 2nd Ed. 2002); Robert E. Price, "The Great Father in Alaska," pp. 103-134 (Douglas Press 1990). For 67 years, the AIRA would not be used again to place lands into trust in Alaska.

## III.     The Alaska Native Claims Settlement Act

31.     In 1958, Congress enacted the Alaska Statehood Act. *See* Pub. L. No. 84-508, 72 Stat. 341 (1958) (Statehood Act). "And because the new State would need property— to propel private industry and create a tax base—the Statehood Act" permitted Alaska to select 103 million acres of " 'vacant, unappropriated, and unreserved' " federal land for state ownership. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1074 (2019) (quoting Statehood Act, § 6(a)-(b) ("*Sturgeon II*")).

*State of Alaska v. Newland, et al.*                                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                                    Page 13 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 13 of 25

32.     Because Alaska Natives were not categorically displaced from their land, there was little need prior to statehood to address the status of their aboriginal land claims. That changed in the 1960s when the State began its land selections under the Statehood Act. The conflict eventually led the Secretary in 1966 to impose a freeze on further selections. Discovery of oil on the Arctic Slope heightened the dispute and the need for resolution. *See Atlantic Richfield Co.*, 435 F. Supp. at 1016-18.

33.     Congress, Alaska Natives, and the State negotiated over four years to settle Alaska Native land claims.

34.     During this process, Alaska Natives—represented *en masse* by the Alaska Federation of Natives—made clear that they "very vehemently" opposed any settlement based on the reservation concept. *Alaska Native Land Claims: Hearings on S. 2906 Before the Senate Comm. on Interior and Insular Affairs*, 90th Cong., 2d Sess. 89 (1968). They also opposed the concept—advanced by the Secretary of the Interior—that the federal government would hold the land in trust. *Id.* at 576. Instead, rather than "some modified form of reservation or paternalism," Alaska Natives urged Congress to adopt "a bold and imaginative approach which fully and finally resolves all claims, . . . and permits the Natives to improve themselves and their land and determine their own destiny." *Alaska Native Land Claims: Hearings on H.R. 13142 and H.R. 10193 Before the Subcomm. on Indian Affairs of the House Comm. on Interior and Insular Affairs*, 91st Cong., 1st Sess. 181 (1969).

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 14 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 14 of 25

35.    For its part, Congress's purpose aligned with that of the Alaska Federation of

Natives. As reflected in the legislative history, "[a] major purpose of this Committee and

the Congress is to avoid perpetuating in Alaska the reservation and the trustee

system which has characterized the relationship of the Federal government to the Indian

peoples in the contiguous 48 states." S. Rep. No. 92-405, at 108-109 (1971) (emphasis

added). Congress wanted to avoid reservations and thus granting large enclaves that

could result in "remote land locked reservations rather than viable open communities."

*Id*. at 76-77.

36.    The third party to this settlement—the State of Alaska—also agreed to this

structure as it would resolve the land claims and solidify the reach of its sovereign

jurisdiction.

37.    Congress passed ANCSA in 1971. "In no clearer fashion could Congress have

departed from its traditional practice of setting aside Indian lands." *Alaska v. Native*

*Village of Venetie Tribal Government*, 522 U.S. 520, 532 (1998). The Act extinguished

the Alaska Natives' aboriginal claims, 43 U.S.C. § 1603, "[b]ut it granted the Natives

much in return." *Sturgeon II*, 139 S. Ct. at 1075. In exchange, ANCSA authorized the

transfer of $962.5 million and 44 million acres of land. 43 U.S.C. §§ 1605, 1611.

Congress sought to effect this settlement by "maximiz[ing] participation by Natives in

decisions affecting their rights and property . . . without creating a reservation system or

lengthy wardship or trusteeship." *Id.* § 1601(b). Thus, it expressly revoked the few

reserves/reservations that had been created in Alaska (save Metlakatla), *id.* § 1618(a), and

provided for the creation of more than 200 state-chartered village and regional corporations, owned and operated by Natives as for-profit businesses subject to state law. *Id.* §§ 1606, 1607. It then conveyed the land to these business corporations in fee, leaving it a freely alienable corporate asset. *Id.* §§ 1611, 1613. To encourage Native villages to adopt municipal governments under state law, Congress required the new ANCSA corporations to reconvey a portion of their land to the existing municipal government or, if none existed, to the State in trust until one was established. *Id.* § 1613(c)(3).

38. As consideration for the settlement, the State relinquished its land selection priorities under the Alaska Statehood Act and provided half of the monetary settlement ($500 million). 43 U.S.C. §§ 1605, 1608, 1610.

## IV.   Post-ANCSA, 1971-2017

39. In 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA"). Pub. L. No. 94-579, 90 Stat. 2743 (1976), *codified as amended at* 43 U.S.C. §§ 1701-1787. Congress declared as one of FLMPA's purposes that "all existing classifications of public lands that were [previously] effected by executive action or statute" be reviewed in accordance with the Act's provisions, and that Congress "delineate the extent to which the Executive may withdraw lands without legislative action." 43 U.S.C. § 1701(a)(3)-(4). Title VII repealed dozens of miscellaneous land laws governing the disposal of federal lands across the nation, including the Secretary's authority to use public lands to establish Indian reservations in Alaska under AIRA, § 2.

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 16 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 16 of 25

FLPMA, tit. VII, § 704(a). Congress did not address the sections of the AIRA that did not specifically deal with public lands (i.e., AIRA, § 1, the Secretary's authority to take lands into trust under 25 U.S.C. § 5108 or to turn those acquired lands into reservations under § 5110).

40.     In the wake of ANCSA, and even FLPMA, those responsible for governing Alaska reaffirmed the historical understanding that Indian country did not exist in the state. In 1978, seven years after ANCSA's passage, Thomas W. Fredericks, Associate Solicitor for Indian Affairs, rejected the Arctic Village and the Native Village of Venetie's petition to have the Department take their former reservation into trust. He concluded that, following Congress's directive in ANCSA, it would be an abuse of the Secretary's discretion to accept in trust the village communities' former reservation lands. Memorandum from Thomas W. Fredericks, Associate Solicitor for Indian Affairs, to Forrest Gerard, Assistant Secretary — Indian Affairs, "*Trust Land for the Natives of Venetie and Arctic Village*," (Sep. 15, 1978) ("Fredericks Opinion"). In 1980, the Department promulgated land-into-trust regulations that prohibited consideration of any trust acquisitions in Alaska, "except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its Members" ("Alaska Exception"). Final Rule, Land Acquisitions, 45 Fed. Reg. 62034 (Sept. 18, 1980).

41.     In 1988—15 years after ANCSA was passed—the Alaska Supreme Court reiterated that "[t]here is not now and never has been an area of Alaska recognized as Indian country." *Native Village of Stevens v. Alaska Management & Planning*, 757 P.2d

*State of Alaska v. Newland, et al.*                                   Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                                   Page 17 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 17 of 25

32, 36 (Alaska 1988). The Department reaffirmed this position again in 1993 with the release of a 133-page opinion authored by Solicitor Thomas L. Sansonetti. Thomas L. Sansonetti, Solicitor Opinion M-36975, "*Governmental Jurisdiction of Alaska Village Over Land and Nonmembers*" (Jan. 11, 1993). Having thoroughly canvassed ANCSA and its historical backdrop, Sansonetti concluded that "ANCSA precludes the treatment of lands received under that Act as Indian country" and that Congress sought "an unambiguous rejection of the reservation system or any categories of trust or restricted land." *Id.* at 88, 112 n. 276, 131, 133. The Department has never revoked or rescinded the Sansonetti opinion.

41.     In the 1980s, Congress considered several amendments to ANCSA. The Alaska Federation of Natives supported what became known as the "qualified transferee entity (QTE) option." *Amendments to the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act and to Establish a Memorial in the District of Columbia*: Hearings on S. 485, S. 1330, S. 2065, and S. 2370 Before the Subcomm. on Public Lands, Reserved Water and Resource Conservation of the Senate Comm. on Energy and Natural Resources, 99th Cong., 2d Sess. 165-66 (1986). The "QTE Amendment" would have allowed ANCSA corporations to transfer land or assets to traditional councils or IRA tribal councils to be held in trust by the federal government. *Id*. The State opposed the amendment, arguing that such transfers would "strengthen the claim that there was Indian country in Alaska" and would contravene ANCSA's declaration of accomplishing a settlement "without creating a reservation system or

lengthy wardship or trusteeship." *Id*.; *see also* 43 U.S.C. § 1601(b).  Congress ultimately rejected the QTE amendment. *Id*. Instead, it adopted the settlement trust option—an option deemed more neutral because it allowed a Native corporation's land to be placed into trust under state law. 43 U.S.C. § 1629e; House Explanatory Statement to P.L. 100-241, 1987 U.S.C.C.A.N. 3299, 3307, 1987 WL 61520 (December 21, 1987). President Reagan signed the settlement trust option into law in 1988. 101 Stat. 1805 (February 3, 1988).

42.     Alaska Native groups petitioned the Department in 1995 to remove the Alaska Exception from the lands-into-trust regulations, Notice of Petition, Land Acquisitions, 60 Fed. Reg. 1,956 (Jan. 5, 1995), and in 1999 the Department concluded that a "credible legal argument" existed that the Secretary's authority to accept lands into trust in Alaska survived ANCSA, Proposed Rule, Acquisition of Title to Land in Trust, 64 Fed. Reg. 17574, 17578 (Apr. 12, 1999). In 2001, the Department rescinded the Fredericks Opinion based on "substantial doubt" regarding its conclusions. Memorandum from John Leshy, Solicitor, to Assistant Secretary — Indian Affairs, "*Rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian Affairs entitled 'Trust Land for the Natives of Venetie and Article Village*' " (Jan. 16, 2001).

43.     In 2014, the Department removed the Alaska Exception by promulgating a new regulation. Final Rule, Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888 (Dec. 23, 2014). This followed a ruling from the United States District Court for the District of Columbia finding the Alaska Exception unlawful. The United States Court of

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 19 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 19 of 25

Appeals for the District of Columbia Circuit later vacated the district court's ruling after the Department's new rule mooted the State's appeal. *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 102 (D.C. Cir. 2016).

44. The Department's removal of the Alaska Exception has resulted in uncertainty, with multiple Solicitor Opinions reaching different conclusion. *See* Hilary C. Tompkins, Solicitor Opinion M-37043, "*Authority to Acquire Land into Trust in Alaska*" (Jan. 13, 2017); Daniel H. Jorjani, Solicitor Opinion M-37053, *"Withdrawal of Solicitor Opinion M-37043, 'Authority to Acquire Land into Trust in Alaska' Pending Review"* (June 29, 2018); Daniel H. Jorjani, Solicitor Opinion M-37064, "*Permanent Withdrawal of Solicitor Opinion M-37043, 'Authority to Acquire Land into Trust in Alaska'"* (Jan. 19, 2021); Robert T. Anderson, Solicitor Opinion M-37069, "*Withdrawal of M-37064 and Announcement of Consultation on the Department's Interpretation of the Indian Reorganization Act and the Alaska Native Claims Settlement Act in Connection with the Secretary's Land into Trust Authority*" (Apr. 27, 2021); Robert T. Anderson, Solicitor Opinion M-37076, "*The Secretary's Lands into Trust Authority for Alaska Natives and Alaska Tribes Under the Indian Reorganization Act and the Alaska Indian Reorganization Act"* (Nov. 16, 2022).

## V. The Central Council's Application

45. The Central Council filed five applications seeking to have the Secretary take lands located within downtown Juneau into trust. If the Secretary granted all five applications, the United States would acquire approximately 3.5 acres in trust on behalf

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 20 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 20 of 25

of the Central Council. The Central Council has also requested that the lands taken into trust constitute a new reservation. *See* 25 U.S.C. § 5110.

46.     The Department's implementing regulations require it to notify the State of a tribe's application, giving it "30 days in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments." 25 C.F.R. § 151.11(d). In its comments, the State questioned the Secretary's authority to take lands into trust for tribes in Alaska after the passage of ANCSA. The State also noted that it could not adequately address "the acquisition's potential impacts on regulatory jurisdiction" when the Department insists on adjudicating the Central Council's applications independently. It makes little sense to address the impacts of acquiring 787 square feet of land when the Central Council actually seeks to place 3.5 acres—and maybe more—into trust.

47.     In a decision dated November 17, 2022, Defendant Bryan Newland, the Assistant Secretary of Indian Affairs approved the Central Council's trust application for Lot 15, Block 5, U.S. Survey 4694, a 787 square foot parcel in Juneau, Alaska. The Assistant Secretary relied on Solicitor Opinion M-37076 to improperly conclude that the Secretary has statutory authority to accept land into trust for Alaska Natives and federally recognized tribes in Alaska. The Assistant Secretary also incorrectly concluded that this authority was not constrained by the Supreme Court's decision in *Carcieri v. Salazar*. Based on this improper legal conclusion, the Assistant Secretary did not consider whether

*State of Alaska v. Newland, et al.*                          Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                          Page 21 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 21 of 25

the Central Council's members are "persons of Indian descent" who were members of a "recognized Indian tribe [] under Federal jurisdiction" as of 1934. *See* 25 U.S.C. § 5129.

48.     The lands into trust regulations also require the Secretary to consider the location of the land relative to state boundaries and the parcel's distance from the boundaries of the tribe's reservation. 25 C.F.R. § 151.11(b). "[A]s the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition." *Id.* Additionally, the Secretary shall give greater weight to the State's concerns about the "impacts on regulatory jurisdiction, real property taxes and special assessments." *Id.* § 151.11(b). In considering this factor, the Assistant Secretary properly recognized that "ANCSA revoked the various reserves that had been set aside for Alaska Native groups or for the administrative of Native affairs (excluding the Annette Island Reserve established for the Metlakatla Indian Community)." Bryan Newland, Notice of Decision, at 11 (November 17, 2022) ("Decision"). Nevertheless, the Assistant Secretary failed, as required by the regulations, to give more weight to the State's concerns about the jurisdictional change his decision would create. Instead, the Assistant Secretary considered, and weighed heavily, the Central Council's "traditional homelands." *Id.* He noted that "[t]he Tribe's ancestors used areas in and around Southeast Alaska, including the area now known as Juneau, as their traditional and cultural homeland since time immemorial." *Id.* The Assistant Secretary's reliance on the Central Council's "traditional cultural homeland" to support his decision to create Indian country in Alaska was

*State of Alaska v. Newland, et al.*                          Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                          Page 22 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 22 of 25

contrary to Congress's extinguishment, through ANCSA, of all claims based on aboriginal title. *See* 43 U.S.C. §§ 1603, 1617.

49.     In his decision, the Assistant Secretary dismissed the State's concerns about the Department's piecemeal approach to reviewing the Central Council's many parcel applications. Decision at 12. He believed it was unclear how this practice—which allows the State to comment only on a small piece of a much larger movement by the Central Council to place lands into trust—inhibited the State's ability to raise jurisdictional or regulatory issues.

50.     The Assistant Secretary also notified the State of his decision to issue a reservation proclamation—declaring this 787 square foot parcel a reservation—30 days after the date of the decision on the trust application. Decision at 12. As such, 51 years after Congress revoked all but one reservation in Alaska, 43 U.S.C. § 1618, and without any clear statement from Congress granting the Secretary authority to create new reservations, the Assistant Secretary used an 86-year-old statute to create a reservation in downtown Juneau, Alaska.

51.     Given that the Secretary of the Interior now claims a "highly consequential power" to shift sovereign power within the State of Alaska, "there is every reason to 'hesitate before concluding that Congress' " meant to confer on the Secretary (or her delegates) the authority she now claims. *See W. Virginia v. Environmental Protection Action*, 142 S. Ct. 2587, 2610 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)). The federal agency—and ultimately the courts—

should "presume that 'Congress intends to make major policy decisions itself, [and] not leave those decisions to agencies.' " *Id.* at 2609 (quoting *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

## CAUSE OF ACTION

52.     The State realleges paragraphs 1 through 51.

53.     The Assistant Secretary's decision to accept land into trust on behalf of the Central Council and create Indian country in Alaska was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and/or otherwise contrary to the law in violation of the APA. *See* 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, the State of Alaska respectfully requests that this Court enter a judgment providing the following relief.

A.     Declare that Defendants' action, as set forth above, was arbitrary and capricious, an abuse of discretion, and not in accordance with law and therefore a violation of the IRA, AIRA, ANCSA, and the APA;

B.     Vacate the decision granting the Central Council's application to take lands into trust and issue an injunction directing Defendants to return the accepted parcel to the Central Council with no restriction or trust status;

C.     Vacate any proclamation declaring the accepted parcel to be a reservation;

*State of Alaska v. Newland, et al.*                    Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief                    Page 24 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 24 of 25

D.	Enjoin the Defendants from accepting or considering requests to have lands in Alaska taken into trust or restricted status;

E.	Award Alaska its costs, expenses, and reasonable attorneys' fees; and

F.	Grant Alaska such other and further relief as the Court may deem necessary and appropriate.

DATED this 13th day of January, 2023.

TREG R. TAYLOR
ATTORNEY GENERAL

By:	*/s/ Jessica Moats Alloway*
	Jessica Moats Alloway
	Assistant Attorney General
	Alaska Bar No. 1205045
	Email: jessie.alloway@alaska.gov
	*Attorney for the Plaintiff*

By:	*/s/ Christopher F. Orman*
	Christopher Orman
	Assistant Attorney General
	Alaska Bar No. 1011099
	Email: christopher.orman@alaska.gov
	*Attorney for the Plaintiff*

*State of Alaska v. Newland, et al.*	Civil Action No.: _____
Complaint For Declaratory Judgment and Injunctive Relief	Page 25 of 25

Case 3:23-cv-00007-SLG   Document 1   Filed 01/17/23   Page 25 of 25