TREG TAYLOR
ATTORNEY GENERAL

Jessie M. Alloway
Christopher Orman
Assistant Attorneys General
Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: jessie.alloway@alaska.gov
        christopher.orman@alaska.gov

Attorneys for the State of Alaska

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, | |
|     Plaintiff, | Civil Action No.: 3:23-cv-00007-SLG |
| v. | |
| BRYAN NEWLAND, in his official capacity as Assistant Secretary, Indian Affairs, U.S. Department of the Interior; and U.S. DEPARTMENT OF THE INTERIOR, | **STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT** |
|     Defendants, and | |
| CENTRAL COUNCIL OF THE TLINGIT & HAIDA INDIAN TRIBES OF ALASKA, | |
|     Intervenor-Defendant. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 10

STATEMENT OF THE CASE ............................................................................. 13

I.    Historical and Statutory Background. ....................................................... 13

      A.    The purchase of Alaska and the Organic Act. ................................ 13

      B.    Trust land is Indian country. .......................................................... 15

      C.    Reservation policy in Alaska. ......................................................... 17

      D.    The limited impact of the IRA land provisions prior to ANCSA and the public
            sentiment regarding reservations in Alaska. ................................... 20

      E.    The reservation issue persists during statehood discussions. .......... 23

      F.    Congress rejects the reservation model and Indian country. ............ 24

      G.    The Secretary's authority—or lack thereof—following ANCSA. .................. 28

II.   Assistant Secretary Newland Grants the Central Council's petition to take its fee
      land into trust to restore the tribe's "traditional homelands." ................... 34

      STANDARD OF REVIEW ............................................................................. 37

      ARGUMENT .................................................................................................. 39

I.    Whether to create Indian country in Alaska post-ANCSA is a "major question"
      requiring clear congressional authorization. ............................................. 40

II.   The Secretary does not have clear congressional authority to create Indian country.
      ............................................................................................................... 45

      A.    Post-ANCSA, the Secretary does not have the authority to create Indian
            country in Alaska. ......................................................................... 45

      B.    Even prior to ANCSA, the Alaska IRA limited the Secretary's authority for
            most Alaska tribes. ........................................................................ 49

      CONCLUSION ............................................................................................... 60

*State of Alaska v. Newland, et al.*                    Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment              Page 2 of 61

Case 3:23-cv-00007-SLG    Document 16    Filed 08/01/23    Page 2 of 61

# TABLE OF AUTHORITIES

**Cases**

*Akiachak Native Community v. Salazar*,
    935 F.Supp.2d 195 (D.C. Ct. 2013)....................................................... 33

*Akiachak Native Cmty. v. U.S. Dep't of Interior*,
    827 F.3d 100 (D.C. Cir. 2016) .............................................................. 33

*Alaska v. Native Village of Venetie Tribal Government*,
    522 U.S. 520 (1998) ..................................... 16, 26, 27, 28, 44, 45, 46, 47

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ..................................................................... 41, 60

*Cape Fox Corp. v. U.S.*,
    4 Cl. Ct. 223 (U.S. Ct. Cl. 1983) .......................................................... 48

*Carcieri v. Salazar*,
    555 U.S. 379 (2009) .................................................................. 35, 51, 59

*Christensen v. Harris Cnty.*,
    529 U.S. 576 (2000) .............................................................................. 38

*Decamps v. United States*,
    570 U.S. 254 (2013) .............................................................................. 42

*E.E.O.C. v. Peabody Western Coal Co.*,
    773 F.3d 977 (9th Cir. 2014) ................................................................ 18

*Fed. Power Comm'n v. Idaho Power Co.*,
    344 U.S. 17 (1952) ................................................................................ 37

*FDA v. Brown & Williamson*,
    529 U.S. 120 (2000) ........................................................................ 39, 45

*Hynes v. Grimes Packing Co*,
    337 U.S. 86 (1949) ....................................................... 15, 21, 42, 58

*In re Sah Quah*,
    31 F. 327 (D. Alaska 1886) .................................................................. 52

*Langley v. Ryder*,
    778 F.2d 1092 (5th Cir. 1985).............................................................. 16

*Larson v. Saul*,
    967 F.3d 914 (9th Cir. 2020)................................................................ 38

*Loper Bright Enterprises v. Raimondo*,
    No. 22-451, 143 S. Ct. 2429 (2023). .................................................... 38

*State of Alaska v. Newland, et al.*          Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment          Page 3 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 3 of 61

*Mescalero Apache Tribe v. Jones*,
  411 U.S. 145 (1973) ........................................................................ 50

*Metlakatla Indian Community, Annette Islands Reserve v. Egan*,
  369 U.S. 45 (1962) ................................................... 11, 16, 17, 52

*Montana v. Blackfeet Tribe of Indians*,
  471 U.S. 759 (1985) ........................................................................ 39

*Morton v. Mancari*,
  417 U.S. 535 (1974) ........................................................................ 53

*Native Village of Eyak v. Blank*,
  688 F.3d 619 (9th Cir. 2012) ........................................................ 44

*Sac & Fox Tribe of Indians of Okla. v. United States*,
  383 F.2d 991 (Ct. Cl. 1967) .......................................................... 44

*Sackett v. EPA*,
  143 S. Ct. 1322 (2023) .................................................................... 41

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ........................................................ 37

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ........................................................................ 38

*State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie Tribal Gov't*,
  101 F.3d 1286 (9th Cir. 1996) ................................................ 26, 39

*Sturgeon vs. Frost* (*Sturgeon I*),
  577 U.S. 424 (2016) ...................................................... 10, 11, 13, 23

*Sturgeon vs. Frost*,
  139 S. Ct. 1066 (2019) .................................................................... 10

*Tee-Hit-Ton Indians v. United States*,
  348 U.S. 272 (1955) ........................................................................ 15

*Tlingit and Haida Indians of Alaska v. United States*,
  177 F. Supp. 452 (Ct. Cl. 1959) .................................................... 14

*United States v. Atlantic Richfield Co.*,
  435 F. Supp. 1009, 1015 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir. 1980),
  *cert. denied*, 449 U.S. 888 (1980) ...................................... 11, 13, 14

*United States v. Atlantic Richfield Co.*,
  612 F.2d 1132 (9th Cir. 1980) ...................................................... 39

*United States v. Libby*,
  107 F. Supp. 697 (D. Alaska 1952) .............................................. 22

*State of Alaska v. Newland, et al.*          Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment          Page 4 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 4 of 61

*United States v. Roberts*,
　　185 F.3d 1125 (10th Cir. 1999) ............................................................. 16

*United States v. Rogers*,
　　45 U.S. 567 (1846) ................................................................................ 53

*United States v. Stands*,
　　105 F.3d 1565 (8th Cir. 1997) ............................................................... 16

*United States Forest Service vs. Cowpasture River Preservation Ass'n*,
　　140 S. Ct. 1837 (2020) .......................................................................... 41

*Utility Air Regulatory Group v. EPA*,
　　573 U.S. 302 (2014) .............................................................................. 40

*Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*,
　　439 U.S. 463 (1979) .............................................................................. 10

*W. Virginia v. EPA*,
　　142 S. Ct. 2587 (2022) ................................................................. *passim*

**Statutes**

5 U.S.C. § 706(2) ........................................................................................ 12

5 U.S.C. § 706(2)(A) ................................................................................... 37

18 U.S.C. § 1151 .................................................................................. 15, 31

25 U.S.C. § 2201(4)(i) ................................................................................ 15

25 U.S.C. § 5123(g) ................................................................................... 32

25 U.S.C. § 5129 .................................................................................. 50, 52

42 U.S.C. § 7411(d) ................................................................................... 40

43 U.S.C. § 732 .......................................................................................... 14

43 U.S.C. § 1601(b) ............................................................................. 11, 28

43 U.S.C. § 1603 .................................................................................. 27, 43

43 U.S.C. § 1603(b) & (c) .................................................................... 27, 46

43 U.S.C. § 1605 ........................................................................................ 27

43 U.S.C. § 1606 ........................................................................................ 11

43 U.S.C. § 1607 ........................................................................................ 11

43 U.S.C. § 1608 ........................................................................................ 27

43 U.S.C. § 1610 ........................................................................................ 27

43 U.S.C. § 1611 ........................................................................................ 47

*State of Alaska v. Newland, et al.*　　　　　Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment　　　　Page 5 of 61

Case 3:23-cv-00007-SLG　　Document 16　　Filed 08/01/23　　Page 5 of 61

43 U.S.C. § 1613 ................................................................................................. 11

43 U.S.C. § 1617 ................................................................................... 27, 46, 47

43 U.S.C. § 1617(a) ........................................................................................... 27

43 U.S.C. § 1618 ......................................................................................... 11, 47

43 U.S.C. § 1618(a) ........................................................................ 21, 43, 46, 47

43 U.S.C. § 1619 ................................................................................... 27, 46

43 U.S.C. § 1629e ............................................................................................. 31

**Legislation**

Act of June 25, 1910, 36 Stat. 363 ................................................................. 47

Alaska Native Claims Settlement Act, Pub. L. No. 92-203, 85 Stat. 688
    (codified at 43 U.S.C. §§ 1601 – 1629h) (December 18, 1971). .................... 29, 47

Alaska Statehood Act, Pub. L. 85-508, 72 Stat. 339 § 4 (July 7, 1958)........................... 54

An Act authorizing the Secretary of the Interior to allot homesteads to the natives of
    Alaska, Pub. No. 171, 34 Stat. 197 (May 17, 1906). ................................. 47, 54, 55

An Act for the establishment of industrial schools for Alaska native children,
    Pub. No. 468, 43 Stat. 978 (February 23, 1925)...................................................... 18

An Act for the protection and regulation of the fisheries of Alaska,
    48 Stat. 594 (April 16, 1934)............................................................................... 55

An Act making Appropriations for the current and contingent Expenses of the Indian
    Department, 16 Stat. 544, 566 (March 3, 1871)...................................................... 17

An Act making further provision for a civil government for Alaska,
    31 Stat. 321 (June 6, 1900). ................................................................................. 14

An Act to amend the Alaska Native Claims Settlement Act,
    Pub. L. No. 100–241 § 17(a)(2), 101 Stat. 1788 (Feb. 3, 1988) ........................... 31

An Act to authorize the issuance of deeds to certain Indians or Eskimos for tracts set
    apart to them in surveys of town sites in Alaska (Alaska Native Townsite Act),
    44 Stat. 629 (May 25, 1926)................................................................................. 55

An Act to authorize the President of the United States to make withdrawals of public
    lands in certain cases, 36 Stat. 847 (June 25, 1910)............................................... 17

An Act to confer jurisdiction on the State of California, Minnesota, Nebraska, Oregon,
    and Wisconsin, with respect to criminal offenses and civil causes of action
    committed or arising on Indian reservations within such states,
    Pub. Law 83-280, 67 Stat. 588 (August 15, 1953)................................................ 36

An Act to conserve and develop Indian lands and resources (Indian Reorganization Act), Pub. L. No. 73-383, 48 Stat. 984 (June 18, 1934) .................................................. 18

An Act to establish an Alaska Game Commission, 52 Stat. 1169 (June 25, 1938) .......... 55

An Act to provide subsistence for Eskimos and other natives of Alaska (Reindeer Industry Act), 50 Stat. 900 (September 1, 1937) .................................... 55

An Act to make certain technical amendments, 108 Stat. 707, 709 (May 31, 1994) ........ 32

An Act making appropriations for the current and contingent expenses of the Bureau of Indian Affairs, for fulfilling treaty stipulations with various Indian tribes, 41 Stat. 3, 34 (codified at 43 U.S.C. § 150) (June 30, 1919). ............................... 17

An Act to provide for the allotment of lands in severalty to Indians on the various reservations (Indian General Allotment Act), 24 Stat. 388 (February 8, 1887) ..... 47

An Act to provide for the annual publication of a list of federally recognized Indian tribes, 108 Stat. 4791 (November 2, 1994) .................................................. 52

An Act to repeal timber-culture laws, 26 Stat. 1095 (March 3, 1891). ............................ 14

Higher Education Relief Opportunities for Students Act of 2003 (HEROS Act), Pub. L. 108-76, 117 Stat. 904 (2003) .................................................................... 42

Organic Act, 23 Stat. 24 (May 17, 1884). ...................................................... 13, 27, 57, 60

Treaty of Cession, March 30, 1867, 15 Stat. 539 ...................................................... 13, 55

## Regulations

25 C.F.R. § 151.11(a) ............................................................................................................ 35

25 C.F.R. § 151.11(b) & (d) .................................................................................................. 35

25 C.F.R. § 151.11(b) ............................................................................................................ 35

25 C.F.R. § 151.11(d) ............................................................................................................ 35

Final Rule, Land Acquisitions, 45 Fed. Reg. 62034 (Sept. 18, 1980) ........................ 28, 48

Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 538 Fed. Reg. 54,364, 1993 WL 420646 (Oct. 21, 1993) ...................................................................................................................... 32

Indian Entities Recognized by and Eligible to Receive Services from the U.S. Bureau of Indian Affairs, 88 Fed. Reg. 2115 (January 12, 2023) ............................................ 45

Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888 (Dec. 23, 2014) ....... 16, 33

## Other Authorities

78 Cong. Rec. 11732 (June 15, 1934) .................................................................................. 51

*State of Alaska v. Newland, et al.*      Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment      Page 7 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 7 of 61

78 Cong. Rec. 11830 (June 15, 1934) ........................................................................ 55, 56

Amendments to the Alaska Native Claims Settlement Act and the Alaska National
   Interest Lands Conservation Act and to Establish a Memorial in the District of
   Columbia: Hearings on S. 485, S. 1330, S. 2065, and S. 2370 Before the
   Subcomm. on Public Lands, Reserved Water and Resource Conservation of the
   Senate Comm. on Energy and Natural Resources, 99th Cong., 2d Sess. 165-66
   (1986) ................................................................................................................ 30

Authorizing Indians to Form Business Councils, Corporations, and For other Purposes,
   S. Rep. 1080, 73d Cong., 2d Sess. (May 10, 1934) ................................................. 50

Bowen, Julia A., The Option of Preserving a Heritage: The 1987 Amendments to the
   Alaska Native Claims Settlement Act," 15 Am. Indian L. Rev. 391, 396 (1991) . 29

David Case and David Voluck, Alaska Natives and American Laws,
   (3d ed. 2012) .......................................................................... 15, 17, 18, 20, 52, 56

Federal Field Committee for Development Planning in Alaska, Alaska Natives and the
   Land (Washington, DC: Government Publishing Office, 1968) ............................ 24

Felix Cohen's Handbook of Federal Indian Law (1942 ed.) ....................................... 53, 56

Hrg. Comm. on Interior and Insular Affairs, House of Representatives, 84th Cong.,
   H.R. 2535 and H.R. 2536,
   January – February 1955 (U.S. Gov. Printing Ofc. 1955) ..................................... 23

Hrg. Comm. on Interior and Insular Affairs, House of Representatives, 99th Cong., H.R.
   4162, April 17, 1986,
   Serial No. 99-76, p. 216 (U.S. Gov. Printing Ofc. 1987) .......................... 29, 30, 48

Hrg. Comm. on Interior and Insular Affairs, United States Senate, 88th Cong., Second
   Session on H.R. 331 and S. 2036,
   April 24-29, 1950, p. 10 (U.S. Gov. Printing Ofc. 1950) ................................ 20, 24

Hrg. Sen. Comm. on Interior and Insular Affairs on S. 1830,
   pt. 1, 91st Cong. 1st Sess. 115 (1969) ................................................................. 25

Hrg. Sen. Comm. on Interior and Insular Affairs on S. 2906,
   90th Cong. 2nd Sess., pp. 55-56 (Feb. 1968) ..................................................... 25, 26

Hrg. Comm. on Interior and Insular Affairs on S. 2906,
   90th Cong. 2nd Sess., p. 576 (June 1968) ............................................................. 26

Hrg. Subcomm. on Public Lands, National parks and Forests of the Comm. on Energy
   and Natural Resources United States Senate on S. 1145, H.R. 278, 100th Cong.,
   May 19, 1987 (U.S. Government Printing Ofc. 1987) ........................................... 30

Hrg. Subcomm. on Public Lands, Reserved Water and Resource Conservation of the
   Committee on Energy and Natural Resources United States Senate, Ninety-Ninth

Congress, S. 2065, May 24, 1986, May 27, 1986, and July 10, 1986 (U.S. Gov. Printing Ofc. 1987) ................................................................................. 30

H. Explanatory Statement to P.L. 100-241, 1987 U.S.C.C.A.N. 3299, 3307, 1987 WL 61520 (December 21, 1987) .............. 32

Petitioner State of Alaska's Brief, *State v. Native Village of Venetie Tribal Government*, 1997 WL 523883 .............................................................................. 52

Price, Robert E., The Great Father in Alaska, p. 103 – 137 (First Street Press, 1990) ..... 20

Proceedings and Debates of the 103rd Congress, Second Session, House of Representatives, Making Certain Technical Corrections to Various Federal Statutes Affecting Native Americans, 140 Cong. Rec. H3802-01, H3803 (May 23, 1994) ......................................................................................... 32

S. Rpt. on Alaska Native Claims Settlement Act Amendments of 1987, Sen. Rpt. 100-201, 1987 U.S.C.C.A.N. 3269 (October 20, 1987) ........................ 31

Scherer, K., Alaska's Tribal Trust Lands: A Forgotten History, 38 Alaska L. Rev. 37 (2021) ................................................................ 20

Sol. Op., The Meaning of "Under Federal Jurisdiction for Purposes of the Indian Reorganization Act," M-37029 (March 12, 2014) .................................. 51

Sol. Op., Withdrawal of Certain Solicitor M-Opinions, Reinstatement of Sol. O. M-37029, M-37070 (April 27, 2021) ............................ 51

Sol. Op., Withdrawal of Solicitor's Opinion M-37029, M-37055 (March 9, 2020) ......... 51

To Grant to Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise: Hearings on S. 2755 and S. 3645 Before the S. Comm. On Indian Affairs ("Hearings on S. 2755 and S. 3645"), 73d Cong. at 265-66 (May 17, 1934) ............................... 50

*State of Alaska v. Newland, et al.*                    Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment            Page 9 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 9 of 61

# INTRODUCTION

This case arises in the shadows of the Alaska Native Claims Settlement Act (ANCSA). The big picture need for the Act is well known: the State of Alaska, via the Alaska Statehood Act, and Alaska Natives, via aboriginal title, claimed large swaths of the same land post statehood.[1] Congress resolved the land dispute in 1971 when it passed ANCSA. It did so by extinguishing all aboriginal title and any claims based on that title in exchange for a $960 million settlement and the ability of eligible Alaska Native corporations to select 40 million acres of federal land and hold that land in fee.[2]

That last detail about corporations—rather than Alaska Natives themselves—selecting the land is important because it reflects a shift in Congress's usual way of handling these issues. Coexisting with the land dispute was another long simmering debate: should Alaska have "Indian country"? Indian country is the touchstone for delineating federal, state, and tribal jurisdiction over Indian-occupied lands.[3] Within Indian country, Indian tribes have broad authority not only over their own members but over the land and non-members. States, on the other hand, are generally precluded from exercising fundamental attributes of their sovereignty within Indian country.[4]

---

[1] *See Sturgeon vs. Frost* (*Sturgeon I*), 577 U.S. 424, 429 (2016); *Sturgeon vs. Frost*, 139 S. Ct. 1066, 1074 (2019).

[2] *Sturgeon I*, 577 U.S. at 429.

[3] *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 470-71 (1979).

[4] *Id.*

*State of Alaska v. Newland, et al.*      Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment      Page 10 of 61

Case 3:23-cv-00007-SLG    Document 16    Filed 08/01/23    Page 10 of 61

Unlike the Lower 48, Indian country is almost nonexistent in Alaska.[5] Indeed, "Alaskans, both Native and non-Native, opposed creation of reservations on the grounds that reservations were socially divisive and tended to perpetuate a wardship rather than equality for the Natives."[6] Through ANCSA, Congress responded to these concerns too. It sought to "maximize participation by Natives in decisions affecting their rights and property . . . without creating a reservation system or lengthy wardship or trusteeship."[7] Thus, it expressly revoked the few reservations that had been created in Alaska (but one)[8] and provided for the creation of more than 200 state-charted village and regional corporations owned and operated by Natives as for-profit businesses subject to state law.[9] It was the corporations, not the Alaska tribes that would receive the land in fee.[10] The land would not be held in trust by the federal government.[11] In short, as it often does, Congress set up a system in Alaska that differed from that found in the rest of the country.[12]

---

[5]     *Metlakatla Indian Community, Annette Islands Reserve v. Egan*, 369 U.S. 45, 51 (1962).

[6]     *United States v. Atlantic Richfield Co.*, 435 F. Supp. 1009, 1015 (D. Alaska 1977), *aff'd*, 612 F.2d 1132 (9th Cir. 1980), *cert. denied*, 449 U.S. 888 (1980).

[7]     43 U.S.C. § 1601(b).

[8]     *Id.* § 1618(a).

[9]     *Id.* §§ 1606, 1607.

[10]    *Id.* at § 1613.

[11]    *Id.*

[12]    *Sturgeon I*, 577 U.S. at 440 ("Alaska is often the exception, not the rule.").

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                              Page 11 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 11 of 61

For 46 years, the Department of the Interior (Interior) respected Congress's

directive and declined to create additional Indian country in Alaska. That changed in

2017, when Interior, for the first time since statehood, accepted lands into trust in Alaska.

Having second thoughts, the agency reversed course and returned to its original view on

the scope (or lack thereof) of its authority in 2021, only to change course again soon

thereafter. The most recent about-face occurred in 2022, leading to Assistant Secretary

Newland granting the Central Council of the Tlingit & Haida Indian Tribe of Alaska's

("Central Council's" or "Tribe's") application to create Indian country in downtown

Juneau. [AR 1-17]

Since ANCSA, Alaska has been governed on the basic jurisdictional premise—

reflecting the unique history of Alaska and its Natives—that no new Indian country will

be created. Given the economic and political significance of any change to that

understanding, the Assistant Secretary must point to "clear congressional authorization"

for the power he now claims.[13] Because the Assistant Secretary cannot do so, he acted

outside the scope of his authority and abused his discretion.[14]

---

[13]     *W. Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

[14]     *See* 5 U.S.C. § 706(2).

*State of Alaska v. Newland, et al.*                     Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                          Page 12 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 12 of 61

**STATEMENT OF THE CASE**

I.      **Historical and Statutory Background.**

       A.      **The purchase of Alaska and the Organic Act.**

The United States purchased Alaska from Russia in 1867.[15] The treaty transferring ownership did not address property rights of the Native inhabitants.[16] Rather, "[i]t provided that the Natives would be subject to such laws as the United States might adopt with respect to aboriginal tribes."[17]

In 1884, Congress passed the Organic Act, which provided the Territory with a civil government and for the first time addressed the rights of Alaska Natives.[18] Specifically, the Act designated Alaska as a "land district" and extended "the laws of the United States relating to mining claims, and the rights incident thereto" to the district.[19] Regarding Alaska Natives, the law stated:

> That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress.[20]

---

15      *Sturgeon I,* 136 S. Ct. at 1064.

16      *See Atlantic Richfield Co.*, 435 F. Supp. at 1014 (discussing Treaty of Cession, March 30, 1867, 15 Stat. 539).

17      *Id*.

18      Organic Act, 23 Stat. 24 (May 17, 1884).

19      *Id*. § 2.

20      *Id*. § 8.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 13 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 13 of 61

Throughout the late nineteenth century, Congress continued to open Alaska to settlement.[21] In 1891, Congress enacted a law that "permitted Alaskan lands to be entered for townsite and industrial site purposes," exempting from the law only "Indian lands to which the Indians had prior rights by virtue of 'actual occupation.'"[22] In 1898, Congress opened Alaska to homestead claims, allowing homesteaders to stake tracts up to 80 acres.[23] Then, in 1900, Congress further extended the laws relating to mining claims and mineral locations to Alaska.[24]

Although the 1900 law again contained language to protect Alaska Natives in the lands "actually in their use or occupation,"[25] by this time it had become clear that Congress did not intend to protect *all* lands Alaska Natives used or occupied. Rather, the general land laws were being administered in Alaska to protect only "village and home sites [with] intensive daily use;" they did not prevent entry on the "hunting, fishing and gathering areas" of Alaska Natives.[26]

---

[21]  *Atlantic Richfield Co.*, 435 F. Supp. at 1015.

[22]  *Tlingit and Haida Indians of Alaska v. United States*, 177 F. Supp. 452, 466 (Ct. Cl. 1959) (discussing Act of March 3, 1891, Ch. 561, 26 Stat. 1095, codified at 43 U.S.C. § 732); *see also Atlantic Richfield Co.*, 435 F. Supp. at 1014 (discussing same).

[23]  *Tlingit and Haida Indians of Alaska*, 177 F. Supp. at 466.

[24]  *Id*. (discussing Act of June 6, 1900, 31 Stat. 321).

[25]  *Id.*

[26]  *Id.*

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 14 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 14 of 61

### B. Trust land is Indian country.

To make sense of reservation policy in Alaska, a general understanding of some basic terms is helpful. The terms "reservation" and "reserves" are often used interchangeably.[27] The legal implications of a reservation or reserve depend on how it was created. Congress could grant a tribe—through a reserve or reservation—"recognized title," meaning the tribe had a right to hold the lands permanently and any subsequent taking required compensation.[28] The other option is a "reservation at will." These were typically created through executive orders and "convey[ed] no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President."[29] Unlike a reservation that conveyed "recognized title," a reservation at will could be "terminated by unilateral action of the United States without legal liability for compensation."[30]

Two other categories of lands are relevant to this litigation: "trust lands" and "Indian country." Trust lands are lands that are "held in trust by the United States for an Indian tribe or individual."[31] "Indian country" is expressly defined by statute.[32] Today, it

---

[27]    *See generally* David Case and David Voluck (Case and Voluck), Alaska Natives and American Laws, at 83 n.15 (3d ed. 2012). ("There is no legal distinction between the use of the terms "reserve" and "reservation.").

[28]    *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 2798 (1955).

[29]    *See Hynes v. Grimes Packing Co.*, 337 U.S. 86, 103 (1949).

[30]    *Id.*

[31]    25 U.S.C. § 2201(4)(i).

[32]    *See* 18 U.S.C. § 1151.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 15 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 15 of 61

includes Indian reservations under the jurisdiction of the United States, dependent Indian communities, and all Indian allotments.[33] The early reserves and reservations that were created in Alaska were not "Indian country" because they did not create tribal jurisdiction.[34] The significance of this designation is its jurisdictional impact. "Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States."[35]

Here, the Assistant Secretary created additional "trust lands" in Alaska by granting the Central Council's application, but did he also create Indian country? Most likely yes. Interior contends trust land held by a tribe constitutes Indian country.[36] This policy aligns with a Tenth Circuit decision concluding that "official 'reservation' status is not dispositive and lands owned by the federal government in trust for Indian tribes are Indian country."[37]

---

[33]    *Id.*

[34]    *See Egan*, 369 U.S. at 51-52 (stating that the only statutory reservation in Alaska at that time did not qualify as Indian country).

[35]    *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998).

[36]    *See* Land Acquisitions in the State of Alaska*, 79 Fed. Reg. 76,888, 76,893 (Dec. 23, 2014).

[37]    *United States v. Roberts*, 185 F.3d 1125, 1131 (10th Cir. 1999); *see also Langley v. Ryder*, 778 F.2d 1092, 1095 (5th Cir. 1985) (same). *But see United States v. Stands*, 105 F.3d 1565, 1572 (8th Cir. 1997) ("For jurisdictional purposes, tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country."). The Ninth Circuit has not yet addressed this issue.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 16 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 16 of 61

## C.   Reservation policy in Alaska.

Prior to ANCSA, there were five ways to create reserves/reservations in Alaska.[38] First, Congress could create a reservation by entering a treaty with a tribe. Congress extinguished that authority in 1871 without having used it in Alaska.[39] Second, Congress could create a reservation by statute. There were two such reservations in Alaska: the Annette Islands Reserve, created in 1891, and Klukwan, confirmed by Congress in 1957. [AR 2283] Third, a reservation (or "reservation at will") could be created by executive order. At least fourteen executive order reserves were created between 1905 and 1919. [AR 2285-86] In 1919, however, Congress prohibited the creation of reservations by executive order without specific congressional authorization.[40]

Between 1920 and 1933, the executive branch deployed the fourth method for creating reservations in Alaska: the public purpose reserve.[41] Unlike the first set of executive orders, which set aside public land to create an Indian reservation, these orders withdrew land for the public purpose of assisting Alaska Natives.[42] During this period, and primarily relying on a 1925 law that allowed the Secretary to "establish a system of

---

[38]   *See generally* Case & Voluck, at 84.

[39]   *See Organized Vill. of Kake v. Egan*, 369 U.S. 60, 72 (1962) (citing 16 Stat. 544, 566 (1871)).

[40]   Act of June 30, 1919, 41 Stat. 34 (codified at 43 U.S.C. § 150).

[41]   *See generally* Case & Voluck, at 85.

[42]   *Id.* The president's authority for this came from the Act of June 25, 1910, 36 Stat. 847.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 17 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 17 of 61

vocational training for the aboriginal native people of the Territory of Alaska,"[43] the executive created five public purpose reserves. [AR 2285-86] Because of the 1919 law prohibiting the creation of Indian reservations without express congressional authorization, these were not "Indian reservations" and were not being held in trust for Alaska Natives.[44]

Congress enacted the fifth and final method for creating reserve/reservations in Alaska in 1936—that is, the Alaska Indian Reorganization Act (Alaska IRA). [*See* AR 3306-07] This is also where the Assistant Secretary purported to find his authority to take the Central Council's fee land into trust. Congress enacted the Alaska IRA to correct how the Indian Reorganization Act (IRA) of 1934 applied to the Territory. [*See* AR 3321-25]

The IRA, also known as the Wheeler-Howard Act, "was a comprehensive reform statute, providing, among other things, for tribal self-government, restoration of lands to tribal ownership, economic development, and vocational training."[45] Not all provisions of the Act applied to the Territory of Alaska.[46] Of the provisions that did apply, none of them related to land.[47]

---

[43]     Act of February 23, 1925, Pub. No. 468, 68th Cong.

[44]     *See generally* Case and Voluck, at 95-96.

[45]     *E.E.O.C. v. Peabody Western Coal Co.*, 773 F.3d 977, 983 (9th Cir. 2014) (citing 48 Stat. Pub. L. No. 73-383 (1934) [found at AR 3321-25]).

[46]     *See* AR 3323 ("The provisions of this Act shall not apply to any of the Territories, colonies, or insular possessions of the United States, except that sections 9, 10, 11, 12, and 16, shall apply to the Territory of Alaska . . . .").

[47]     *See* AR 3323-24 (IRA, §§ 9-12, 16).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 18 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 18 of 61

Immediately after passage of the IRA, problems arose in trying to apply the Act to the Territory. Because Congress had not included section 17 in the list of provisions applicable to Alaska, [*see* AR 3325] the Secretary had no authority to issue an organized Alaska tribe a charter and therefore had no authority to issue the same tribe a loan under section 10. [AR 3325; *see also* AR 3309]

To correct this problem, Congress passed the Alaska IRA. [AR 3306] The first part of section 1 of that Act applied additional IRA provisions to "Indians" and "tribes" as defined by section 19 of the IRA. [*Id.*] One of those provisions is section 5, which allows the Secretary to take lands into trust "for the Indian tribe or individual Indian for which the land is acquired." [*Id.*] The second part of section 1 authorized groups not yet recognized as tribes to organize, incorporate, and get federal loans. [*Id.*] Section 2 provided the Secretary the authority to designate certain public lands withdrawn for Alaska Native use and occupancy as Indian reservations. [AR 3306-07]

From 1936 to ANCSA's passage in 1971, sixty-nine Alaska Native villages and regional groups adopted constitutions and organized under the IRA, but only six of those villages obtained reservations under section 2 of the Alaska IRA. [AR 927, 959] During that same period, the Secretary granted applications to take three parcels of land into trust under section 5 of the IRA: 10.24 acres for the Angoon Tribe in 1948; 15.9 acres for the

*State of Alaska v. Newland, et al.*       Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment       Page 19 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 19 of 61

benefit of the Kake Tribe in 1950; and, also in 1950, 0.92 acres for the benefit of the Alaska Natives at Klawock.[48]

The limited impact of the IRA and the Alaska IRA prior to ANCSA was due in large part to public opposition to reservations—or the general concept of Indian country—in Alaska.[49] [AR 1038 n.112]

### D. The limited impact of the IRA land provisions prior to ANCSA and the public sentiment regarding reservations in Alaska.

Even after the Alaska IRA's enactment, application of section 2's reservation authority to the Territory was inconsistent, eventually resulting in litigation. Initially, Interior took a conservative approach by limiting its authority to existing Native villages and townsites or requiring strict proof of actual use and occupancy.[50] [AR 3289, 3293] Its approach shifted, however, in 1942 with the issuance of a new opinion by then-Solicitor, Nathan R. Margold, that advanced for broader authority to create larger Indian reservations.[51]

---

[48]  *See* Scherer, K., Alaska's Tribal Trust Lands: A Forgotten History, 38 Alaska L. Rev. 37, 27 (2021).

[49]  Hearings Before the Committee on Interior and Insular Affairs, United States Senate, Eighty-First Congress, Second Session on H.R. 331 and S. 2036, April 24-29, 1950, p. 10 (U.S. Gov. Printing Ofc. 1950) ("The reservation program being followed pursuant to the authority of the 1936 act has met with considerable opposition from persons who feel that the setting aside of vast areas is detrimental to the development of Alaska."); Robert E. Price, The Great Father in Alaska, p. 103 – 137 (First Street Press, 1990) (An extensive chapter detailing Interior's problems with creating reservations in Alaska under the IRA).

[50]  *See also* Case & Voluck, at 99.

[51]  *Id.*

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                          Page 20 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 20 of 61

Margold concluded that section 2 of the Alaska IRA gave the Secretary authority to create Indian reservations based on the aboriginal use and occupancy of Alaska Natives.[52] Following this interpretation, in 1943, Interior withdrew 1,408,000 acres for the Venetie Reserve and another 35,200 acres for the Karluk Reserve. [AR 2284] Over the next four years, the agency created another four reservations, bringing the total acres reserved under the Alaska IRA to 1,540,270 acres. [*Id.*] During this same period, Alaska Natives voted against the reserves Interior proposed at Shungak, Barrow, White Mountain and Shishmaref.[53] [AR 2281]

The public immediately responded with outrage to Interior's creation of such large reserves. Ernest Gruening, then-governor of the Territory, argued that Interior's new policy of creating large reservations in Alaska was not "the one which Congress believed it was approving when it passed the necessary legislation in 1936." [AR 3144]

All told, Interior's application of its section 2 authority resulted in litigation that effectively ended its efforts. In *Hynes v. Grimes Packing Co*, the Supreme Court affirmed the Secretary's authority to create large reservations that encompassed surrounding waters but rejected the argument that the Secretary finally disposed of the land such that a tribe received "recognized title."[54] What Alaska Natives instead received was a

---

[52]     *Id.* at 100.

[53]     The Alaska IRA required approval of at least 30 percent of members entitled to vote in each reserve. [AR 3307]

[54]     337 U.S. 86, 110-11 (1949).

*State of Alaska v. Newland, et al.*                  Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                        Page 21 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 21 of 61

"reservation at will," and the Secretary had no authority to grant the Alaska Natives living on the reservation exclusive commercial fishing rights.[55]

In *United States v. Libby*, the district court reached a number of conclusions pertaining to the purported Hydaburg Reserve that further winnowed the Secretary's section 2 authority.[56] It held not only that the Secretary's authority was limited to land actually used or occupied by Alaska Natives since passage of the Organic Act of 1884, the court also held that the Secretary was required to comply with the Administrative Procedures Act, which he had failed to do.[57] In explaining its holdings, the district court noted that "it is no exaggeration to say that nothing since the purchase of Alaska has engendered so much ill-feeling and resentment as [Interior's] reservation policy."[58]

After *Libby*, Interior never again invoked its section 2 authority, nor did it apply its lands-into-trust and reservation authority under sections 5 and 7 of the IRA. No more reservations were created in Alaska and Congress repealed section 2 of the Alaska IRA in 1976 when it passed the Federal Land Policy and Management Act (FLPMA). [AR 1540]

---

[55]     *Id.* at 110, 122.

[56]     107 F. Supp. 697 (D. Alaska 1952).

[57]     *Id.* at 700, 703.

[58]     *Id.* at 699.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                         Page 22 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 22 of 61

### E. The reservation issue persists during statehood discussions.

Alaska became a State in 1959.[59] Although Congress granted Alaska the ability to select 103 million acres of "vacant, unappropriated, and unreserved" federal land, Congress did not resolve Alaska Natives' aboriginal claims to that same land.[60]

While the Statehood Act left aboriginal claims unanswered, the legislative history leading to the Act is still instructive as it sets the stage for what Congress would ultimately face when it considered ANCSA. For example, in a 1950 hearing, a delegate from Alaska explained to the Committee on Interior and Insular Affairs, that there were "no land held in trust in Alaska by the Federal Government for the benefit of the Indians."[61] He further explained:

> [In addition to Metlakatla,] [t]here are other parcels of land which were created under the reservation as a consequence of the act of May 1, 1936, which extended the Wheeler-Howard Act to Alaska but the holding of land in trust in the sense that phrase is used in the State does not apply in Alaska.[62]

In a separate hearing held later that same year, it was noted that "[t]he reservation program being followed pursuant to the authority of the 1936 Act has met with

---

[59]     *Sturgeon I*, 577 U.S. at 429.

[60]     *Id.*

[61]     Hearings Before the Committee on Interior and Insular Affairs, House of Representatives, Eighty-Fourth Congress, H.R. 2535 and H.R. 2536, January – February 1955 (U.S. Gov. Printing Ofc. 1955).

[62]     *Id.*

*State of Alaska v. Newland, et al.*                          Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                          Page 23 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 23 of 61

considerable opposition from persons who feel that the setting aside of vast areas is detrimental to the development of Alaska."[63]

**F.    Congress rejects the reservation model and Indian country.**

Discussions about adopting a reservation system in Alaska continued in the hearings leading to ANCSA's enactment. One of the reports considered by Congress was the Field Commission Report prepared by the Federal Field Committee for Development Planning in Alaska.[64] [AR 2032-3082] This report documented much of the information already discussed, including the general disfavor within Alaska of reservations. On this topic, the report explained:

> Reservations have never been looked upon with favor in Alaska; and except for the Metlakatla Reserve on Annette Island and the Klukwan Reserve, which were both created by Act of Congress, there are no reservations in Alaska. Those Alaska Natives who do live on lands reserved for their use do not do so under tribal governments or legal systems familiar in other parts of the United States.

[AR 780]

The idea that Alaska would emerge from this process with a reservation system like the Lower 48 was disliked by all involved—including Alaska Natives. Multiple representatives from the Alaska Federation of Natives (AFN) testified in opposition to

---

[63]    Hearings Before the Committee on Interior and Insular Affairs, United States Senate, Eighty-First Congress, Second Session on H.R. 331 and S. 2036, April 24-29, 1950, p. 10 (U.S. Gov. Printing Ofc. 1950).

[64]    Federal Field Committee for Development Planning in Alaska, Alaska Natives and the Land (Washington, DC: Government Publishing Office, 1968). This report was expressly made part of ANSCA's legislative history. S. Rpt. 92-405, at 74 (Oct. 21, 1971).

*State of Alaska v. Newland, et al.*          Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment          Page 24 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 24 of 61

any system that resembled the Lower 48 reservation system or treated the Alaska Natives like "wards" of the federal government. Byron I. Mallot, then second vice-president of AFN, confirmed that Native leaders opposed the idea of Indian country:

> Freed of their own volition and by their accomplishments, from dependency upon the Government, the native of Alaska will be able to take his rightful place in this Nation and the Government will be freed from this haunting responsibility in a nation of plenty.[65]

Similarly, AFN President Emil Notti testified that Alaska Natives opposed the wardship status of Indians in the Lower 48:

> We have been treated as "wards" for many years. We have not profited by the "wardship"; we are humiliated by the very concept which assumes that we are something less than other citizens—and I assure you that we are not.[66]

Contrasting their goals with the Indian country status of Pueblo lands in New Mexico, Barry Jackson, an attorney representing AFN, confirmed that Alaska Natives did not want their land to be "Indian country":

> [T]he natives in Alaska are very vehemently anti reservation and they have never been in favor of reservations and are not today . . . .
>
> Now, we are also trying to get away from the BIA, frankly, and from the Secretary of the Interior . . . We are trying to build in provisions which will prevent us from having, if you will pardon the expression, our villages frozen in history. It is my personal feeling that the Pueblos of New Mexico

---

[65]    Hearings on S.2906 before Sen. Comm. on Interior and Insular Affairs, 90th Cong. 2nd Sess., 55-56 (Feb. 1968).

[66]    Hearings on S.1830 before Sen. Comm. on Interior and Insular Affairs, pt. 1, 91st Cong. 1st Sess. 115 (1969).

*State of Alaska v. Newland, et al.*            Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment            Page 25 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 25 of 61

are frozen in history because of their rules that they have, and this is something that we want to avoid.[67]

Unlike a forced wardship, an optional trusteeship had some support during the legislative process.[68] Barry Jackson explained AFN's view on one such proposal: "Generally speaking, we are opposed to trusts being established, but it may be some groups will desire to have the lands held in trust."[69] This was not, however, the path Congress chose to follow.

When Congress passed ANCSA in 1971, the Act embodied a permanent, comprehensive lands claims settlement that did not envision creation of any new trust land or other special status land in the state. It "was intended to be and was something very different" than a "mere continuation of prior Indian policy."[70] "It attempted to preserve Indian tribes, but simultaneously attempted to sever them from the land; it attempted to leave them as sovereign entities for some purpose, but as sovereigns without territorial reach."[71]

---

[67]    Hearings on S.2906 before Sen. Comm. on Interior and Insular Affairs, 90th Cong. 2nd Sess., 89-90 (Feb. 1968). The trust status of the Publo land is like what Central Council will have here. *See Venetie*, 522 U.S. at 528.

[68]    Hearings on S. 2906 before the Committee on Interior and Insular Affairs, 90th Cong. 2nd Sess., 576, 579 (June 1968).

[69]    *Id.* at 579.

[70]    *State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J., concurring).

[71]    *Id.*

*State of Alaska v. Newland, et al.*                    Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 26 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 26 of 61

Through ANCSA, Congress took several actions to implement its objective of separating the land from the tribes themselves. It revoked all reservations in Alaska except the Annette Islands Reserve and repealed the Native Allotment Act.[72] It extinguished all aboriginal titles that may have existed and all future claims based on aboriginal right, title, use or occupancy.[73] And it extinguished all land claims based on any statute relating to Native use and occupancy.[74] In return, Congress conveyed 44 million acres of land to Native corporations formed under state law (in addition to providing nearly 1 billion dollars).[75] These Native corporations received the title in fee simple, with no federal restrictions.[76]

And it was not just the federal government or the Alaska Natives that gave up something to reach this compromise, the State was a party too. In exchange for the Alaska Natives' release of any future land claims, the State relinquished its land selection priorities under the Alaska Statehood Act and provided one-half of the monetary settlement ($500 million).[77]

It took Congress nearly 90 years to resolve the land claims left unresolved by the Organic Act of 1884. But when it did, Congress acted comprehensively and with clarity

---

[72]    43 U.S.C. §§ 1617(a); 1618.

[73]    43 U.S.C. § 1603.

[74]    43 U.S.C. §§ 1603(b) & (c), 1617, 1618(a), and 1619.

[75]    *Venetie*, 522 U.S. at 524.

[76]    *Id.*

[77]    43 U.S.C. §§ 1605, 1608, 1610.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 27 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 27 of 61

and purpose. It wanted Alaska Natives to enjoy "maximum participation" in "decisions affecting their rights and property" and it wanted to do so "without establishing any permanent racially defined institutions, rights, privileges, or obligations, [and] *without creating a reservation system or lengthy wardship or trusteeship.*"[78]

## G.     The Secretary's authority—or lack thereof—following ANCSA.

For 46 years following the passage of ANCSA, under the guidance of multiple Secretaries of the Interior, the Department declined to take lands into trust on behalf of Alaska Natives. In 1978, seven years after ANCSA's passage, Thomas W. Fredericks, Associate Solicitor for Indian Affairs, rejected the Arctic Village and the Native Village of Venetie's petition to take their former reservation into trust. [AR 1534-1536] He concluded that, following Congress's directive in ANCSA, it would be an abuse of the Secretary's discretion to accept in trust the village communities' former reservation lands. [*Id.*] And in 1980, Interior promulgated land-into-trust regulations that prohibited consideration of any trust acquisitions in Alaska, "except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its Members" ("Alaska Exception").[79]

During the 1980s—only a short decade after ANCSA's passage—Congress reaffirmed the lack of Indian country in Alaska when it considered several amendments

---

[78]     *Venetie*, 522 U.S. at 524 (quoting 43 U.S.C. § 1601(b) (emphasis and alternation in original)).

[79]     Final Rule, Land Acquisitions, 45 Fed. Reg. 62034 (Sept. 18, 1980).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 28 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 28 of 61

to ANCSA. As originally passed, several of the Act's provisions concerning stock and shareholder eligibility expired statutorily in 1991.[80] This, and concerns over the economic health of the Native corporations, led some within the Native community to reconsider the lands-into-trust issue and the reservation model.[81]

As Congress considered whether to extend the statutory eligibility requirements, AFN started lobbying to authorize the Secretary to place lands into trust. In 1985, AFN passed a special resolution that proposed seeking legislative amendments to the IRA to allow Alaska tribes "to be afforded the same rights and privileges as Indian Tribes elsewhere in the United States."[82] Specifically, AFN wanted the Secretary to take lands into trust on behalf of Alaska Natives and to create reservations. The resolution asserted:

> No provision of ANCSA or any law shall be construed as in any way impairing the authority of the Secretary of the Interior at the request of a Native Tribe, community or individual, pursuant to Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465 [(now codified at 25 U.S.C. § 5105)] as amended, to acquire any interest in lands in Alaska in the name of the United States in trust for the benefit of the Native Tribe, community or individual for which the land is acquired.[83]

---

[80] Section 7(h)(1) of "An Act to provide for the settlement of certain land claims of Alaska Natives, and for other purposes," Pub. Law 92-203, 85 Stat. 688. (December 18, 1971).

[81] *See* Julia A. Bowen, The Option of Preserving a Heritage: The 1987 Amendments to the Alaska Native Claims Settlement Act," 15 Am. Indian L. Rev. 391, 396 (1991).

[82] Hearing before Committee on Interior and Insular Affairs, House of Representatives, Ninety-Ninth Congress, H.R. 4162, April 17, 1986, Serial No. 99-76, p. 216 (U.S. Gov. Printing Ofc. 1987).

[83] Hearing before Committee on Interior and Insular Affairs, House of Representatives, Ninety-Ninth Congress, H.R. 4162, April 17, 1986, Serial No. 99-76, p. 216 (U.S. Gov. Printing Ofc. 1987).

*State of Alaska v. Newland, et al.*  Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment  Page 29 of 61

Case 3:23-cv-00007-SLG Document 16 Filed 08/01/23 Page 29 of 61

To accomplish its shifting goal, AFN proposed two amendments to the IRA. First, it sought to amend section 5 of the IRA to allow the Secretary to take "any lands within any state" into trust.[84] Second, AFN sought to amend section 7 of the IRA to include the following: "The provisions of this paragraph shall be fully applicable within any state notwithstanding the repeal of Section 2 of the Act of May 1, 1936 (49 Stat. 1250)" via FLPMA. AFN believed this sentence was needed because Congress had, through FLPMA, expressly repealed section 2 of the Alaska IRA—the provision that granted the Secretary the authority to designate public land in Alaska an Indian reservation. [AR 1540]

In 1986 and 1987, Congress considered three separate bills to amend ANCSA. None of them included AFN's proposed amendments to the IRA.[85] Instead, all three bills included what became known as the "qualified transferee entity (QTE) option."[86] The

---

[84]    Hearing before Committee on Interior and Insular Affairs, House of Representatives, Ninety-Ninth Congress, H.R. 4162, April 17, 1986, at p. 217.

[85]    *See* Hearings before Committee on Interior and Insular Affairs House of Representatives, Ninety-Ninth Congress Second Session on H.R. 4162, April 17, 1986, Serial No. 99-76 (U.S. Gov. Printing Off. 1987); Hearings before the Subcommittee on Public Lands, Reserved Water and Resource Conservation of the Committee on Energy and Natural Resources United States Senate, Ninety-Ninth Congress, S. 2065, May 24, 1986, May 27, 1986, and July 10, 1986 U.S. Gov. Printing Ofc. 1987); and Hearing before the Subcommittee on Public Lands, National parks and Forests of the Committee on Energy and Natural Resources United States Senate, 100th Congress, S. 1145, H.R. 278, May 19, 1987 (U.S. Government Printing Ofc. 1987).

[86]    *Amendments to the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act and to Establish a Memorial in the District of Columbia*: Hearings on S. 485, S. 1330, S. 2065, and S. 2370 Before the Subcomm. on Public Lands, Reserved Water and Resource Conservation of the Senate Comm. on Energy and Natural Resources, 99th Cong., 2d Sess. 165-66 (1986).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                         Page 30 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 30 of 61

QTE Amendment would have allowed ANCSA corporations to transfer land or assets to traditional councils or IRA tribal councils to be held in trust by the federal government.[87] The State opposed the amendment, arguing that such transfers would "strengthen the claim that there was Indian country in Alaska" and would contravene ANCSA's declaration of accomplishing a settlement "without creating a reservation system or lengthy wardship or trusteeship."[88]

Congress agreed with the State and rejected the QTE amendment, instead opting to avoid any change to Indian country status in Alaska. As an alternative to the QTE option, Congress chose the settlement trust option, which allowed Native corporations to place land into trust under state law.[89] Regarding the territorial jurisdiction issues, the bill included a disclaimer that nothing within the Act was to validate or invalidate "[a]ny assertion that Indian country (as defined by 18 U.S.C. § 1151 or any other authority) exists or does not exist within the boundaries of the State of Alaska."[90]

In the 1990s, Indian law continued to evolve. In 1993, the Secretary published a list that officially listed Alaska Native groups as federally recognized tribes deemed

---

[87]     *Id.*

[88]     *Id.*

[89]     43 U.S.C. § 1629e; House Explanatory Statement to P.L. 100-241, 1987 U.S.C.C.A.N. 3299, 3307, 1987 WL 61520 (December 21, 1987).

[90]     Pub. L. No. 100–241 § 17(a)(2), 101 Stat. 1788, 1814 (Feb. 3, 1988); *see also* Alaska Native Claims Settlement Act Amendments of 1987, Sen. Rpt. 100-201, 1987 U.S.C.C.A.N. 3269, 3291 (October 20, 1987).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 31 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 31 of 61

"eligible to receive services from the United States Bureau of Indian Affairs."[91] In 1994, Congress amended section 16 of the IRA to clarify that a regulation that diminished the privileges and immunities of a federally recognized tribe relative to another federally recognized tribe had "no force or effect."[92] This amendment was adopted to clarify that Congress, not Interior, was the sole authority responsible for "the formulation of Indian policy."[93]

In 1993, Interior Solicitor Thomas Sansonetti issued an extensive opinion on the governmental jurisdiction of Alaska Native villages over land and nonmembers. [AR 927-1062] Sansonetti called the opinion "one of the most difficult to prepare" during his tenure with Interior. [AR 1057] He concluded that, "even if certain Native villages qualify as tribes for purposes of federal law, Congress clearly limited Native village exercise of sovereign jurisdiction over lands and nonmembers in a decisive fashion." [*Id.*] "ANCSA largely controls the determination whether any territory exists over which Alaska Native villages might exercise governmental powers." [AR 1058] "Congress has

---

[91]     Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 58 Fed. Reg. 54,364, 1993 WL 420646 (Oct. 21, 1993). Congress passed legislation in 1994 for Central Council to be included on Interior's list. [AR 922]

[92]     An Act to make certain technical corrections, 108 Stat. 707, 709 (May 31, 1994); *see* 25 U.S.C. § 5123(g) ("Any regulation . . . in effect on the date of enactment of this Act . . . that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized tribe relative to the privileges and immunities available to other federal recognized tribes by virtue of their status as Indian tribes shall have no force or effect.").

[93]     140 Cong. Rec. H3802-01, H3803 (May 23, 1994).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 32 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 32 of 61

left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands and nonmembers." [*Id.*]

Alaska Natives then began the long process of convincing federal officials within Interior to shift course and take an expansive view of the agency's fee-to-trust authority. This started in 1995 when Alaska Native groups petitioned Interior to remove the Alaska Exception from the lands-into-trust regulations. [AR 920] Four years later, near the end of the Clinton Administration, Interior concluded that a "credible legal argument" existed that the Secretary's authority to accept lands into trust in Alaska survived ANCSA. [AR 909] And then in 2001, with four days remaining in the Clinton Administration, Interior rescinded the Fredericks Opinion based on "substantial doubt" regarding its conclusions. [AR 889-904]

Despite these "substantial doubts," Interior did not act to remove the Alaska Exception from its regulations until 2014.[94] This followed a ruling from the United States District Court for the District of Columbia finding the regulatory exception unlawful.[95] The D.C. Circuit Court later vacated the district court's ruling after Interior's new rule mooted the State's appeal.[96]

---

[94]     Final Rule, Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888 (Dec. 23, 2014).

[95]     *Akiachak Native Community v. Salazar*, 935 F.Supp.2d 195, 211 (D.C. Ct. 2013).

[96]     *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 102 (D.C. Cir. 2016).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 33 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 33 of 61

A "credible legal argument" does not amount to clear congressional direction, as evidenced by the roller coaster ride that began in 2017. Then, for the first time post-ANCSA, Interior granted a petition by an Alaska tribe to take lands into trust. [AR 421-33] This petition was granted in conjunction with the issuance of the first of a new round of Solicitor Opinions. That same year then-Solicitor Tompkins opined that the Secretary's fee-to-trust authority survived ANCSA. [AR 399-420] Just over a year later a new Solicitor, Daniel Jorjani, withdrew that opinion; in 2021 he issued a new opinion that concluded "uncertainty . . . caution[ed] against the Secretary implementing IRA section 5 in Alaska." [AR 219] Four short months later, a different Solicitor withdrew that opinion; and in November 2022, [AR 182-83] the parties learned that the agency, once again, believed that the Secretary held the broad discretion to create Indian country in Alaska. [AR 31-67]

## II. Assistant Secretary Newland Grants the Central Council's petition to take its fee land into trust to restore the tribe's "traditional homelands."

On the same day Interior issued the new solicitor opinion, the Assistant Secretary granted the Tribe's petition to take a 787 square foot parcel—currently enclosed by a fence and not being used by Central Council—into trust, and proclaim it a new reservation, after concluding that the acquisition met the requirements contained in 25 C.F.R. Part 151. [AR 1-17; 125-29] This parcel is located in downtown Juneau; the state's capital.

*State of Alaska v. Newland, et al.*          Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment          Page 34 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 34 of 61

When the subject land is "off-reservation" the regulations require, among other considerations, the Assistant Secretary to consider the impact to the State.[97] Specifically, § 151.11(b) requires the Assistant Secretary to consider "[t]he land relative to state boundaries, and its distance from the boundaries of the tribe's reservation." "[A]s the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition."[98] This includes giving "greater weight to the concerns" raised by the State regarding the acquisition.[99] Specifically, the Secretary must consider concerns regarding "the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments."[100]

The Assistant Secretary found that the Tribe's petition met these requirements.[101] Of greatest significance to this litigation, the Secretary rejected the State's concerns over his authority, concluding that section 5 of the IRA "was not repealed or otherwise amended" by any post-IRA enactments, including ANCSA, and was not impacted by the Supreme Court's decision in *Carcieri v. Salazar*.[102] [AR 5] The Assistant Secretary adopted the Tribe's position that the acquisition was necessary to "meet [the Tribe's]

---

[97]     25 C.F.R. § 151.11(b) & (d).

[98]     25 C.F.R. § 151.11(b).

[99]     *Id.*

[100]    25 C.F.R. § 151.11(d).

[101]    *See* 25 C.F.R. § 151.11(a), (b) & (d).

[102]    555 U.S. 379 (2009).

*State of Alaska v. Newland, et al.*            Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment            Page 35 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 35 of 61

need to regain land that it previously lost and to consolidate existing tribal landholdings."
[AR 6] He also found that "the ability to hold title in trust can enhance the Tribe's
eligibility for federal programs based on the ownership of Indian trust or restricted land."
[AR 6] On the territorial jurisdictional issue, the Assistant Secretary did not consider the
near non-existence of Indian country in Alaska. Instead, he noted that the State will retain
criminal jurisdiction under Public Law 83-280. [AR 8] And "[a]lthough State and local
governments generally do not have regulatory jurisdiction or taxation authority over trust
land, even in PL-280 states," the Secretary appeared to conclude this was not a concern
because "Alaska State courts will generally continue to serve as an available forum for
civil disputes." [AR 8]

Of all the Assistant Secretary's findings, the most difficult to reconcile with
ANCSA's extinguishment of aboriginal claims was how he addressed § 151.11(b) and
the distance between the Tribe's property and its reservation. [AR 11] Correctly noting
that the Tribe "does not have a reservation" because "ANCSA revoked the various
reserves that had been set aside for Alaska Native groups or for the administration of
Native Affairs," he concluded that the Tribe does have "recognized traditional
homelands." [AR 11] He further reasoned that the subject property is located within the
"traditional Juneau Indian Village" and the "Tribe's ancestors used areas in and around
Southeast Alaska . . . as their traditional and cultural homeland since time immemorial."
[AR 11] As such, the Secretary believed this acquisition satisfied the IRA's purposes

*State of Alaska v. Newland, et al.*                    Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 36 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 36 of 61

because it would result in the "restoration of Indian lands" and would "allow the Tribe to access federal funding and grants only available for trust lands." [AR 12]

Of note, the Assistant Secretary also addressed the Tribe's request for a reservation proclamation to establish "an initial reservation for the Tribe" under section 7 of the IRA. The Secretary called the State's concerns about this request "misplaced," saying "[a] reservation proclamation is simply an administrative function that allows tribes to take advantage of special federal assistance programs." [AR 12] Although his final resolution of this issue is unclear based on this record, the Assistant Secretary indicated that "[s]ubject to the expiration of the 30-day notice period, and following the transfer of the property to trust status, [he would] issue a reservation proclamation." [AR 13] The 30-day notice period was triggered by the decision to grant the Tribe's petition. [*Id.*]

## STANDARD OF REVIEW

This Court does not uphold an agency action under the Administrative Procedures Act if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[103] If the Court concludes that the agency made an "error of law," the Court's inquiry is at an end.[104]

---

[103]     *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citing 5 U.S.C. § 706(2)(A)).

[104]     *Fed. Power Comm'n v. Idaho Power Co.,* 344 U.S. 17, 20 (1952) (When reviewing an administrative decision, "the function of the reviewing court ends when an error of law is laid bare.").

This case implicates three competing doctrines that, if applicable, would impact how the Court reviews the agency action: *Chevron* deference, the major question doctrine, and an Indian canon of construction.

*Chevron* deference does not apply. As an initial matter, next term the Supreme Court will decide whether to overrule *Chevron* or it will at least address how it applies in the face of statutory silence.[105] Regardless of the outcome in that case, *Chevron* deference is inapplicable to an opinion letter—such as the multiple Solicitor Opinions in this case— because it does not carry the force of law.[106] Nor is the opinion entitled to the respect discussed in *Skidmore v. Swift & Co*.[107] Courts give *Skidmore*-type deference to "well-reasoned views" that reflect "a body of experience and informed judgment to which courts and litigants may properly resort for guidance."[108] With the agency's Solicitors issuing three new substantive opinions over the last six years, an argument by Interior that its *new* interpretation is consistent and something the parties can rely on would be unreasonable.

Aside from the questions surrounding the status of *Chevron*, there are other reasons why the agency's decision in this case is not entitled to deference—it implicates

---

[105]    *See Loper Bright Enterprises v. Raimondo*, No. 22-451, 143 S. Ct. 2429 (2023).

[106]    *Christensen v. Harris Cnty*., 529 U.S. 576, 587 (2000).

[107]    323 U.S. 134, 140 (1944).

[108]    *Larson v. Saul*, 967 F.3d 914, 924-25 (9th Cir. 2020) (internal quotation marks omitted); *see also id.* (stating that the level of deference can "range from very little to fully deferential, depending on the degree of the agency's care, consistency, formality, relative expertise, and the persuasiveness of the agency's decision").

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 38 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 38 of 61

the major question doctrine. Whether Interior has the authority to shift the balance of territorial jurisdiction in Alaska by creating Indian country presents a significant political question.[109] This requires the agency to "point to clear congressional authority for the power it claims."[110]

There is also an Indian canon of construction that provides "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."[111] This canon does not apply. The Ninth Circuit recognizes that this rule of construction "operates with less force" when interpreting ANCSA because the canon's historical basis does not apply to the impacts of ANCSA on Alaska Natives.[112]

## ARGUMENT

Even when an agency's assertion of power has a "colorable textual basis," there are some cases—namely those in which the agency's decision will have "vast 'economic and political significance'"—where the Supreme Court requires more than a "merely plausible textual basis for the agency action."[113] This is now known as the major question

---

[109]    *W. Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022) (explaining that there are "extraordinary cases" in which "the economic and political significance" of the agency's assertion provide a "reason to hesitate before concluding that Congress" meant to confer such authority (internal quotation marks omitted)).

[110]    *Id*. at 2609.

[111]    *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

[112]    *United States v. Atlantic Richfield Co.*, 612 F.2d 1132, 1139 (9th Cir. 1980); *see also State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie Tribal Gov't*, 101 F.3d 1286, 1303 (9th Cir. 1996) (Fernandez, J., concurring).

[113]    *W. Virginia*, 142 S. Ct. at 2608 (quoting *FDA v. Brown & Williamson*, 529 U.S. 120, 159-60 (2000)).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                              Page 39 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 39 of 61

doctrine. When applicable, it requires the agency to "point to 'clear congressional authorization' for the power it claims."[114] It applies here.

## I. Whether to create Indian country in Alaska post-ANCSA is a "major question" requiring clear congressional authorization.

Over the last two terms, the Supreme Court has had several opportunities to apply and further explain the major question doctrine. In *West Virginia v. EPA,* the Court applied the doctrine when the EPA promulgated a regulation that significantly altered the agency's longstanding application of the "standard of performance" requirement in the Clean Air Act.[115] The Court found relevant the fact that for the first 50 years the agency exercised its authority, it had applied it one way.[116] But now, the agency sought to dust off a rarely used provision to regulate carbon dioxide pollution from existing power plants.[117] As stated by the Court, "[i]n arguing that Section 111(d) empowers it to substantially restructure the American energy market, EPA 'claim[ed] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority."[118] The agency located this power in an "ancillary provision" of the Clean Air Act that was designed to function as a gap filler, and the "Agency's discovery

---

[114]    *Id.* at 2609 (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014)).

[115]    *Id.* at 2599.

[116]    *Id.*

[117]    *Id.* at 2602 (discussing 42 U.S.C. § 7411(d) and noting that EPA had "used it only a handful of times since the enactment of the statute in 1970").

[118]    *Id.* at 2610 (quoting *Utility Air*, 573 U.S. at 324).

*State of Alaska v. Newland, et al.*                              Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                          Page 40 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 40 of 61

allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."[119]

The concurrence in *West Virginia* offered further guidance on the scope and application of the major question doctrine. Of particular importance here, the concurrence noted that "major questions" often arise "when an agency seeks to 'intrud[e] into an area that is the particular domain of state law."[120]

This notion that major questions arise when a federal agency attempts "to significantly alter the balance between federal and state power" was reaffirmed by the Court in an opinion issued this term—*Sackett v. EPA*.[121] There, the Court reviewed EPA's definition of "waters of the United States" under the Clean Water Act.[122] In doing so, it reiterated that it "require[s] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property."[123]

The most recent Supreme Court case to address the major question doctrine— *Biden v. Nebraska*—provides further instruction.[124] In that case, the Secretary of Education used the Higher Education Relief Opportunities for Students Act of 2003

---

[119]    *Id*; *see also id.* at 2621 (Gorsuch, J., concurring) (same).

[120]    *Id*. at 2621 (Gorsuch, J., concurring) (internal quotation marks omitted).

[121]    143 S. Ct. 1322, 1341 (2023).

[122]    *Id.* at 1329.

[123]    *Id*. (quoting *United States Forest Service vs. Cowpasture River Preservation Ass'n*, 140 S. Ct. 1837, 1849-50 (2020)).

[124]    143 S. Ct. 2355 (2023).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 41 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 41 of 61

(HEROS Act), which granted the Secretary the authority to waive or modify requirements in federal student loan programs, to cancel roughly $430 million in federal student loans.[125] In rejecting the agency's claim of power, the Court noted that "Congress opted to make debt forgiveness available only in a few particular exigent circumstances; the power to modify does not permit the Secretary 'to convert that approach into its opposite' by creating a new program."[126]

Even before the Supreme Court's more recent jurisprudence giving a name to this doctrine, the Court applied the yet-to-be-named doctrine to the Alaska IRA.[127] In 1948, when it considered whether the Alaska IRA gave the Secretary the authority to dispose finally of federal lands to create a reservation, the Court answered in the negative. It concluded that "[i]t would take specific and unambiguous language" for the Court to rule that Congress intended to authorize the Secretary to designate permanent reservations including exclusive fishing grounds for the exclusive benefit of Alaska Natives.[128] In its view, for the Secretary to create a permanent reservation for Alaska Natives, there would have to be "specific recognition by the United States of Indian rights to control absolutely tribal lands."[129]

---

125    *Id.*

126    *Id.* at 2369 (quoting *Decamps v. United States*, 570 U.S. 254, 274 (2013)).

127    *See Hynes v. Grimes Packing Co.*, 337 U.S. 86, 104 (1949).

128    337 U.S. at 105.

129    *Id.* at 107.

*State of Alaska v. Newland, et al.*                     Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                          Page 42 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 42 of 61

Turning to this case, the Secretary claims authority to rebalance territorial jurisdiction in Alaska. While Congress extinguished all reservations (but one) and expressed a clear intent to avoid reservation systems or lengthy warship or trusteeships,[130] the Secretary claims the discretion to undue ANCSA's $962 million settlement and the authority to take an Alaskan tribe's land into trust to create Indian country. After years of angst over Interior's reservation policy, the Assistant Secretary asserts that a "reservation proclamation is simply an administrative function." [AR 12] And while Congress extinguished all aboriginal title in Alaska, all claims based on that title, and all "reserves set aside . . . for Native use or for administration of Native affairs,"[131] the Secretary claims the need to take lands into trust to restore the Tribe's "traditional homelands"— i.e., "their traditional and cultural homeland since time immemorial." [AR 11; *see also* AR 6 ("The Tribe states that the Property is uniquely situated to meet its need to regain land that it previously lost and to consolidate existing tribal landholdings.")]

In other words, the Secretary claims the authority to resurrect what Congress extinguished—aboriginal title. A successful claim of aboriginal title requires a showing of "actual, exclusive, and continuous use and occupancy 'for a long time.'"[132] The use and occupancy requirement "is measured 'in accordance with the way of life, habits,

---

[130]      *See* 43 U.S.C. §§ 1603, 1618(a).

[131]      *See* 43 U.S.C. § 1618(a).

[132]      *Native Village of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012) (en banc) (quoting *Sac & Fox Tribe of Indians of Okla. v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967)).

*State of Alaska v. Newland, et al.*                    Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 43 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 43 of 61

customs and usages of the Indians who are its users and occupiers.'"[133] Whatever the Assistant Secretary's test is for determining "traditional homeland" (he does not say), it likely looks like the test for determining aboriginal title.[134]

The agency's decision not only alters the balance between federal and state power, it also alters the power of the federal government over private property. "[P]rimary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, and not with the States."[135] By creating Indian country in Alaska, the Secretary is shifting territorial jurisdiction away from the State and placing it with itself and the Tribe. Prior to the Secretary exercising this authority, there were two sovereigns with territorial jurisdiction in Alaska: the federal government and the State.[136] Now there are three: the federal government, the State, and the Tribe. While this may not seem significant here, given that this case is about a 787 square foot parcel, there are

---

[133]    *Id.* (quoting *Sac & Fox Tribe of Indians of Okla.*, 383 F.2d at 998).

[134]    In addition to returning the Tribe's "traditional homelands," the Assistant Secretary also contends the Tribe needs trust lands "to access federal funding and grants only available to trust lands." [AR 12] But that too is a question for Congress. When Congress intends to make federal funding available to Alaska Natives, it knows how to do it. *See Yellen v. Confederated Tribes of Chehalis Reservation*, 141 S. Ct. 2434, 2443 (2021) (holding that Alaska Native Corporations meet the definition of "Indian tribe" under the Indian Self-Determination and Education Assistance Act and are therefore entitled to CARES Act funding).

[135]    *Venetie*, 522 U.S. at 527 n.1.

[136]    The only exceptions are the Annette Islands Reserve and the small trust parcels in Southeast Alaska. *See supra* n.48 and n.166.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                         Page 44 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 44 of 61

currently 227 federally recognized tribes in Alaska;[137] that is potentially 227 different sovereigns exercising territorial jurisdiction in the state.

And, as the EPA had done in *West Virginia*, Interior now claims authority that Congress expressly refused to delegate to the agency on its own. Congress looked at this issue in the mid-1980s after AFN submitted a proposal that would have expressly amended sections 5 and 7 and declined to act. "Given these circumstances, there is every reason to 'hesitate before concluding that Congress'" meant to confer on Interior "the authority it [now] claims."[138]

Whether Indian country exists in Alaska post-ANCSA is a politically significant question that implicates the State's sovereign territory. It is a major question and, as such, "[w]hether the concept of Indian country should be modified [in Alaska] is a question entirely for Congress" and should not depend on the Secretary's discretion.[139]

## II. The Secretary does not have clear congressional authority to create Indian country.

### A. Post-ANCSA, the Secretary does not have the authority to create Indian country in Alaska.

To determine whether the agency has "clear congressional authorization," the Court must analyze the statutory authority relied on by the agency and that provision's

---

[137]   88 Fed. Reg. 2115 (January 12, 2023).

[138]   *W. Virginia*, 142 S. Ct. at 2610 (quoting *Brown & Williamson*, 529 U.S. at 159-160).

[139]   *Venetie*, 522 U.S. at 534.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 45 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 45 of 61

place within the overall statutory scheme.[140] Additional factors for the Court to consider include the agency's historic interpretation and the age and purpose of the statute.[141] Each of these considerations weighs against the Secretary's position.

The Court cannot consider the Secretary's authority to create Indian country in Alaska without factoring in ANCSA. Unlike most other native land claims settlements, ANCSA was a comprehensive, statewide settlement of all Native land claims in the state.[142] Congress explicitly revoked all reservations; discontinued individual allotments; extinguished *all* aboriginal titles that may have existed; extinguished all *future* claims based on aboriginal right, title use or occupancy; and extinguished all claims based on any statute relating to Native use and occupancy.[143] This framework simply did not envision a federal agency having the discretion to resurrect aboriginal title in support of the creation of Indian country.

For those few tribes in Alaska that had a reservation, Congress provided a choice. They could either select land pursuant to ANCSA § 12[144] and receive distribution of regional corporation funds pursuant to ANCSA § 7,[145] or they could take reservation land

---

[140]    *W. Virginia*, 142 S. Ct. at 2608.

[141]    *Id.* at 2615; *Id.* at 2623 (Gorsuch, J., concurring) ("[A]n agency's attempt to deploy an old statute focused on one problem to solve a new and different problem may also be a warning sign that it is acting without clear congressional authority.").

[142]    *Venetie*, 522 U.S. at 524.

[143]    43 U.S.C. §§ 1603(b)-(c), 1617, 1618(a), and 1619.

[144]    43 U.S.C. § 1611.

[145]    43 U.S.C. § 1618.

*State of Alaska v. Newland, et al.*          Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment          Page 46 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 46 of 61

in fee.[146] Even if the tribe decided to accept its reservation land in fee, Congress would not preserve the reservation status; it would convey the land to the village corporation.[147]

ANCSA also ended federal agencies' authority to take land into trust for individual Indians.[148] Section 18 revoked Indian allotment authority for Alaska Natives under the Act of February 8, 1887 (24 Stat. 289) and the Act of June 25, 1910 (36 Stat. 363).[149] ANCSA also repealed the Alaska Native Allotment Act.[150]

And if those provisions were not clear enough, Congress enacted a savings clause. That provision provides that when there is a conflict between ANCSA and any other Federal law applicable to Alaska, ANCSA controls.[151]

At bottom, ANCSA left no room for the Secretary's lands-into-trust authority, and even if the Court reads the statutes as generously as possible to Alaska Natives, ANCSA created doubt as to whether the Secretary's lands-into-trust authority survives its enactment.[152] It is not only the State officials that have this doubt; Federal officials have

---

146    43 U.S.C. § 1618.

147    *Id.*

148    *See Venetie*, 522 U.S. at 532 ("In no clearer fashion could Congress have departed from its traditional practice of setting aside Indian lands.").

149    43 U.S.C. § 1617.

150    Act of May 17, 1906, 34 Stat. 197.

151    Pub. L. No. 92-203, § 26, 85 Stat. 715.

152    *Cape Fox Corp. v. U.S.*, 4 Cl. Ct. 223, 233-234 (U.S. Ct. Cl. 1983) (reaffirming ANCSA's purpose and saying that a "trustee-beneficiary relationship" should not be created by "judicial fiat").

*State of Alaska v. Newland, et al.*               Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 47 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 47 of 61

it as well. Recall that another consideration is the agency's historic interpretation.[153] Seven years after ANCSA, Interior's then solicitor advised the Secretary that he would abuse his discretion if he took lands in Alaska into trust. [AR 1534-36] Two years later, Interior promulgated a regulation with the Alaska exception.[154] Eight years later, with the Solicitor's opinion and the regulation on the books, Congress declined to act on AFN's request to amend the IRA to broaden the Secretary's authority.[155]

The last factor for the Court to weigh is the age and focus of the Alaska IRA. As the Supreme Court described the issue, "it is unlikely that Congress will make an extraordinary grant of regulatory authority through vague language in a long-extant statute."[156] "[A]n agency's attempt to deploy an old statute focused on one problem to solve a new and different problem" is also a warning sign that it is not acting with clear authority.[157]

Here, the Secretary relies on the IRA as it is applied to Alaska through the Alaska IRA. As discussed in more detail below, the IRA's focus was to mitigate the harms from the allotment era and to facilitate tribal self-governance. Even at the time, Congress openly recognized that the provisions of the IRA would not apply to Alaska the same

---

[153]  *W. Virginia*, 142 S. Ct. at 2608.

[154]  Final Rule, Land Acquisitions, 45 Fed. Reg. 62034 (Sept. 18, 1980).

[155]  Hrg., H.R. 4162 at p. 216; and Hrg. Before the Subcomm. On Public Lands, Reserved Water and Resource Conservation of the Senate Comm. On Energy and Natural Resources, 99th Cong., 2d Sess. at 165-66.

[156]  *W. Virginia*, 142 S. Ct. at 2623 (Gorsuch, J., concurring) (cleaned up).

[157]  *Id.*

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 48 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 48 of 61

way they would apply in the Lower 48. The reason being Alaska simply did not have the same kind of reservation system and did not suffer the same consequences from the allotment era. Indeed, the main function of the Alaska IRA's land provisions was to give the Secretary the authority to define the territorial reach of the Alaska Natives' tribal governments. Congress addressed that question in ANCSA when it extinguished all reservations and conveyed land to the Native Corporations. The Secretary's present-day use of the IRA's lands-into-trust provision to address perceived faults with ANCSA is a clear sign that the agency is acting without clear congressional authority.

### B.  Even prior to ANCSA, the Alaska IRA limited the Secretary's authority for most Alaska tribes.

Assuming the Court is not convinced that ANCSA had any impact on the Secretary's sections 5 and 7 authorities, the Court must still find clear congressional authority within the IRA itself. That Act does not provide the clear statement required to support the Secretary's claim of authority.

The IRA is a multi-purposed law directing some benefits to individuals with indigenous ancestry and other benefits to tribes that were recognized and under federal jurisdiction in 1934 as well as their members. As stated above, the law had two main purposes: to mitigate the legacy of the allotment era and to give tribes the ability to incorporate and get federal funding for economic projects.[158] In Alaska, certain

---

[158]  The purpose of the IRA was "[t]o stop the alienation" of lands belonging to Indians, "[t]o provide for the acquisition, through purchase, of land for Indians, now landless, "[t]o stabilize the tribal organization of Indian tribes, "[t]o permit Indian tribes . . . to form[ ] business corporations, "[t]o supply Indians with means for collegiate and

*State of Alaska v. Newland, et al.*  Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment  Page 49 of 61

Case 3:23-cv-00007-SLG  Document 16  Filed 08/01/23  Page 49 of 61

provisions of the IRA—including the land-into-trust provision—applied to individuals based on their "blood quantum," while more limited provisions—excluding the land-into-trust provision—apply to tribes that were recognized after 1936.

Congress limited the IRA's applicability to tribes that were recognized and under federal jurisdiction as of 1934, members of those tribes, descendants of those tribal members who were living on reservations in 1934, and persons who are at least one-half Indian blood.[159] These limitations are found in section 19 of the IRA which defines "Indian" and "tribe." [AR 3325 (codified at 25 U.S.C. § 5129)] An "Indian" falls into one of three categories:

(i) "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction,"

(ii) "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation," and

(iii) "all other persons of one-half or more Indian blood."

[*Id.*] And a "tribe" "refer[s] to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." [*Id.*] The definition of "tribe" incorporates the definitions of "Indian" above and means that in order for the IRA to apply to a tribe, the tribe must be

---

technical training in the best schools, and "[t]o open the way for qualified Indians to hold positions in the Federal Indian Service." Authorizing Indian to Form Business Councils, Corporations, and For other Purposes, S. Rep. 1080, 73d Cong., 2d Sess. (May 10, 1934). *See also Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973).

[159] 25 U.S.C. § 5129; *see also* To Grant to Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise: Hearings on S. 2755 and S. 3645 Before the S. Comm. On Indian Affairs ("Hearings on S. 2755 and S. 3645"), 73d Cong. at 265-66 (May 17, 1934).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 50 of 61

Case 3:23-cv-00007-SLG    Document 16    Filed 08/01/23    Page 50 of 61

recognized and under federal jurisdiction in 1934. [*Id.*][160] Congress wanted to maintain

"the status quo of the present reservation Indians" and further include persons having a

certain "Indian" blood quantum but wanted to draw the line somewhere "or the

Government would take on impossible financial burdens in extending wardship over

persons with a minor fraction of Indian blood."[161]

       The first two categories of "Indian" do not apply to Alaska. The first category

applies to members of tribes that were recognized and under federal jurisdiction in

1934.[162] Most tribes in Alaska were not recognized by the federal government until the

1990s.[163] In the late 19th century, courts concluded that the United States had never

"recognized any tribal independence."[164] And around the time the IRA was passed,

---

[160]   *See also Carcieri v. Salazar*, 555 U.S. 379 (2009).

[161]   78 Cong. Rec. 11732 (June 15, 1934) (explanation of Representative Howard, co-sponsor of Wheeler-Howard bill and Chairman of the House Committee on Indian Affairs).

[162]   *See Carcieri*, 555 U.S. at 379. *Carcieri* holds that tribes must have been under federal jurisdiction in 1934, but it does not address whether tribes must also have been recognized in 1934. In just the last eight years, the Department of the Interior has offered conflicting opinions about whether federal recognition must have occurred by 1934. *See* Sol. Op., The Meaning of "Under Federal Jurisdiction for Purposes of the Indian Reorganization Act," M-37029 (March 12, 2014) [AR 701-26]; Sol. Op., Withdrawal of Solicitor's Opinion M-37029, M-37055 (March 9, 2020); available at: https://www.doi.gov/sites/doi.gov/files/m-37055.pdf (accessed on July 31, 2023); and Sol. Op., Withdrawal of Certain Solicitor M-Opinions, Reinstatement of Sol. O. M-37029, M-37070 (April 27, 2021); available at: https://www.doi.gov/sites/doi.gov/files/m-37070.pdf (accessed on July 31, 2023). As applied in Alaska, "now" might refer to the passage of the Alaska IRA on May 1, 1936, rather than in 1934 when the IRA was passed.

[163]   Federally Recognized Indian Tribe List Act of 1994, 108 Stat. 4791.

[164]   *See, e.g.*, *In re Sah Quah,* 31 F. 327, 329 (D. Alaska 1886).

---

*State of Alaska v. Newland, et al.*        Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment       Page 51 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 51 of 61

"Alaska Natives were perceived as being organized as villages rather than as tribes or bands."[165] As for the federal government's jurisdiction over indigenous peoples in Alaska in 1934, John Collier, the Commissioner of Indian Affairs, explained that the Secretary's jurisdiction "over Indians up there" was limited in subject-matter and geographically "scattered." [AR 3434] He explained that Alaska Natives were, in 1934, "entitled to educational aid [and] health aid, but otherwise are not under the guardianship of the Government."[166]

The second category of "Indian" applies to descendants of tribal members who were living on "reservations" in 1934. [AR 3325 (codified at 25 U.S.C. § 5129)] The federal government did not adopt the same approach in Alaska as in the Lower 48 and had not forced Alaska Natives to live on reservations. "Indian country," as that term is understood today to include reservations of tribal territorial jurisdiction, did not exist.[167]

This leaves the third category of "Indian" as defined by the IRA, which applies in Alaska. Today, tribal membership with a federally recognized tribe is firmly regarded as a political affiliation.[168] But in the 19th and early 20th centuries, "Indians" were often

---

[165]    Case & Voluck, at 29 (3d. ed 2012).

[166]    Hearings on S. 2755 and S. 3645, 73d Cong. at 265 (May 17, 1934).

[167]    *Egan*, 369 U.S. at 51-52; *see generally* Petitioner State of Alaska's Brief in *State v. Native Village of Venetie Tribal Government*, 1997 WL 523883, *4-10 (compiling numerous sources discussing lack of "Indian country" in Alaska). The Annette Islands Reserve likely did not constitute "Indian country" in 1934 but falls within that definition today; the reservation was not terminated by ANCSA, thus the lands are held in trust, and the Metlakatla Indian Community is a federally recognized tribe.

[168]    *Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 52 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 52 of 61

defined by blood quantum related to race or ancestry. For instance, the Supreme Court in 1846 concluded that a "white man" who was living with and recognized by a tribe as a tribal member, was not an "Indian" within the meaning of the 1934 Trade and Intercourse Act, because "Indians are regarded as belonging to their race."[169] And in Felix Cohen's 1942 edition of the Handbook of Federal Indian Law, Cohen explained that the "term 'Indian' may be used in an ethnological or legal sense. Ethnologically, the Indian race may be distinguished from the Caucasian, Negro, Mongolian, and other races . . . . From a legal standpoint, then, the biological question of race is generally pertinent, but not conclusive."[170] For the 1934 Congress, the statutory terms "Indian descent" and "Indian blood" describes ethnographical status.[171]

But Congress did not, in the beginning of Alaska's territorial days, view Alaska Natives as Indians entitled to federal wardship.[172] That began to change around the turn of the 20th century. By the time Congress deliberated on the scope of the IRA, Alaska's Congressional delegate argued that the IRA should apply to "Alaska Indians who are

---

[169]    *See, e.g.*, *United States v. Rogers*, 45 U.S. 567 (1846). (concluding that a "white man" who was recognized by a tribe as a tribal member, was not an "Indian" within the meaning of the 1934 Trade and Intercourse Act, because "Indians are regarded as belonging to their race"); Felix Cohen's Handbook of Federal Indian Law, at 2 (1942 ed.) ("The term 'Indian' may be used in an ethnological or legal sense. Ethnologically, the Indian race may be distinguished from the Caucasian, Negro, Mongolian, and other races . . . . From a legal standpoint, then, the biological question of race is generally pertinent, but not conclusive.").

[170]    Felix Cohen's Handbook of Federal Indian Law, at 2 (1942 ed.).

[171]    *Id.*

[172]    *Id.* at 404.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 53 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 53 of 61

pure-blood Indians and very much in need, and they are neglected, and they are Indians pure and simple."[173]

Also complicating matters in Alaska was the debate about whether certain indigenous peoples in Alaska (namely Eskimos and sometimes also Aleuts) were "Indians."

This background helps illuminate why Congress amended the definition of "Indian" in the IRA bill to clarify that all indigenous peoples of Alaska, no matter their ethnographical race or ancestry, constituted Indians.[174] For the same reason, the Alaska Native Allotment Act applies to "any Indian or Eskimo of full or mixed blood."[175] This is also why the Alaska Statehood Act disclaims title to property held by "any Indians, Eskimos, or Aleuts (hereinafter called natives)."[176] And this is why, when Anthony

---

[173]    Hearings on S. 2755 and S. 3645, 73d Cong. at 265 (May 17, 1934).

[174]    *Cf.* AR 3475 (earlier version of H.R. 7902 that does not clarify that "Indians" include Eskimos and other aboriginal Alaskans), *with* AR 3325 (section 19 of the IRA) (clarifying that Eskimos and other aboriginal peoples in Alaska are considered "Indian").

[175]    Act of May 16, 1906, ch. 2469, 34 Stat. 197.

[176]    Statehood Act § 4. *See also* An Act to Establish an Alaska Game Commission, 52 Stat. 1169, § 2 (1938) (protecting Indians and Eskimos from certain gaming regulations and defining "Indian" and "Eskimo" in Alaska by blood); Reindeer Industry Act, § 15, 50 Stat. 900 (1937) (creating self-sustaining and exclusive reindeer industry for natives of Alaska and defining "natives of Alaska" as "native Indians, Eskimos, and Aleuts of whole or part blood inhabiting Alaska at the time of the Treaty of Cession" and their descendants and the Indians who migrated to Alaska from Canada); An Act for the Protection and Regulation of the Fisheries of Alaska, 48 Stat. 594 (1934) (regulating fishing with exceptions for "native Indians" and defining "native Indians" as "members of the aboriginal races inhabiting Alaska when annexed to the United States, and their descendants of the whole or half blood"); Alaska Native Townsite Act, 44 Stat. 629 (1926) (authorizing townsites for "Indian or Eskimo of full or mixed blood"); Alaska

---

*State of Alaska v. Newland, et al.*                    Civil Action No.: 3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 54 of 61

Dimond, the House of Representatives Delegate from the Territory of Alaska, was discussing the IRA's application in Alaska, he clarified that when he used the term "Indians of Alaska," he meant, "to include, of course, the Eskimos."[177]

The sentence in section 19 clarifying that Eskimos and all other Alaskan Natives are also entitled to the benefits of the IRA, regardless whether they are ethnographically considered "Indians" is not a stand-alone definition of "Indian." It is a clarification—found in most if not all contemporaneous legislation—so that certain ethnographically distinct Alaskans were not excluded from the benefits of Indian legislation. Indeed, Felix Cohen, concluded as much: "It seems to me that sec. 19 puts Eskimos on the same basis as Indians. To qualify for the benefits of the [Wheeler-Howard] act they must meet one of 3 criteria: tribal affiliation, tribal descent plus residence on a reservation, or the half-blood test." [AR 4427] And in 1937, Cohen and two other Assistant Solicitors concluded that the sentence clarifying that all aboriginal peoples in Alaska are considered "Indian" "should be read in conjunction" with the three criteria defining "Indian," otherwise "there would be no law as to what persons of Indian blood were eligible for benefits and organization." [AR 3266-69]

In short, when Congress passed the IRA in 1934, the federal government had not yet recognized tribes, jurisdiction over individual Alaska Native peoples was limited, and

---

Native Allotment Act, 34 Stat. 197 (1906) (authorizing allotments to "any Indian or Eskimo of full or mixed blood").

[177]    78 Cong. Rec. 11830 (June 15, 1934).

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 55 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 55 of 61

federal benefits to individual Alaska Natives were defined by blood quantum related to race or ancestry. This means that most provisions of the IRA were simply inapplicable to Alaska. Indeed, Delegate Dimond from Alaska conceded that "[s]o far as Alaska is concerned, not so many of the provisions of the bill can apply."[178] And prominent attorney and executive member of the Alaska Native Brotherhood, William Paul, agreed that there was "very little [in the bill] that can apply to Alaska, and that little appears to be entirely beneficial—the matter of education principally," and that "[s]ome people without an understanding of the legal position of the Alaska native would think these natives would come under the bill." [AR 498]

"As originally enacted, the IRA did not fully apply to Alaska, and was geared more to the needs of existing Indian reservations[.]"[179] Congress passed the Alaska IRA to fix two problems.[180] The first problem was an unintentional drafting error.[181] The 1934 Act gave the Secretary authority to provide federal loans to Indian chartered organizations in Alaska, but did not make applicable section 17, which authorized the creation of such organizations. [AR 3314-3317] This inadvertent omission effectively "nullified" the part of the act providing federal funding to Indian communities. [*Id.*]

The second problem with applying the IRA in Alaska was "the peculiar nontribal organizations under which the Alaska Indians operate." [AR 3315] Even though

---

[178]    78 Cong. Rec. 11830 (June 15, 1934).

[179]    Case & Voluck, at 29.

[180]    Cohen's Handbook, at 413 (1942 ed.).

[181]    *Id.*

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 56 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 56 of 61

section 16, which allowed tribes to organize and create tribal governments, ostensibly applied to Alaska, as Secretary of the Interior, Harold Ickes, described in 1936, "Indian tribes do not exist in Alaska in the same sense as in [the] continental United States." [AR 3316] "In order, therefore, to define an Alaskan tribe it is necessary to identify it with the land it occupies and in terms of the language of the act 'reservation.'" [AR 3316-17] He urged that "if native communities of Alaska are to set up systems of local government," the Secretary can set reservations to delineate "the geographical limits of their jurisdictions." [AR 3317]

In his remarks to the committee, Secretary Ickes made an additional point, one that ties back to the Organic Act of 1884 and the Act of 1891. He stated that "[a]n even more important reason for the designation of reservation in Alaska" was the need for the United States Government to fulfill "its moral and legal obligations in the protection of the economic rights of the Alaska natives." [AR 3371] The secretary argued that the land occupied by Alaska Natives should have already been segregated for their use via the 1884 and 1891 Acts and that the authority granted to him via section 2 of the Alaska IRA would "aid . . . in rectifying this condition, and in protecting the interests of the natives in the future." [*Id.*] Regarding application of section 5 (lands into trust) and section 7 (reservation proclamations) to Alaska, Secretary Ickes stated this was needed to aid "in the establishment and the administration of [the] reservations" created via the broader authority granted under the Alaska IRA. [*Id.*]

*State of Alaska v. Newland, et al.*            Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment            Page 57 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 57 of 61

Congress fixed the first problem by making applicable in Alaska the provision authorizing tribes to incorporate (and thereby receive federal funding). Congress resolved the second problem by doing two things: First, in section 1, it allowed groups of Indians not yet recognized by the federal government to organize as an IRA tribe and to incorporate to receive federal funding. [AR 3306] Congress did not provide *all* the benefits of the IRA to these new IRA tribes, just the authority to organize as a government (section 16), incorporate as an economic entity (section 17), and receive federal funding (section 10). [*Id.*] Second, in section 2, it allowed the Secretary to create revocable reservations for Native Alaskans on certain land already occupied and being used by them. [*Id*][182] Section 2 has since been repealed. [AR 1540]

The first part of section 1 of the Alaska IRA incorporated some other provisions of the 1934 Act and these sections had very limited application in Alaska. Again, Congress did not make all these incorporated provisions applicable to new IRA tribes (i.e., tribes "not heretofore [prior to 1936] recognized as bands or tribes"). Rather, Congress made them applicable in Alaska to "Indians" and "tribes" as defined by section 19 of the IRA. The incorporated provisions relevant to this case are sections 5 and 7. Section 5 allows the Secretary to take land into trust for "an Indian tribe or individual Indian." Because of the narrow definition of tribe in Alaska, *see* supra above about section 19, the land-into-trust provision applies to individual Indians who meet the blood quantum requirement, but it does not apply to tribes unless they were recognized and under federal jurisdiction

---

[182]     *Hynes*, 337 U.S. at 86.

in 1934.[183] Section 7 allows for the creation of new reservations or adding to existing reservations from lands acquired under the Act, but it is not clear how it could apply in Alaska except, perhaps, by adding lands to the Annette Islands Reserve. Because the Secretary can take section 5 lands into trust for individuals only, and not also for tribes (as defined by section 19), it is not clear how the Secretary can turn trust land for an individual into reservation land for a tribe. To the extent Secretary Ickes intended sections 5 and 7 of the IRA to make "a smoother and more efficient administration" of section 2 of the Alaska IRA, section 19's limited definition curtails that interpretation.

Any contrary interpretation—i.e., that the Secretary can take lands in trust for and create reservations for tribes that were not then recognized and under federal jurisdiction—is not only divorced from the statutes' text but makes little sense. The IRA's land-into-trust and new reservation provisions are limited to tribes that were recognized and under federal jurisdiction in 1934 and their members.[184] If this limitation does not apply in Alaska that would mean that Congress gave more rights under the IRA to Alaska Natives than to Lower 48 tribes. This interpretation makes little sense because the main purpose of the land provisions in the IRA was to reverse the disastrous legacy of the allotment era, a legacy that did not occur in Alaska.

---

[183]    The Assistant Secretary did not decide whether Central Council met this requirement and therefore acted contrary to law.

[184]    *Carcieri*, 555 U.S. at 379.

*State of Alaska v. Newland, et al.*                    Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                    Page 59 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 59 of 61

An interpretation otherwise would also hide a mountain in a molehole—something courts presume Congress does not do, especially when doing so would completely change the jurisdictional balance in a state. Congress did not draft a specific provision for creating reservations in Alaska only to hide in a 1936 cross-reference the Secretary's unfettered authority to create permanent and limitless reservations.

Moreover, as Secretary Ickes explained, the purpose of the Alaska IRA's section 2 land provision was to define the Alaska Natives' territorial jurisdiction, including fulfilling Congress's promise in the 1884 Organic Act. But that limited purpose of the Alaska IRA's land provisions did not work as initially envisioned for the reasons already discussed. So, Congress instead resolved the unanswered questions regarding land claims and territorial jurisdiction through ANCSA.

## CONCLUSION

"The question here is not whether something should be done; it is who has the authority to do it."[185] Congress has not clearly delegated to the Secretary unfettered authority to alter the balance of territorial jurisdiction in the state by creating Indian country. To the contrary, Congress considered and rejected the creation of Indian country when it passed ANCSA. And it considered and again rejected authorizing the creation of Indian country when it amended ANCSA. For the foregoing reasons, the Court should grant summary judgment in favor of the State of Alaska.

---

[185] *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023).

*State of Alaska v. Newland, et al.*                     Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment                          Page 60 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 60 of 61

DATED:  August 1, 2023.

TREG TAYLOR
ATTORNEY GENERAL

By:    */s/ Jessie M. Alloway*
       Jessica M. Alloway
       Assistant Attorney General
       Alaska Bar No. 1205045
       Email: jessie.alloway@alaska.gov

By:    */s/ Christopher F. Orman*
       Christopher F. Orman
       Assistant Attorney General
       Alaska Bar No. 1011099
       Email: christopher.orman@alaska.gov

       *Attorneys for the State of Alaska*

**CERTIFICATE OF WORD COUNT**
Should the Court grant the State's unopposed motion for leave to file an overlength pleading, I certify that this document complies with the court-ordered word count limit because it contains 13,359 words.

*/s/ Jessie M. Alloway*
Jessica M. Alloway
Assistant Attorney General

**CERTIFICATE OF SERVICE**
I hereby certify that on August 1, 2023, I electronically filed the foregoing by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Angela Hobbs
Angela Hobbs
Law Office Assistant III

*State of Alaska v. Newland, et al.*                Civil Action No.:  3:23-cv-00007-SLG
Motion and Memorandum ISO Summary Judgment          Page 61 of 61

Case 3:23-cv-00007-SLG   Document 16   Filed 08/01/23   Page 61 of 61