TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
CHARMAYNE G. STALOFF, Trial Attorney
WILLIAM J. CRUM, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Telephone: (202) 616-3148
Email: charmayne.staloff@usdoj.gov

*Attorneys for the United States*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>          Plaintiff,<br><br>     v.<br><br>BRYAN NEWLAND, in his official capacity as Assistant Secretary, Indian Affairs, U.S. Department of the Interior;<br>and U.S. DEPARTMENT OF THE INTERIOR<br><br>          Defendants,<br><br>     and<br><br>CENTRAL COUNCIL OF THE TLINGIT & HAIDA INDIAN TRIBES OF ALASKA,<br><br>          Intervenor-Defendant. | Case No. 3:23-cv-00007-SLG<br><br><br>**UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT AND CONSOLIDATED MEMORANDUM IN SUPPORT OF CROSS-MOTION AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>ORAL ARGUMENT REQUESTED |

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 2

  I.      STATUTORY AND REGULATORY BACKGROUND.................................. 2

    A.   Enactment and Implementation of the Indian Reorganization Act and the Alaska IRA............................................................................................... 2

    B.   The Alaska Native Claims Settlement Act and Subsequent Legislation ........... 4

    C.   Interior's Policy on Trust Acquisitions in Alaska ............................... 6

  II.     FACTUAL AND PROCEDURAL BACKGROUND ...................................... 7

STANDARD OF REVIEW...................................................................................... 8

DISCUSSION.......................................................................................................... 9

  I.     The Secretary Has Authority to Acquire Land in Trust in Alaska ................... 9

    A.   Congress Conferred Authority on the Secretary to Acquire Land in Trust Under Section 1 of the Alaska IRA ..................................................... 9

    B.   ANCSA Did Not Repeal the Secretary's Trust Acquisition Authority ............ 10

      1.   Congress Did Not Explicitly Repeal AIRA Section 1 ..................................... 14

      2.   Congress Did Not Implicitly Repeal AIRA Section 1 ..................................... 15

        a.   There Is No Irreconcilable Conflict Between ANCSA and AIRA Section 1 ............................................................... 16

        b.   ANCSA Does Not "Cover the Whole Subject" ........................................... 22

        c.   Post-Enactment Legislative History Does Not Demonstrate that ANCSA Repealed AIRA Section 1 ...................................................... 24

  II.     Section 19's First Definition of "Indian" Does Not Limit the Secretary's Authority to Acquire Land in Trust in Alaska ............................................. 25

    A.   The State Concedes that All Alaska Natives Are "Indians" Under the IRA ................................................................... 26

    B.   The Alaska Definition Is an Independent Definition of "Indian"..................... 27

i

1.  The Plain Text and Structure Demonstrate that the Alaska Definition is Independent .......................................................................................... 28

2.  Legislative History and Post-IRA Department Guidance Do Not Support the State's Argument that Alaska Tribes Must Meet Another Definition of "Indian" ...................................................................................... 31

III.   This is Not a Major Questions Case ................................................ 35

A.   This Case Does Not Raise a Major Question ................................... 36

B.   AIRA Section 1 and the Alaska Definition Clearly Authorize the Secretary to Take Land in Trust for the Tribe ..................................................... 39

**CONCLUSION** .......................................................................................... **40**

ii

*State of Alaska v. Newland et al.*                           Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Case 3:23-cv-00007-SLG   Document 19   Filed 09/29/23   Page 3 of 49

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                   **Page(s)**

*Akiachak Native Cmty. v. Salazar,*
935 F. Supp. 2d 195 (D.D.C. 2013) ................................................................ *passim*

*Akiachak Native Cmty. v. U.S. Dep't of the Interior,*
827 F.3d 100 (D.C. Cir. 2016) ....................................................................... 11

*Alaska Indus. Dev. v. Biden,*
2023 U.S. Dist. LEXIS 136474 (Aug. 7, 2023) ........................................... 37

*Alaska v. Native Village of Venetie,*
522 U.S. 520 (1998) ...................................................................................... 17

*Alyeska Pipeline Serv. v. Kluti Kaah Native Vill. of Copper Ctr.,*
101 F.3d 610 (9th Cir. 1996) ................................................................. 5, 11

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) .................................................................................. 36

*Carcieri v. Kempthorne,*
497 F.3d 15–36 (1st Cir. 2007) ............................................................. 20, 21

*Carcieri v. Salazar,*
555 U.S. 379 (2009) ............................................................................ 20, 21, 26

*Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ............................................................................. 9, 30, 36

*Club One Casino, Inc. v. Bernhardt,*
959 F.3d 1142–50 (9th Cir. 2020) ............................................................... 38

*Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell,*
830 F.3d 552–65 (D.C. Cir. 2016) ............................................................... 26

*Connecticut v. U.S. Dep't of the Interior,*
228 F.3d 82 (2d Cir. 2000) .......................................................................... 22

*Ctr. for Cmty. Action & Envtl. Justice v. FAA,*
18 F.4th 592 (9th Cir. 2021) .......................................................................... 8

*Ctr. for Investigative Reporting v. U.S. Dep't of Justice,*
14 F.4th 916 (9th Cir. 2021) ........................................................................ 22

*County of Amador v. U.S. Dep't of Interior,*
872 F.3d 1012–27 (9th Cir. 2017) ............................................................... 26

iii

*County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*,
   502 U.S. 251 (1992) ................................................................................... 2, 3

*Eleri v. Sessions*,
   852 F.3d 879 (9th Cir. 2017) ................................................................ 28, 34

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ............................................................................... 15

*Flores-Miramontes v. INS*,
   212 F.3d 1133 (9th Cir. 2000) ................................................................... 14

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) ....................................................................... 18

*Hernandez v. Williams*,
   829 F.3d 1068 (9th Cir. 2016) ........................................................... *passim*

*Hynes v. Grimes Packing Co.*,
   337 U.S. 86 (1949) .................................................................................... 39

*Ledezma-Galicia v. Holder*,
   599 F.3d 1055 (9th Cir. 2010) ................................................................... 15

*Mendoza-Linares v. Garland*,
   51 F.4th 1146 (9th Cir. 2022) ................................................................... 30

*Morton v. Mancari*,
   417 U.S. 535 (1974) ............................................................................ 3, 15

*Mescalero Apache Tribe v. Jones*,
   411 U.S. 145 (1973) ............................................................................ 3, 31

*Montana v. Blackfeet Tribe of Indians*,
   471 U.S. 759 (1985) ................................................................................. 34

*Posadas v. Nat'l City Bank of N.Y.*,
   296 U.S. 497 (1936) ........................................................................... 15, 22

*Pueblo of Jemez v. United States*,
   350 F. Supp. 3d 1052 (D.N.M. 2018) ...................................................... 20

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) ........................................................................... 15, 22

*Sackett v. EPA*,
   143 S. Ct. 1322 (2023) ............................................................................. 38

*Skidmore v. Swift*,
   323 U.S. 134 (1944) ............................................................................. 8, 34

iv

*Stand Up for Cal.! v. U.S. Dep't of the Interior*,
  204 F. Supp. 3d 212 (D.D.C. 2016) ............................................................ 27, 31

*Tyonek Native Corp. v. Sec'y of the Interior*,
  629 F. Supp. 554 (D. Alaska 1986) ............................................................ 9

*United States v. King*,
  24 F.4th 1226 (9th Cir. 2022) ................................................................... 24

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ................................................................... 35, 36, 39

**Statutes and Legislation**

5 U.S.C. § 706 ............................................................................................... 8

25 U.S.C. § 5108 ................................................................................... *passim*

25 U.S.C. § 5119 ................................................................................... *passim*

25 U.S.C. § 5129 ................................................................................... *passim*

25 U.S.C. § 5110 ................................................................................... *passim*

43 U.S.C. § 1601 ................................................................................... 18, 19

43 U.S.C. § 1603 ............................................................................................ 19

43 U.S.C. § 1605 ............................................................................................ 5

43 U.S.C. § 1607 ............................................................................................ 5

43 U.S.C. § 1613 ............................................................................................ 5

43 U.S.C. § 1617 ..................................................................................... 5, 14

43 U.S.C. § 1618 ..................................................................................... 5, 14

43 U.S.C. §§ 1701–1787 ............................................................................. 5

Act of May 1, 1936, Pub. L. No. 74-538, 49 Stat. 1250, § 2 .................... *passim*

Alaska. Pub. L. No. 100-241, 101 Stat. 1814 (1988) ............................... 25

FLPMA § 701(f) ........................................................................................ 14

FLPMA § 704(a) ................................................................................... 6, 14

*State of Alaska v. Newland et al.*                          Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Case 3:23-cv-00007-SLG   Document 19   Filed 09/29/23   Page 6 of 49

Pub. L. No. 85-508, 72 Stat. 339 (1958) ...................................................... 4, 17

**Regulations**

25 C.F.R. Part 151 .................................................................................... *passim*

**Other**

*Cohen's Handbook of Federal Indian Law* § 15.07 (2023) .....................................*passim*

Exec. Order No. 10798 and Proclamation of Admission of the State of Alaska into the Union, 24 Fed. Reg. 79, 79-82 (1959) ................................................................. 4

*Keynote Address: Alaska Native Peoples and the Environment*, 39 Alaska L. Rev. 193 (2022) ............................................................... 3

Land Acquisitions, 60 Fed. Reg. 1956 (Jan. 5, 1995) ....................................... 6

Land Acquisitions, 87 Fed. Reg. 74334 (Dec. 5, 2022) .................................... 4

Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76888 (Dec. 23, 2014) ......... 6, 12

Natalie Landreth & Erin Dougherty, *The Use of the Alaska Native Claims Settlement Act to Justify Disparate Treatment of Alaska's Tribes*, 36 Am. Indian L. Rev. 321, 345–46 (2011) ................................................................................................. 17

*State of Alaska v. Newland et al.*          Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

# INTRODUCTION

In its 2013 decision holding that "[the Alaska Native Claims Settlement Act] left intact the Secretary [of the Interior]'s authority to take land in trust throughout Alaska," the United States District Court for the District of Columbia observed that, "[d]espite the length and complexity of the history recounted above, the legal questions in this case are relatively straightforward." *Akiachak Native Cmty. v. Salazar*, 935 F. Supp. 2d 195, 203, 208 (D.D.C. 2013). That is as true today as it was a decade ago.

Nevertheless, the State of Alaska advances substantively the same arguments the D.D.C. rejected in *Akiachak* in this Administrative Procedure Act challenge to the Department of the Interior's 2022 decision ("Decision") to acquire land in trust, pursuant to the Indian Reorganization Act, for the benefit of the Central Council of the Tlingit & Haida Indian Tribes of Alaska. The State's attempt to dress up those rejected arguments in the mantle of the major questions doctrine does not alter its failure to demonstrate any error in the Decision or Interior's exercise of its well-established authority to acquire land in trust in Alaska.

The Indian Reorganization Act authorizes the Secretary of the Interior to acquire land in trust for the purpose of providing land for Indians. 25 U.S.C. § 5108. The exercise of that authority is critical to the furtherance of tribes' political and economic self-governance. In 1936, Congress explicitly provided that the Secretary's IRA trust

acquisition authority "shall hereafter apply to the Territory [State] of Alaska." *Id.* § 5119.

"For the purposes of [the IRA,]" Alaska Natives "shall be considered Indians." *Id.*

§ 5129. Even if the major questions doctrine did apply—it does not—Congress thereby

provided authorization for agency action clear enough to satisfy the doctrine. Congress

has never repealed or limited the Secretary's authority, and it remains in effect today.

For these and the reasons set forth below, the United States respectfully requests

that the Court grant its Cross-Motion for Summary Judgment in this case and deny the

State's Motion.

## BACKGROUND

### I.  STATUTORY AND REGULATORY BACKGROUND

#### A. Enactment and Implementation of the Indian Reorganization Act and the Alaska IRA

The Indian Reorganization Act ("IRA"), 25 U.S.C. §§ 5101–5129 is the

foundation for the modern relationship between the United States and Indian tribes,

including tribes in Alaska. Congress enacted the IRA in 1934 as part of the federal

government's return to supporting "principles of tribal self-determination and self-

governance[.]" *County of Yakima v. Confederated Tribes & Bands of Yakima Indian*

*Nation*, 502 U.S. 251, 255 (1992). The IRA charted a sweeping, new course in federal

policy, reversing the disastrous assimilationist policy of the nineteenth century that had

aimed to "extinguish tribal sovereignty, erase reservation boundaries, and force the

assimilation of Indians into the society at large." *Id.* at 254.

The "overriding purpose" of the IRA was to "establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1974). Congress sought "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (quoting H.R. Rep. No. 73-1804 at 6 (1934)). The destructive effects of assimilation on tribal cultures and economies did not spare Alaska Natives. *See, e.g.*, *Keynote Address: Alaska Native Peoples and the Environment*, 39 Alaska L. Rev. 193 (2022) (describing harms to Alaska Natives of the "assimilation era," including forced removal of children from their homes to be "civilized" in boarding schools).

Section 5, the "capstone" of the IRA's land-related provisions, *Cohen's Handbook of Federal Indian Law* § 15.07 (Nell Jessup Newton ed., 2023) ("Cohen"), authorizes the Secretary ("Secretary") of the Department of the Interior ("Interior" or "Department") to acquire land in trust "for the purpose of providing land for Indians." 25 U.S.C. § 5108. Section 7 authorizes the Secretary to "proclaim new Indian reservations on lands acquired pursuant to any authority conferred by [the IRA], or to add such lands to existing reservations." *Id.* § 5110. Section 19 defines "Indian" in multiple ways; as relevant here, it provides that "[f]or the purposes of [the IRA], Eskimos and other aboriginal peoples of

3

Alaska shall be considered Indians." *Id.* § 5129. The IRA's implementing regulations are codified at 25 C.F.R. Part 151.[1]

Despite a general prohibition against application of the original IRA to any of the "[t]erritories" of the United States, it included an Alaska Proviso that applied five sections—not including Sections 5 or 7—to the Territory of Alaska. *Id.* § 5118. Congress enacted the Alaska IRA ("AIRA") in 1936 to address concerns arising from the omission of various other provisions in the original IRA. *See* AR0000036–37. The AIRA comprised two sections. Section 1, which remains in effect and is the subject of this case, provided that additional provisions of the IRA—including Sections 5, 7, and 19—"shall hereafter apply to the Territory [State] of Alaska." 25 U.S.C. § 5119. Section 2 separately authorized the Secretary to designate certain public lands as Indian reservations for Alaska Natives. Act of May 1, 1936, Pub. L. No. 74-538, 49 Stat. 1250, § 2.

### B.  The Alaska Native Claims Settlement Act and Subsequent Legislation

Alaska was admitted into the Union in 1959 and was authorized to select certain "vacant and unappropriated" lands to become State lands. Pub. L. No. 85-508, 72 Stat. 339 (1958) ("Statehood Act"); Exec. Order No. 10798 and Proclamation of Admission of

---

[1] Interior is currently considering comments on a proposed rule to amend the Part 151 regulations. 87 Fed. Reg. 74334 (Dec. 5, 2022).

*State of Alaska v. Newland et al.*                                                    Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

the State of Alaska into the Union, 24 Fed. Reg. 79, 79-82 (1959). Many of the lands the State sought to select under the Statehood Act were also claimed by Alaska Natives. AR0000038. In 1966, then Secretary Udall instituted a freeze on State land selections pending the resolution of Alaska Native land claims. AR0000038–39. In 1968, oil was discovered at Prudhoe Bay on Alaska's North Slope, creating an urgent need to settle the status of lands so that the 800-mile Trans-Alaska Pipeline could be built to bring oil to Valdez and to market. *See* Cohen § 4.07. Thus, the impetus behind the Alaska Native Claims Settlement Act ("ANCSA") was "to quiet title quickly to land to allow unhindered construction of the Trans[-A]laska Oil Pipeline." *Alyeska Pipeline Serv. v. Kluti Kaah Native Vill. of Copper Ctr.*, 101 F.3d 610, 613 (9th Cir. 1996).

To accomplish that goal, ANCSA, enacted in 1971, extinguished existing aboriginal title and claims to such title; repealed the Alaska Native Allotment Act; and revoked nearly all existing Alaska Native reserves. *See* AR0000039–40 (citing 43 U.S.C. §§ 1617, 1618). ANCSA thereby cleared the way for the Trans-Alaska Pipeline. In exchange, state-chartered Alaska Native corporations received approximately 44 million acres of land and $962 million. AR0000040 (citing 43 U.S.C. §§ 1605, 1607, 1613).

In 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA"). Pub. L. No. 94-579, 90 Stat. 2744 (1976) (*codified as amended at* 43 U.S.C. §§ 1701–1787). FLPMA expressly repealed AIRA Section 2, which authorized the

Secretary to designate certain public lands as Indian reservations, but not Section 1. AR0000040–41 (citing FLPMA § 704(a), 90 Stat. 2744, 2792).

## C. Interior's Policy on Trust Acquisitions in Alaska

Interior's policy concerning the Secretary's authority to acquire land in trust in Alaska has been extensively recounted and is not repeated in full here. *See* AR0000041–44; *Akiachak*, 935 F. Supp. 2d at 200–02. The determination that the Secretary retains her trust acquisition authority in Alaska does not mark a sudden shift in policy. To the contrary, Interior began reconsidering the policy embodied in the Part 151 "Alaska exception" nearly two decades ago. *See* Land Acquisitions, 60 Fed. Reg. 1956 (Jan. 5, 1995) (notice of petition recommending elimination of Alaska exception). Almost a decade ago, Interior removed the legally untenable Alaska exception from its regulations. Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76888 (Dec. 23, 2014). The State did not challenge the removal. In 2017, the Secretary accepted land in trust for the Craig Tribal Association, another federally recognized tribe in Alaska. AR0000398. The State did not challenge that acquisition. And in 2022, in response to a 2021 legal opinion raising "concerns" over the scope of the Secretary's trust acquisition authority, Interior set forth a definitive legal analysis of the matter in its 2022 M-Opinion. *See* AR0000042–44.

6

## II.     FACTUAL AND PROCEDURAL BACKGROUND

In 2009, the Central Council of the Tlingit & Haida Indian Tribes of Alaska ("Tribe") petitioned Interior to have the 787-square-foot property ("Property"), which the Tribe acquired from a tribal member, accepted and held in trust for the Tribe. *See* AR0000764. The Property is located in the "'Juneau Indian Village,' where Tlingit and Haida Indians have resided since time immemorial." *Id.* After Interior removed the Alaska exception from its Part 151 regulations, the Tribe renewed its request in 2016, *see* AR0000536, and again in 2021, *see* AR0000136.

On November 17, 2022, the Assistant Secretary – Indian Affairs ("AS-IA") issued the Decision approving the Tribe's request. AR0000001. The AS-IA concluded, consistent with a governing 2022 Interior Solicitor Opinion ("2022 M-Opinion")[2], AR0000031, that the Secretary has authority under Section 5 of the IRA to accept the Property in trust for the Tribe and that the acquisition meets the requirements of Interior's Part 151 regulations. AR0000001.[3]

---

[2] M-Opinion M-37076, *The Secretary's Land into Trust Authority for Alaska Natives and Alaska Tribes Under the Indian Reorganization Act and the Alaska Indian Reorganization Act* (Nov. 16, 2022). M-Opinions set out Interior's formal legal views and are binding on the agency. *See* Interior Departmental Manual 3.2A(11), https://www.doi.gov/elips/browse.

[3] The Decision provided that the AS-IA "will consider the Tribe's request to issue a reservation proclamation under IRA Section 7 after the Property is acquired in trust."

7

## STANDARD OF REVIEW

The State bears the burden of proof in this Administrative Procedure Act ("APA")
case. *See Ctr. for Cmty. Action & Envtl. Justice v. FAA*, 18 F.4th 592, 599 (9th Cir.
2021). Under the APA, a court may set aside agency action only when it finds the action
is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the
law." 5 U.S.C. § 706(2)(A).

Here, the State does not contest Interior's findings in the Decision that the
acquisition satisfies the regulatory requirements of 25 C.F.R. Part 151, but instead argues
that the Secretary lacks authority to acquire land in trust for Indians in Alaska because
ANCSA repealed Section 1 of the IRA or, in the alternative, that tribes in Alaska must
demonstrate that they meet the first definition of "Indian" in Section 19 of the IRA. The
question whether agency action is in accordance with the law is a question of statutory
interpretation for which an agency is generally afforded deference. *See Chevron, USA,
Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *Skidmore v. Swift*, 323 U.S.
134, 139 (1944).

---

AR0000012. To date, the AS-IA has not addressed the Tribe's request.

## DISCUSSION

## I.    The Secretary Has Authority to Acquire Land in Trust in Alaska

The State seeks to obscure the "relatively straightforward" question at the heart of this case: whether Congress repealed Section 1 of the Alaska IRA, which authorizes the Secretary to accept land in trust in Alaska. *See Akiachak*, 935 F. Supp. 2d at 203. ANCSA did not explicitly repeal Section 1. The State, therefore, must demonstrate that Congress did so implicitly. *See Tyonek Native Corp. v. Sec'y of the Interior*, 629 F. Supp. 554, 558 (D. Alaska 1986) ("[P]laintiffs must bear the burden of demonstrating that Congress intended by implication to repeal" a prior statute.). Because the State is aware of this heavy burden from its experience before the D.D.C. in *Akiachak*, it attempts to shift this burden by invoking the major questions doctrine. As discussed in Section III, however, there is no major question within the meaning of that doctrine, and in any event the doctrine is satisfied when Congress has spoken as plainly as it did in AIRA Section 1.

### A.  Congress Conferred Authority on the Secretary to Acquire Land in Trust Under Section 1 of the Alaska IRA

As enacted in 1936, the AIRA had two sections. Section 1 expressly extended several IRA provisions, including the Secretary's Section 5 trust acquisition and Section 7 reservation proclamation authority, to Alaska. 25 U.S.C. § 5119. Section 2 separately authorized the Secretary to designate certain public lands as Indian reservations. Act of

9

May 1, 1936, Pub. L. No. 74-538, 49 Stat. 1250, § 2.[4] The State does not contest the plain

meaning of Section 1. Rather, it insists that "Interior now claims authority that Congress

expressly refused to delegate to the agency on its own." ECF-16 at 45. The State's

argument is, in effect, that Congress had to *reiterate* that authority in or after ANCSA.

See *id.* at 29–30 (discussing proposed amendments to the IRA that would have reaffirmed

the Secretary's authority). We are not aware of any such requirement. Congress already

granted the Secretary the authority invoked here; no further legislation was required.

### B. ANCSA Did Not Repeal the Secretary's Trust Acquisition Authority

Despite the State's attempt to reframe this case, the "relatively straightforward"

legal question before the Court is whether Congress repealed Section 1, revoking the

Secretary's trust acquisition authority in Alaska. In litigation before the D.D.C., the State

"t[ook] the position that [ANCSA] implicitly repealed the Secretary's authority to take

Alaska land into trust." *Akiachak*, 935 F. Supp. 2d at 204. And the State alludes to

---

[4] The State goes to great lengths to diminish the importance and effect of the IRA in
Alaska, even prior to ANCSA. That discussion focuses almost solely on Section 2, which
is not at issue here. For instance, the State emphasizes public opposition to the
implementation of Section 2. ECF-16 at 20–22. Even had that public opposition been
aimed at Section 1, the sole issue in the context of an implied repeal argument is what
Congress provided—not public opinion. The Secretary no longer has the authority to
create Indian reservations under Section 2 because Congress repealed that provision in
1976—not because the public objected to it at the time.

*State of Alaska v. Newland et al.* Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

implied repeal here, arguing that ANCSA "left no room for the Secretary's land-into-trust authority" and "created doubt as to whether [that authority] survives [ANCSA's] enactment." ECF-16 at 47. But that is simply not the case.

The question today is the same one the D.D.C., the D.C. Circuit, and Interior have already answered, and this Court should reach the same conclusion: "that ANCSA left intact the Secretary's authority to take land into trust throughout Alaska." *Akiachak*, 935 F.2d at 208; *see also Akiachak Native Cmty. v. U.S. Dep't of the Interior*, 827 F.3d 100, 103 (D.C. Cir. 2016) ("Congress never repealed the IRA's Alaska trust provision"); AR0000067.[5] The exacting requirements of the presumption against implied repeal compel that conclusion. So, too, does the history of ANCSA.

As discussed in the background, the primary driver behind ANCSA was the need "to quiet title quickly to land to allow unhindered construction of the Trans[-A]laska Oil Pipeline." *Alyeska*, 101 F.3d at 613. In exchange for the extinguishment of aboriginal title and claims, Alaska Native corporations received approximately 44 million acres of land

---

[5] Interior and Alaska initially appealed the district court's decision in *Akiachak*; Interior dismissed its appeal after the agency revised its Part 151 regulations to remove the Alaska exception. *See Akiachak*, 827 F.3d at 105. The D.C. Circuit rejected the State's argument that its appeal should nevertheless be allowed to proceed and vacated the district court decision on mootness grounds without reaching the merits. *See id.* at 105–15.

and $962 million. AR0000040. That was the deal: no less and—central to this case—no

more. As Interior explained in its final rule eliminating the Alaska exception:

> It is important to remember that Alaska Native land and history did not
> commence with ANCSA, and that ANCSA did not terminate Alaska Native
> tribal governments . . . [W]hile ANCSA revoked [most] existing reservations
> in Alaska and established a separate statutory scheme in Alaska for the
> settlement of land claims, it did not repeal the Secretary's authority to take
> land into trust in Alaska under the IRA.

79 Fed. Reg. at 76890.

The State confuses what ANCSA *accomplished* with a purported *prospective*

effect that it desires. For instance, the State points to Solicitor Sansonetti's conclusion

that ANCSA "left virtually no room . . . for Native villages in Alaska to exercise

governmental power over land and nonmembers." ECF-16 at 32–33 (quoting

AR0001058). While it may be true that ANCSA—by revoking existing reserves—left

most tribes in Alaska with little land over which to exercise jurisdiction, it does not

preclude Alaska tribes from obtaining and petitioning to have such land held in trust

today.[6]

---

[6] Indeed, the memorandum on which Interior's Alaska exception was based, which was
subsequently withdrawn, *see* AR0000042; AR0000887, did not even address ANCSA's
prospective effect. It addressed the distinct question whether ANCSA "precludes the
restoration of former reservations to trust status" and incorrectly stated that "Congress
intended permanently to remove from trust status all Native land in Alaska" except the
Annette Island Reserve of the Metlakatla Indian Community. The memorandum said
nothing of the Secretary's *future authority* to acquire other ANCSA or non-ANCSA land

12

The State further claims that "[s]ince ANCSA, Alaska has been governed on the basic jurisdictional premise . . . that no new Indian country will be created." ECF-16 at 12. To the extent that is true, it is not a function of any preclusive effect of ANCSA, but a function of administrative uncertainty and executive branch discretion in trust acquisitions. *See* AR0000929 ("As a result [of the unique circumstances in Alaska] all three branches of the Federal Government have dealt with the relationship [between the federal government and Alaska Natives] in a tentative and reactive way."). The State incorrectly suggests that the Secretary properly interpreted Congress's intent by declining to take land in trust in Alaska in the immediate wake of ANCSA. ECF-16 at 12. Rather, the record demonstrates that, at times, Interior misconstrued that intent. The reticence of some Interior officials to exercise discretionary land acquisition authority stemmed primarily from the novel and complex nature of ANCSA, rather than any statutory text or congressional intent that the Secretary lacked such authority. While Interior officials initially vacillated on the question of the Secretary's post-ANCSA authority, the Department now has conclusively resolved the issue. Interior properly exercised its authority to issue the Decision, which furthers the IRA's and the AIRA's goal of promoting tribal self-determination in Alaska. The policy views of former Interior

_____

in trust. *See* AR0001525–26.

13

*State of Alaska v. Newland et al.*                                        Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Case 3:23-cv-00007-SLG   Document 19   Filed 09/29/23   Page 20 of 49

officials cannot thwart Congress's express extension of this IRA benefit to the Tribe or other tribes in Alaska or change the fact that Congress declined to limit or repeal that authority in ANCSA.

### 1. Congress Did Not Explicitly Repeal AIRA Section 1

Had Congress intended to repeal Section 1 of the Alaska IRA, it could have done so by "using the same explicit references it used to repeal" the Alaska Native Allotment Act, 43 U.S.C. § 1617; to revoke existing reserves (*id.* § 1618); and, five years later, to repeal Section 2 of the Alaska IRA and the Alaska Native Townsite Act.[7] *See Flores-Miramontes v. INS*, 212 F.3d 1133, 1137 (9th Cir. 2000).

But ANCSA "did not explicitly revoke the Secretary's [Section 1] land-into-trust authority." *Akiachak*, 935 F. Supp. 2d at 203. Moreover, if Congress intended to revoke this authority, it had another opportunity to do so when it enacted FLPMA and repealed the Alaska Native Townsite Act and Section 2 of the Alaska IRA. But Congress opted not to repeal Section 1. *See* AR0000054; FLPMA § 704(a), 90 Stat. 2792; *Akiachak*, 935 F. Supp. 2d at 199–200.

---

[7] Contrary to the State's contention, ECF-16 at 47, ANCSA did not "end[] federal agencies' authority to take land into trust for individual Indians" by ending allotment. Section 1 authorizes the Secretary to acquire land in trust for individual Indians. FLPMA did not speak to that issue and expressly specified that "[n]othing in this Act shall be deemed to repeal any existing law by implication." FLPMA § 701(f).

14

## 2. Congress Did Not Implicitly Repeal AIRA Section 1

The unspoken gravamen of the State's case is that ANCSA implicitly repealed AIRA Section 1. It is a "cardinal rule . . . that repeals by implication are not favored," *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936), and the standard is "extremely strict," *Ledezma-Galicia v. Holder*, 599 F.3d 1055, 1064 (9th Cir. 2010). If "two statutes are capable of co-existence," then "it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (quoting *Mancari*, 417 U.S. at 551). The presumption against implied repeal "exist[s] for good reasons," among them "respect for the separation of powers." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) ("Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them.").

The Supreme Court has recognized "two well-settled categories of repeals by implication": "(1) where provisions in the two statutes are in irreconcilable conflict; and (2) where the later act covers the whole subject of the earlier one and is clearly intended as a substitute." *Posadas*, 296 U.S. at 503. The bar for finding implied repeal under either category is high: "[T]he intention of the legislature to repeal must be clear and manifest." *Id.*; *see also Ledezma-Galicia*, 599 F.3d at 1069–70. "Because it is possible to give effect to both ANCSA and [AIRA Section 1], it is the court's obligation to do so." *Akiachak*,

15

935 F. Supp. 2d at 207.

### a. There Is No Irreconcilable Conflict Between ANCSA and AIRA Section 1

"[T]he terms of [ANCSA] are 'capable of co-existence' with the power to take Alaska land into trust." *Akiachak*, 935 F. Supp. 2d at 206–07 (citing *Traynor v. Turnage*, 485 U.S. 535, 548 (1988)). As the D.D.C. explained, "[i]t is perfectly possible for land claims to be settled by transferring land and money to tribal corporations, while the Secretary retains the discretion—but not the obligation—to take additional lands (or, perhaps, those same transferred lands) into trust." *Id.* at 207.

The most obvious reason that the two statutes can co-exist is that ANCSA lands and Section 1 trust lands—along with other lands that are plainly "Indian country"— harmoniously exist in Alaska today. The State briefly acknowledges that the Secretary acquired land in trust under Section 1 for three southeast Alaska communities during the 1940s and 1950s. ECF-16 at 19–20, 44 n.136. But the State fails to mention that ANCSA did not revoke the trust status of those lands or that they remain in trust today.[8] *See* AR0000051 n.175; AR0001038 n.277; *Akiachak*, 935 F. Supp. 2d at 207 n.7; Cohen § 4.07(3)(b)(iii). Instead, the State cites to a 1955 statement by Delegate Bob Bartlett, who

_____

[8] Interior and Congress agreed in 1978 that the United States holds title to the Kake cannery lands in trust. AR0001038 n.277 (citing 124 Cong. Rec. 33468 (1978)).

erroneously opined in a statehood hearing that there was "no land held in trust in Alaska by the Federal Government for the benefit of Indians."[9] ECF-16 at 23. Not only was that statement inaccurate at the time, it does not undermine the fact that the Secretary had authority to accept land in trust under Section 1—authority that Congress never repealed.

In addition to the Southeast Alaska trust parcels, by a conservative estimate, there are more than 16,000 allotments and 4,000 Native townsites in Alaska—totalling 4 to 6 million acres—which, like trust land, are restricted and only alienable with approval of the Secretary. Natalie Landreth & Erin Dougherty, *The Use of the Alaska Native Claims Settlement Act to Justify Disparate Treatment of Alaska's Tribes*, 36 Am. Indian L. Rev. 321, 345–46 (2011). As the State acknowledges, those lands are "Indian country." ECF-16 at 16; *see also Alaska v. Native Village of Venetie*, 522 U.S. 520, 529 (1998) ("Indian allotments . . . [are] Indian country."). The addition of new trust land cannot create an irreconcilable conflict when ANCSA did not end a mixed land tenure that has endured for more than 50 years without presenting any such conflict.

Nor is there any provision of ANCSA that "shall have [no] meaning at all" if the

---

[9] Delegate Bartlett's position was not reflected in the Statehood Act, which included a disclaimer of the State's right and title to "any lands . . . the right or title to which . . . is held by the United States in trust for [Alaska N]atives." Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339 (1958).

*State of Alaska v. Newland et al.*                                    Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Secretary retains the authority exercised in the Decision. *See Akiachak*, 935 F. Supp. 2d at 206 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007)). As it did in *Akiachak*, the State relies heavily on ANCSA's declaration of policy, which provides in relevant part that "*the settlement* should be accomplished . . . without creating a reservation system or lengthy wardship or trusteeship." 43 U.S.C. § 1601(b) (emphasis added). As a threshold matter, "prefatory language" like ANCSA's declaration of policy is "insufficient to alter the substance of the phrases [it] precede[s], even when codified." *Gonzalez v. Google LLC*, 2 F.4th 871, 889 (9th Cir. 2021). The State fails to identify any "substantive provision" of ANCSA that conflicts with Section 1.[10] *See id.*

Even if the declaration of policy were accorded substantive force, Section 1 does not render it meaningless. The State claims that by accepting land in trust, the Secretary "claims the discretion to [undo] ANCSA's $962 million settlement." ECF-16 at 43. But even if ANCSA had revoked all existing trust and restricted lands, which it did not, "the fact that the *settlement* would not create a trusteeship does not necessarily mean that it prohibits the creation of any trusteeship *outside of the settlement*." *Akiachak*, 935 F. Supp. 2d at 207 (emphases added). The exercise of the Secretary's trust acquisition

---

[10] As it did in *Akiachak*, the State points to ANCSA's savings clause. ECF-16 at 47. As the D.D.C. found, that clause "does not help the State" because "there is no irreconcilable conflict here." *Akiachak*, 935 F. Supp. 2d at 207 n.9.

18

*State of Alaska v. Newland et al.*      Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Case 3:23-cv-00007-SLG   Document 19   Filed 09/29/23   Page 25 of 49

authority does not hamper or render meaningless any provision of ANCSA.[11]

Nor is the Secretary's authority irreconcilable with ANCSA's extinguishment of "[a]ll claims against the United States, the State, and all other persons" based on either "claims of aboriginal right, title, use, or occupancy of land or water areas in Alaska" or "on any statute or treaty of the United States relating to Native use or occupancy." 43 U.S.C. § 1603(c). A petition to have land taken into trust is not a "claim." *Akiachak*, 935 F. Supp. 2d at 205 ("[P]etitions to have land taken into trust are not 'claims,' because to grant or deny those petitions is within the discretion of the Secretary, *see* 25 U.S.C. § [5108], and a 'claim' is necessarily an assertion of [an existing] right."). Further, § 1603(c) extinguishes claims *against* the United States and other parties; a petition to have land taken into trust is not a claim against anyone. *Id.*

Relatedly, the State refers to the Secretary's decision to acquire land in trust as "resurrect[ing] aboriginal title," which ANCSA extinguished. ECF-16 at 43. The State's

---

[11] Nor do cherry-picked statements from Alaska Natives testifying before Congress prior to ANCSA's enactment assist the State. ECF-16 at 24–26. *See Akiachak*, 935 F. Supp. 2d at 206 n.5. The State's suggestion that the justified concerns of Alaska Natives in the immediate wake of termination be used today to deprive a federally recognized tribe of the benefits of the IRA's capstone provision—intended to promote, not diminish, self-determination and self-governance—defies not only logic, but conscience. Approval of a fee-to-trust request is the farthest cry from the forced removal of Indians or the disastrous policies of termination.

19

*State of Alaska v. Newland et al.*                                       Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Case 3:23-cv-00007-SLG   Document 19   Filed 09/29/23   Page 26 of 49

construal reveals its fundamental misunderstanding of bedrock principles of federal

Indian law. Aboriginal title "refers to land claimed by a tribe by virtue of its possession

and exercise of sovereignty rather than by virtue of letters of patent or any formal

conveyance." Cohen § 15.04(2). Unlike the acquisition of land in trust, which occurs only

at the discretion of the Secretary—and as a result of a formal conveyance of title of

tribally owned fee land to the federal government—aboriginal title is "not dependent on

[the] United States' recognition for its existence."[12] Cohen § 15.04(2); *see also Carcieri*

*v. Kempthorne*, 497 F.3d 15, 35–36 (1st Cir. 2007), *rev'd sub nom. on other grounds*,

*Carcieri v. Salazar*, 555 U.S. 379 (2009) (explaining that "aboriginal title . . . is not the

only basis for tribal sovereignty" and that "[h]owever aboriginal title . . . was lost, the

IRA [Section 5] provides an alternative means of establishing tribal sovereignty over

land").

---

[12] The State alleges that the AS-IA's "test for determining 'traditional homeland' . . . likely looks like the test for determining aboriginal title." ECF-16 at 44. To the extent the State suggests that consideration of the location of the Tribe's homelands under 25 C.F.R. § 151.11(b) somehow demonstrates that a trust acquisition resurrects aboriginal title out of thin air, this Court should reject that suggestion. The purpose and requirements of § 151.11(b) are forward-looking: to address potential effects of a trust acquisition on state and local governments. Establishing aboriginal title, on the other hand, is a fact-intensive inquiry requiring extensive examination of a tribe's pre-contact and contact-era history to confirm the exclusive, sovereign use of the subject lands. *Pueblo of Jemez v. United States*, 350 F. Supp. 3d 1052, 1093 (D.N.M. 2018). The two analyses share no common purpose or method.

*State of Alaska v. Newland et al.*                    Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Finally, courts—including the D.D.C. in *Akiachak*—have considered the effect of settlements of similar Indian land claims on the Secretary's IRA Section 5 trust acquisition authority. Together, the case law stands for the proposition that a settlement act extinguishes that authority only to the extent expressly required by the statute. For instance, like ANCSA, the Rhode Island Indian Claims Settlement Act extinguished all claims of aboriginal title. 25 U.S.C. §§ 1705(a)(2), 1712(a)(2). Like Alaska, Rhode Island argued that "the extinguishment of aboriginal title over land in Rhode Island precludes the later exercise of tribal sovereignty over Rhode Island land acquired by the Secretary in unrestricted trust." *Carcieri*, 497 F.3d at 35. The First Circuit disagreed, holding that "no language [in the settlement act] explicitly curtails, or even references, the Secretary's power under the IRA to take lands into trust and thereby to create Indian country" and explaining that "[t]rust acquisition is not incompatible with the extinguishment of aboriginal title." *Id.* at 34, 36.[13] Indeed, even when an Indian land claims settlement act has specifically precluded certain lands from being held in trust—e.g., in the case of the Connecticut Settlement Act, non-settlement lands acquired with settlement funds—courts

---

[13] The Supreme Court granted certiorari on the question whether this Settlement Act precluded the Secretary from taking land into trust, but the Court did not reach that question because it determined that the Narragansett Tribe was ineligible to have land taken into trust regardless. *See Carcieri*, 555 U.S. at 393 n.7.

have held that the Secretary retains authority to take *other* lands into trust. *Connecticut v. U.S. Dep't of the Interior*, 228 F.3d 82 (2d Cir. 2000). In other words, courts are hesitant to read into Indian land claims settlement statutes the wholesale extinguishment of the Secretary's trust acquisition authority. Only when Congress's intent is plain have courts concluded otherwise. *See Connecticut*, 228 F.3d at 90 (finding that the Maine Settlement Act's "broad provision that prevents lands not specifically covered by that Act from being taken into trust by the Secretary . . . is plain on its face and decisively supplants the Secretary's authority to take land into trust under the 1934 IRA beyond that expressly contemplated by the Maine Settlement Act"). ANCSA did not even address the Secretary's Section 1 authority, let alone extinguish it in part, much less in whole.

### b. ANCSA Does Not "Cover the Whole Subject"

The Court may also consider whether ANCSA "covers the whole subject"—in other words, whether ANCSA "plainly shows that it was intended . . . to prescribe the only rules with respect [to that subject]." *Ctr. for Investigative Reporting v. U.S. Dep't of Justice*, 14 F.4th 916, 928, 929 (9th Cir. 2021). The State cannot demonstrate that AIRA Section 1 and ANCSA cover the same "subject" or that ANCSA was "clearly intended as a substitute" for Section 1. *Posadas*, 296 U.S. at 503. First, the two statutes cover subjects "quite different" from one another. *See Radzanower*, 426 U.S. at 157. IRA Section 5 was enacted to authorize the Secretary to acquire land in trust for individuals

and tribes that qualify as "Indians" under Section 19 of the IRA. As then Secretary Ickes explained, if tribes in Alaska were to set up systems of local government, "it [would] be necessary to stipulate the geographical limits of their jurisdiction" by establishing reservations. H.R. Rep. No. 74-2244 at 4; *see also* AR0000037. Therefore, in addition to Section 2, Secretary Ickes observed that extending Sections 5 and 7 to Alaska was necessary for the establishment and administration of new reservations. *See* AR0000037.

Second, as discussed above, ANCSA did not dispose of all existing trust land in Alaska. Had Congress intended ANCSA to "cover the whole subject," it stands to reason that at the very least it would have included a provision in ANCSA eliminating existing trust land. Finally, the State points to Congress's decision to provide money and land to corporations instead of tribes as evidence that "Congress set up a system in Alaska that differed from that found in the rest of the country." ECF-16 at 11. But that difference matters here only if the subject of ANCSA were sufficiently broad to cover Section 1 or render it superfluous. To find in favor of the State on this point, the Court would need to read into ANCSA's silence congressional intent to deprive tribes in Alaska of one of the principal benefits of the IRA—arguably the most important Indian legislation ever enacted, which Congress took special pains to extend to Alaska.[14] The Court should

---

[14] This is not the first time ANCSA has been read too broadly to undermine the sovereignty of tribes in Alaska. *See* AR0001027–33 (explaining that the "unprecedented

decline that invitation.

### c. Post-Enactment Legislative History Does Not Demonstrate that ANCSA Repealed AIRA Section 1

The State relies on unenacted, proposed amendments to the IRA recommended by the Alaska Federation of Natives ("AFN") in the mid-1980s to support its position that ANCSA precludes the acquisition of land into trust. *See* ECF-16 at 30–31. As a preliminary point, "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation [since it] by definition could have had no effect on the congressional vote." *United States v. King*, 24 F.4th 1226, 1232 (9th Cir. 2022) (quoting *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011)).

Even if the Court were to consider the proposed amendments, they do not support the State's arguments. AFN's proposed amendments were intended to "reaffirm" the Secretary's existing authority—not to create new authority. *ANCSA: Hearing on H.R. 4162 Before the H. Comm. on Interior and Insular Affairs*, 99th Cong. 162, 216 (1986) (explanation of draft legislation to implement AFN resolution 35). That Congress declined to amend the IRA to reiterate a provision of the IRA that was already in effect cannot support the conclusion that Congress believed such authority had been revoked.

---

approach and structure of ANCSA" led some to characterize it as "'termination' legislation that forecloses the exercise of governmental jurisdiction by Native villages").

Indeed, it tends to show the opposite: Congress could have taken the opportunity to repeal Section 1 but did not do so.

Congress's decision to amend ANCSA to permit Native corporations to place land into trust under state, rather than federal, law is likewise unhelpful to the State. *See* ECF-16 at 30–31. The State posits that Congress's choice reflects "agreement" with the State's concern at the time that the qualified transferee entity option would have "strengthen[ed] the claim" that Indian country existed in Alaska. *Id.* at 28, 31. But as even the State acknowledges, *id.*, Congress expressly disclaimed that reading, explaining that the amendments neither "validate[d] [n]or invalidate[d] . . . the assumption that Indian country . . . exists or does not exist" in Alaska. Pub. L. No. 100-241, 101 Stat. 1814 (1988).

In sum, Congress has never repealed AIRA Section 1, and the authority Congress conferred on the Secretary remains today.

## II. Section 19's First Definition of "Indian" Does Not Limit the Secretary's Authority to Acquire Land in Trust in Alaska

Section 19 of the IRA defines "Indian" in four ways, one of which—the "Alaska Definition"—specifies that "*[f]or the purposes of [the IRA]*, Eskimos and other aboriginal peoples of Alaska *shall be considered Indians*." 25 U.S.C. § 5129 ("Alaska Definition") (emphases added). Indeed, the State *concedes* that Alaska Natives are "Indians" under the IRA. The Tribe satisfies the Alaska Definition, *see* AR0000006 n.31,

25

AR0000058, and the State does not argue otherwise.

The State wrongly argues, however, that the Tribe must *also* meet the first of Section 19's three preceding definitions: "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction," 25 U.S.C. § 5129. *See* ECF-16 at 58–59. In 2009, the Supreme Court held that the word "now" in the first definition meant 1934.[15] *Carcieri*, 555 U.S. at 395. But the first definition—the only definition considered by the Court in *Carcieri*—is not at issue here because the Alaska Definition provides an independent definition of "Indian." The Court should reject the State's contention that *Carcieri* or the first definition of "Indian" has any bearing on this case. The IRA's plain text, structure, and purpose demonstrate that the Tribe's eligibility does not hinge on any other of Section 19's definitions. To the extent any ambiguity exists, Interior's reasonable interpretation should be accorded deference.

## A. The State Concedes that All Alaska Natives Are "Indians" Under the IRA

IRA Section 5 authorizes the Secretary to acquire land in trust for "Indians."

---

[15] The State misconstrues the requirements of the first definition. The first definition of "Indian" in Section 19 imposes no requirement that a tribe demonstrate it was *recognized* in 1934—as opposed to only under federal jurisdiction. *See, e.g.*, *County of Amador v. U.S. Dep't of Interior*, 872 F.3d 1012, 1024–27 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 64 (2018); *Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 559–65 (D.C. Cir. 2016).

25 U.S.C. § 5108. The State concedes that "all indigenous peoples of Alaska" constitute "Indians" and that "Eskimos and all other Alaskan Natives are also entitled to the benefits of the IRA." ECF-16 at 54–55. In other words, the State agrees that Alaska Natives are "Indians" for the purposes of the IRA. The Court's inquiry should end there. *See Stand Up for Cal.! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 287 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018) (finding that tribes must satisfy no more than one Section 19 definition). Any further argument that the Secretary lacks the power to acquire land in trust for Alaska Natives because they are not Indians is "wasting this Court's time." *Id.* at 287.

Nevertheless, in the same breath, the State maintains that Section 19's provision that "[f]or the purposes of [the IRA], Eskimos and other aboriginal peoples of Alaska shall be considered Indians," 25 U.S.C. § 5129, is not a "stand-alone definition of 'Indian.'" ECF-16 at 55. As discussed below, the Alaska Definition unambiguously provides an independent definition of "Indian" that is not conditioned on compliance with any other "Indian" definition in the IRA. *See*, *e.g.*, *Stand Up*, 204 F. Supp. 3d at 287.

### B. The Alaska Definition Is an Independent Definition of "Indian"

Alaska Natives are included "as a separately defined group of 'Indians'" in Section 19. AR0000056. Despite the plain language of this provision, the State contends that the Alaska Definition "is not a stand-alone definition of 'Indian.'" ECF-16 at 55. In

*State of Alaska v. Newland et al.*                                    Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

so arguing, the State asks this Court to add an additional statutory requirement that an Alaska tribe petitioning to have land taken into trust must *also* satisfy the first definition of Section 19. That argument has no basis in the statutory text or elsewhere.

In ascertaining the meaning of any statute, a court "begin[s], as always, with the statutory text." *Hernandez v. Williams*, 829 F.3d 1068, 1072 (9th Cir. 2016) (citing *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004)). "When an examination of 'the plain language of the statute, its structure, and purpose' clearly reveals congressional intent, [the] 'judicial inquiry is complete.'" *Id.* at 1073. Only when "the plain meaning of the statutory text remains unclear after consulting internal indicia of congressional intent" may a court turn to "extrinsic indicators, such as legislative history, to help resolve the ambiguity." *Id.*

When a court deems a statute ambiguous even after application of the traditional tools of statutory interpretation, and the court "ha[s] the benefit of an administrative agency's interpretation, [the court] may defer to it if it is 'based on a permissible construction of the statute.'" *Eleri v. Sessions*, 852 F.3d 879, 882 (9th Cir. 2017) (quoting *Chevron*, 467 U.S. at 843). Here the Alaska Definition in Section 19 is not ambiguous. But even if it were, any ambiguity should be interpreted in the Tribe's favor.

### 1. The Plain Text and Structure Demonstrate that the Alaska Definition is Independent

Beginning with the text and structure, Alaska Natives are a "separately defined

28

group" of "Indians" whose definition "stands apart from and is not dependent upon any other definition" in Section 19. *See* AR0000056, AR0000056 n.213 (noting that the Alaska Definition "includes no temporal limitation similar to the 'now'" in the first definition, further underscoring its distinctiveness). Section 19 states unequivocally that, "[f]or the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians." 25 U.S.C. § 5129; *see* AR0000057–58. The meaning of the Alaska Definition is as plain as its text. "Shall" ordinarily means "must," and renders its definition mandatory. AR0000057 (citing *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1030 (D.C. Cir. 2016)). Dictionaries at the time of enactment defined "considered" as "[d]eemed; determined; adjudged; reasonably regarded," or "[t]o view as in a certain relation; to regard; to judge." *Id.* at 0000057–58 (citing Black's Law Dictionary, 406 (3d ed. 1933) and Webster's New International Dictionary, 568–69 (def. 5(a)) (2d ed. 1934)). The Alaska Definition therefore directs the reader to "regard" or "deem[]" Alaska Natives as Indians under the Act. That makes Alaska Natives "Indians" under the IRA and, therefore, the Secretary has authority to acquire land in trust for tribes in Alaska under Section 5. *Id.* at 0000057.

Nor does the Alaska Definition contain any reference to the other three definitions, or vice versa, that would suggest that eligibility under the Alaska Definition is conditioned on satisfaction of one of the preceding definitions. Congress could have

29

said that "Eskimos and other aboriginal peoples of Alaska *may* be considered Indians," suggesting that compliance with other definitions might be required. It did not. Nor did it qualify the definition by stating that Alaska Natives "shall" be considered Indians "so long as they meet one of the three definitions in the preceding sentence." *See* AR0000058. That latter clause or a similar conditional statement appears nowhere in Section 19, and the Court should resist the State's invitation to rewrite Section 19 in such a manner. *See* ECF-16 at 50–55.

The canon against surplusage also counsels in favor of reading the Alaska Definition as standalone. *See* AR0000056. Under that canon of statutory construction, "every word and every provision is to be given effect" and "none should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *Mendoza-Linares v. Garland*, 51 F.4th 1146, 1163 (9th Cir. 2022). But if the State's interpretation is correct—that to qualify as "Indian," a tribe in Alaska must also meet one of the first three definitions—then the Alaska Definition is rendered surplusage with "no consequence," *see id.*; ECF-16 at 50–55.

Finally, reading the Alaska Definition as an independent definition of "Indian" "is consistent with the broad remedial purposes" of the IRA and AIRA. AR0000062. The IRA ushered in a new era of federal Indian policy in which Congress sought to "rehabilitate the Indian's economic life," and "give the Indians the control of their own

30

affairs and of their own property," *id.* (citing *Mescalero*, 411 U.S. at 152). As the 2022

M-Opinion explains:

> By including Alaska Natives separately in the definition section of the IRA,
> Congress meant for them to use directly the five applicable portions of the
> IRA as originally enacted and those later made applicable by the Alaska IRA,
> for the same goals of economic development and self-governance available
> for Indian tribes in the lower 48 states.

*Id.*

The plain text, structure, and purpose of Section 19 "clearly reveal[] [Congress's]

intent" to include a standalone definition of "Indian" comprising "Eskimos and other

aboriginal peoples of Alaska," 25 U.S.C. § 5129. *See Hernandez*, 829 F.3d at 1073. No

ambiguity remains. The Court therefore need not examine "extrinsic indicators" like

legislative history, *see id.*, or rely on canons designed to interpret ambiguity. Nor must it

examine any of Section 19's "alternative definitions of Indian," just as "there was no

need for the Secretary" to do so, *Stand Up*, 204 F.Supp.3d at 287. "Under *Carcieri*, it is

ultimately irrelevant 'which definition [in Section 19] is applicable'" so long as the tribal

applicant satisfies one of them. *Id.*

> ### 2. Legislative History and Post-IRA Department Guidance Do Not Support the State's Argument that Alaska Tribes Must Meet Another Definition of "Indian"

Because the Alaska Definition's plain language, structure, and purpose clearly

reveal congressional intent, the Court does not need to examine extrinsic indicators like

legislative history to determine its meaning. *Hernandez*, 829 F.3d at 1073. Nevertheless,

31

the State relies on such indicators, including legislative history and post-IRA internal Department guidance, to argue that Alaska tribes must meet the first definition of "Indian." Neither is necessary to construe the Alaska Definition's meaning. And even were the Court to consider these indicators, neither supports the State.

The State first argues that Congress meant to wade into to an anthropological debate about whether aboriginal peoples of Alaska were "Indians." *See* ECF-16 at 54–55. In support, the State cites 19th and early 20th century sources exploring race and Indian status, as well as a smattering of statutes and a congressional statement that list, in various combinations, Indians, Eskimos, and Aleuts. *See id.* To the State, this evidence proves that Congress intended the Alaska Definition as merely "a clarification" ensuring "that certain ethnographically distinct Alaskans were not excluded from the benefits of Indian legislation."[16] *Id.* at 55.

But Congress already made its purpose clear, and it wasn't to make an ethnographic clarification. Rather, Congress included the Alaska Definition in the IRA to resolve specific Indian policy concerns. As Commissioner of Indian Affairs John Collier explained in a May 1934 hearing, the Alaska Proviso (Section 13) and Alaska Definition

---

[16] As noted, this concedes that Alaska Natives are "Indians" under the IRA. *See supra* at 28–29.

*State of Alaska v. Newland et al.*                    Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

would "extend the land acquisition and credit benefits to these Alaska Indians who are pure-blood Indians and very much in need, and they are neglected, and they are Indians pure and simple." AR0000061; *see generally id.* at 0000058–61. The legislative history makes plain that the Alaska Definition was intended to ensure that the IRA applied to Alaska Natives without conditioning its application on compliance with the statute's other definitions. The State fails to point to any evidence in support of its theory that debates over the ethnographic status of Alaska Natives animated Congress in 1934.

The State also relies on selected pieces of Interior correspondence from the 1930s to argue that the Alaska Definition does not stand alone, but such reliance is misplaced. *See* ECF-16 at 55. One is an undated, handwritten note from Assistant Solicitor Cohen venturing that Section 19 requires Alaska Natives to meet one of the first three definitions. AR0004427. The other is an internal 1937 memo in which Cohen and two other Assistant Solicitors submit that the Alaska Definition "should be read in connection" with the first three, while acknowledging that "this conclusion can be reopened" later. AR0003268. To be sure, Cohen was pivotal to Interior's implementation of the IRA and had a thorough knowledge of Indian law. *See* AR0000063–65. But this extrinsic evidence cannot trump the statute's plain text and meaning.[17]

---

[17] The Cohen note's persuasive value is diminished by its "impromptu" nature, as is the value of the 1937 memo by the fact that it did not contain "formal legal analyses for the

33

Furthermore, Secretary Ickes himself thought the Alaska Definition swept more broadly. Ickes wrote to the Chair of the Senate Indian Affairs Committee in 1939 that Interior understood AIRA Section 1, applying Section 19 to Alaska, as having brought Alaska Indians and Eskimos "fully within the terms" of the IRA. AR0000064–65. Secretary Ickes's interpretation underscores that selected post-enactment correspondence cannot override the Alaska Definition's clear text, structure, and purpose, or—should the Court consider it—the legislative history of the IRA discussed above, in which Commissioner Collier made the intent of the Definition plain.

Even if the Court finds the Alaska Definition to be ambiguous, deference principles and the Indian canons of construction weigh in favor of interpreting the Alaska Definition as independent. Interior's conclusion regarding the independence of the Alaska Definition, AR0000057, is "based on a permissible construction" of the statute, *Eleri*, 852 F.3d at 882 (quoting *Chevron*, 467 U.S. at 843), and evinces "thoroughness . . . in its consideration," "validity" in "its reasoning," and "consistency with earlier and later pronouncements[.]" *Skidmore*, 323 U.S. at 140. Moreover, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit[.]" *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). The State urges a

---

Department." AR0000063–64.

*State of Alaska v. Newland et al.*                          Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

reading of the Alaska Definition that would frustrate the IRA's purposes and goals with respect to tribes in Alaska. The Court should reject such a reading.

In sum, the State's concession that the Tribe and other tribes in Alaska are "Indians" for the purposes of the IRA confirms that the Secretary's authority to acquire land in trust for "Indians" was properly applied in the Decision. The State's flawed attempt to rewrite the Alaska Definition to impose inapplicable conditions on the Secretary's authority does not demonstrate error in the Decision and must be rejected.

### III. This is Not a Major Questions Case

As set forth in Sections I and II, the Secretary has the authority to take the land at issue here in trust for the Tribe. The authority Congress expressly conferred on the Secretary in AIRA Section 1 to take land in trust in Alaska has never been repealed, and Section 19 contains a standalone definition of "Indian" under which the Tribe is eligible to have land acquired in trust for its benefit. But in search of a more favorable narrative, the State asks the Court to view this matter as a rare "extraordinary case" demanding application of the "major questions doctrine" articulated by the Supreme Court last year. *See West Virginia v. EPA*, 142 S. Ct. 2587 (2022). This is a red herring. This is not a major-questions case, and even if it were, the Court should uphold the Decision.

The major questions doctrine can only apply when an agency claims authority that a reviewing court deems to be of "vast economic and political significance." *Id.* at 2605

35

(quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). The Secretary's trust acquisition authority does not fit that bill. And even if it did, the doctrine would be satisfied because the Secretary has clear congressional authorization to take the Property in trust for the Tribe.

### A.  This Case Does Not Raise a Major Question

The major questions doctrine does not apply because the State has not identified a "major question." This case presents two legal questions: (1) whether the Secretary has authority to acquire land in trust for Indians in Alaska under AIRA Section 1; and, if so, (2) whether a tribe in Alaska must satisfy the first definition of IRA Section 19. Both issues are undeniably important to the parties. But they are not of "vast economic and political significance," and Interior has not asserted "extravagant statutory power over issues of the national economy." *Id.* at 2609 (quoting *Util. Air*, 573 U.S. at 324). This case simply does not involve the assertion of "sweeping and consequential authority," *id.* at 2608, akin to that at issue in major questions doctrine cases (e.g., interpretations allowing an agency to "substantially restructure the American energy market," *see id.* at 2610, or to "cancel[] roughly $430 billion of federal student loan balances, completely erasing the debts of 20 million borrowers," *see Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023)). Unsurprisingly, plaintiffs throughout the lower courts have invoked the doctrine in a variety of cases, only to have courts swiftly conclude that the issue at bar is not a

36

major question. *See, e.g.*, *Alaska Indus. Dev. v. Biden*, No. 3:21-cv-00245-SLG, 2023

U.S. Dist. LEXIS 136474, *25 (Aug. 7, 2023).

The State contends that this is a major questions case because the acquisition of

trust land in Alaska "rebalance[s] territorial jurisdiction" by "resurrecting" aboriginal

title. ECF-16 at 43. Aside from the fact that accepting land in trust does no such thing, the

State does not articulate the "vast economic and political" effects upon which its

argument rests. Of course, acquisition of a 787-square-foot parcel in Juneau may have

minor practical consequences for the State.[18] But criminal jurisdiction in Indian country

will remain with the State because Alaska is a Public Law 280 State. AR0000008. If the

State has concerns about effects on civil jurisdiction, it does not articulate them. Nor did

it do so in its comments on the proposed acquisition in 2017 or 2022. *See* AR0000345

(2017 comments, in which the State did not challenge the Secretary's trust authority at

all) and AR0000087 (2022 comments). To the extent the State premises its claims on

typical civil jurisdiction concerns—e.g., effects on regulatory jurisdiction and taxation

authority—the Secretary must, and in this case did, consider those impacts under 25

C.F.R. § 151.11(d), which the State fails to challenge here.[19] AR0000013–16; *see*

---

[18] As previously noted, the State did not challenge a trust acquisition in Craig in 2017 and
does not allege here that such acquisition had vast economic and political consequences.

[19] The City and Borough of Juneau, which stands to bear the brunt of any change in civil

37

*Akiachak*, 935 F. Supp. 2d at 207 n.8.

The State also relies on another rule requiring "Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Sackett v. EPA*, 143 S. Ct. 1322, 1341 (2023). According to the State, the decision to accept land into trust for the Tribe alters that balance by "creating Indian country in Alaska." ECF-16 at 44. The State is correct that the Property acquired will be Indian Country. *See Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142, 1149–50 (9th Cir. 2020). Setting aside the fact that millions of acres of Indian country already exist in Alaska, this case does not involve a sweeping alteration of the balance between federal and state power because taking land into trust for Indians does not "lie[] at the core of traditional state authority." *Sackett*, 143 S. Ct. at 1341. Nor does it implicate private property concerns; the only property that can be taken into trust is land that, as here, is voluntarily conveyed to the United States to hold in trust for the requesting tribe.

Because this case does not involve an assertion of authority that falls within the narrow purview of the major questions doctrine, the Court should consider the matter no

---

jurisdiction, has worked closely with the Tribe to ensure a smooth transition of the Property into trust. *See* AR0000006-7.

*State of Alaska v. Newland et al.*                                    Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

further.

### B. AIRA Section 1 and the Alaska Definition Clearly Authorize the Secretary to Take Land in Trust for the Tribe

Even were the Court to deem this an "extraordinary case" warranting application of the major questions doctrine, Congress spoke with sufficient clarity to authorize the Secretary to acquire land in trust for the Tribe. In cases like *West Virginia v. EPA*—in which the Court found that EPA relied on "vague language" in an "ancillary provision" of the Clean Air Act to justify the assertion of authority the Court deemed of "vast economic and political significance," 142 S. Ct. at 2610—the Court eschewed "routine statutory interpretation" in favor of the standard established by a requirement for "clear congressional authorization," *id.* at 2609. But when an agency relies on plain language directly conferring the precise authority at issue, that constitutes "clear congressional authorization."[20]

_____

[20] The State contends that the Supreme Court effectively applied the major questions doctrine in *Hynes v. Grimes Packing Co.*, 337 U.S. 86 (1949). ECF-16 at 42 & n.127. As a threshold matter, *Hynes* is irrelevant to this case because it addressed the Secretary's authority to create Section 2 reservations, not to acquire land in trust under Section 1. Further, even were the rule relied upon in *Hynes* equivalent to today's major questions doctrine, it does not assist the State. The language in AIRA Section 2 was *ambiguous* as to whether reservations created pursuant to that section were permanent. The Court held that it "would take specific and unambiguous legislation to cause us to rule that Congress intended to authorize the Secretary of the Interior" to create permanent reservations, *id.* at 105, and that, therefore, Section 2 "convey[ed] no right of use or occupancy to the beneficiaries beyond the pleasure of Congress or the President [and] such rights may be

39

Here, however, Congress clearly authorized the Secretary to acquire land in trust in Alaska under AIRA Section 1 (providing that the Secretary's IRA trust acquisition authority "shall hereafter apply to the Territory [State] of Alaska"), *see supra* Section I, and to do so for the Tribe under Section 19 (providing that Alaska Natives "shall be considered Indians" for the purposes of the IRA), *see supra* Section II. Thus, even if the major questions doctrine were applicable to this case (and it is not) it cannot provide a basis to invalidate the Decision.

## CONCLUSION

For the foregoing reasons, the United States respectfully asks this Court to deny the State's Motion and grant the United States' Cross-Motion for Summary Judgment.

DATED:  September 29, 2023.

--------------------------------------

terminated by the unilateral action of the United States without legal liability for compensation in any form," *id* at 103. No such ambiguity features in this case.

*State of Alaska v. Newland et al.*                                    Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

/s/ *Charmayne G. Staloff*
CHARMAYNE G. STALOFF, Trial Attorney
WILLIAM J. CRUM, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
OF COUNSEL:                          Washington, D.C. 20044
Robert Hitchcock, Attorney-Advisor   TEL:  (202) 616-3148
Melissa Thaisz, Attorney-Advisor     FAX:  (202) 305-0275
Office of the Solicitor              Email: charmayne.staloff@usdoj.gov
U.S. Department of the Interior       *Attorneys for the United States*

41

*State of Alaska v. Newland et al.*                              Case No. 3:23-cv-00007-SLG
U.S. Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and Opposition

Case 3:23-cv-00007-SLG   Document 19   Filed 09/29/23   Page 48 of 49

**CERTIFICATE OF SERVICE**

I, Charmayne G. Staloff, hereby certify that, on September 29, 2023, the foregoing UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT AND CONSOLIDATED MEMORANDUM IN SUPPORT OF CROSS-MOTION AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT will be sent electronically to the registered parties as identified on the Notice of Electronic Filing.

*/s/ Charmayne G. Staloff*
CHARMAYNE G. STALOFF, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice

**CERTIFICATE OF WORD COUNT**

I certify that this document complies with Local Rule 7.4(a)(1) because it contains 9,959 words.