Richard D. Monkman
rdm@sonosky.net
Lloyd B. Miller
lloyd@sonosky.net
Whitney A. Leonard
whitney@sonosky.net
Sonosky, Chambers, Sachse,
  Miller & Monkman, LLP
510 L Street, Suite 310
Anchorage, Alaska 99501
Telephone: (907) 258-6377

*Attorneys for Tlingit & Haida*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 3:23-cv-00007-SLG |
| | ) |
| BRYAN NEWLAND *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| CENTRAL COUNCIL OF TLINGIT & | ) |
| HAIDA INDIAN TRIBES OF | ) |
| ALASKA, | ) |
| | ) |
| Intervenor-Defendants. | ) |

**TLINGIT & HAIDA'S CONSOLIDATED CROSS-MOTION FOR SUMMARY JUDGMENT, MEMORANDUM IN SUPPORT, AND OPPOSITION TO STATE OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

    I.     TLINGIT & HAIDA'S CONNECTION TO THE TRUST
          LAND ........................................................................................... 3

    II.    NATIVE LAND TENURE IN ALASKA ..................................... 5

ARGUMENT .......................................................................................................... 10

    I.     THIS CASE DOES NOT IMPLICATE THE MAJOR
          QUESTIONS DOCTRINE. ....................................................... 10

    II.    EVEN IF A CLEAR STATEMENT WERE NEEDED, THE
          IRA CLEARLY GIVES THE SECRETARY THIS
          AUTHORITY .............................................................................. 15

          A.    The Grant of Authority in the IRA and the Alaska IRA
               is Exceptionally Clear. ..................................................... 16

          B.    By Definition, Alaska Tribes are "Indians" Pursuant to
               Section 19. ......................................................................... 18

          C.    Even if the State's Section 19 *Carcieri* Test Applied,
               Tlingit & Haida Satisfies It. ............................................. 21

CONCLUSION ...................................................................................................... 28

i

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 2 of 39

# TABLE OF AUTHORITIES

**Cases**

*Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100 (D.C. Cir. 2016)..................................................................................................18, 19

*Akiachak Native Community v. Salazar*, 935 F. Supp. 2d 195 (D.D.C.)....................18, 20

*Alaska Indus. Dev. & Exp. Auth. v. Biden*, No. 3:21-CV-00245-SLG, 2023 WL 5021555 (D. Alaska Aug. 7, 2023) ........................................................12

*Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520 (1988) ..............................8, 9

*Aleknagik Natives Ltd. v. United States*, 886 F.2d 237 (9th Cir. 1989) ..............................7

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ...................................................................11, 15

*Carcieri v. Salazar*, 555 U.S. 379 (2009)......................................................................19, 20

*County of Amador v. United States Department of the Interior*, 872 F.3d 1012 (9th Cir. 2017) ......................................................................23, 24

*County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985)....................................14

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) .........................................................17

*Hynes v. Grimes Packing Co.*, 337 U.S. 86 (1949) ...........................................................14

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996) ...........................................17

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237 (1985)....................................................................................................19

*People of South Naknek v. Bristol Bay Borough*, 466 F. Supp. 870 (D. Alaska 1979).....................................................................................................8

*Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497 (1936).................................................18

*Sackett v. E.P.A.*, 598 U.S. 651 (2023)......................................................................11, 15

*State of Alaska v. Central Council of Tlingit and Haida Indian Tribes of Alaska,* 371 P.3d 255 (Alaska 2016) ...........................................................10

*State of Alaska v. United States*, 2016 WL 1948801 (May 3, 2016)................................22

ii

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 3 of 39

*Tlingit & Haida Indians of Alaska v. United States*, 177 F. Supp. 452 (Ct. Cl. 1959) ............................................................................................. passim

*United States v. Ramsay*, 271 U.S. 467 (1926) .................................................. 8

*Weisberg v. Webster*, 749 F.2d 864 (D.C. Cir. 1984) ...................................... 18

*West Virginia v. E.P.A.*, 142 S. Ct. 2587 (2022) ........................... 11, 12, 13, 16

**Federal Statutes**

25 U.S.C. § 1305(a) .............................................................................................. 9

25 U.S.C. § 5108 ............................................................................. 13, 16, 17, 19

25 U.S.C. § 5119 ......................................................................................... 13, 17, 20

25 U.S.C. § 5129 ................................................................................................. 21

28 U.S.C. § 2401 ................................................................................................. 12

43 U.S.C. § 1617(a) ............................................................................................. 6

43 U.S.C. § 1618(a) ............................................................................................. 7

43 U.S.C. § 1626(d) ............................................................................................. 9

Act of May 17, 1884 § 8, 23 Stat. 24 (1884) .................................................... 27

Alaska Indian Reorganization Act Amendments of 1936, Pub. L. No. 74-538, ch. 254, §1, 49 Stat. 1250 (1936) (codified as amended at 25 U.S.C. § 5119) ............................................................................................................ 1

Alaska Land Status Technical Corrections Act of 1992, Pub. L. No. 102-415, 106 Stat. 2112 (1992) ............................................................................ 6

Alaska Land Transfer Acceleration Act, Pub. L. No. 108-452, tit. III, §§ 302–304, 118 Stat. 3575, 3588–90 (2004) ...................................................... 6

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, § 905, 94 Stat. 2371, 2435 (1980) (codified at 43 U.S.C. § 1634).................... 6

Alaska Native Allotment Act, Pub. L. No. 59-171, ch. 2469, 34 Stat. 197 (1906)............................................................................................................... 6

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Alaska Native Claims Settlement Act, Pub. L. No. 92-203, 85 Stat. 688
(1971) (codified as amended at 43 U.S.C. §§ 1601–1629h) ............................................. 1

Alaska Native Townsite Act, Pub. L. No. 69-280, ch. 379, 44 Stat. 629
(1926) (formerly codified at 43 U.S.C. §§ 732–36) ........................................................ 6

Alaska Tribal Public Safety Empowerment Act, Pub. L. No. 117-103,
subtit. B, §§ 811–13, 136 Stat. 49, 904–10 (2022) (codified in part at 25
U.S.C. § 1305) ................................................................................................................ 10

Federal Land Policy Management Act, Pub. L. No. 94-579, 90 Stat. 2744
(1976) (codified in part at 43 U.S.C. §§ 1701-1703) ........................................... 1, 17, 18

Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, tit. I,
§ 104, 108 Stat. 4791, 4792 (codified at 25 U.S.C. §§ 5130, 5131) .............................. 3

Indian Reorganization Act of 1934, Pub. L. No. 73-383, ch. 576, §5, 48
Stat. 984, 985 (1934) (codified as amended at 25 U.S.C. § 5108). ................................ 1

John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub.
L. No. 116-9, § 1119, 133 Stat. 580, 630–34 (2019) (codified at 43
U.S.C. § 1629g–1) .......................................................................................................... 8

Pub. L. No. 95-487, 92 Stat. 1635 (1978) ......................................................................... 7

Tlingit and Haida Claims Authorization Act, Pub. L. 74-152, § 8, 49 Stat.
388, 390 (1935), *as amended by* Pub. L. 89-130, 79 Stat. 543, 544 (1965).............. 3, 29

**State Statutes**

Alaska Tribal Recognition Act, AS 01.15.100 .................................................................... 3

**Federal Rules and Regulations**

25 C.F.R. pt. 151 ............................................................................................................... 12

Indian Entities Recognized by and Eligible To Receive Services From the
United States Bureau of Indian Affairs, 88 Fed. Reg. 2112 (Jan. 12,
2023) ................................................................................................................................. 3

Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76888 (Dec. 23,
2014) .......................................................................................................................... 10, 18

iv

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 5 of 39

Land Acquisitions; Craig Tribal Association, Craig, Alaska, 82 Fed. Reg. 4915 (Jan. 17, 2017) ....................................................................... 7

**Other Authorities**

"*Traditional Tlingit Country, Tlingit Tribes, Clans and Clan Houses*," University of Alaska, Alaska Native Knowledge Network, http://www.ankn.uaf.edu/ancr/southeast/tlingitmap/TlingitMap.pdf (last visited Oct. 11, 2023) ..................................................................... 26

Alaska Native Allotment Act Entitlements, Bureau of Land Mgmt., https://www.blm.gov/programs/lands-and-realty/regional-information/alaska/land_transfer/ak-native-allotment-act (last visited Oct. 11, 2023) ....................................................................... 8

*Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior for the Year 1875* (1875) .............................................. 26

*Annual Report of the Department of the Interior, "Origin of the Kake War"* (1870)....................................................................................... 27

Arnold, Robert B., ALASKA NATIVE LAND CLAIMS (1978)............................. 10

*Elder reveals the history, knowledge embedded in Tlingit place names*, Sealaska Heritage Foundation: Blog, https://www.sealaskaheritage.org/node/438 (last visited Oct. 11, 2023) ........................ 4

Goldschmidt, Walter R. & Haas, Theodore H., HAA AANÍ / OUR LAND: TLINGIT AND HAIDA LAND RIGHTS AND USE (1998) ...................................... 5

HAIDA GWAII: HUMAN HISTORY AND ENVIRONMENT FROM THE TIME OF THE LOON TO THE TIME OF THE IRON PEOPLE (Daryl W. Fedje & Rolf W. Mathewes eds., 2005) ............................................................... 3

Jones, Z., Search For and Destroy: U.S. Army Relations with Alaska's Tlingit Indians and the Kake War of 1869, ETHNOHISTORY 60:1 (Winter 2013)..................................................................................... 25, 26

Krause, Aurel, THE TLINGIT INDIANS (1956).............................................. 4, 5

Nat'l Park Serv. Am. Battlefield Prot. Program, *The 1869 Bombardment of Ḵaachx̱an.áak'w from Fort Wrangell: The U.S. Army Response to Tlingit Law, Wrangell, Alaska* (July 2015) ............................................. 27

v

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 6 of 39

Newton, Nell Jessup, ed. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW
(2005 ed.) ................................................................................................................ 8

*Our History*, Central Council Tlingit & Haida Indian Tribes of Alaska,
http://www.ccthita.org/about/history/index.html (last visited Oct. 11,
2023) ...................................................................................................................... 4

*Shelling of the Alaskan Native American Village of Angoon, October 1882*,
U.S. Naval History and Heritage Command (Oct. 30, 2017),
https://www.history.navy.mil/research/library/online-reading-room/title-
list-alphabetically/s/shelling-of-the-alaskan-native-american-village-of-
angoon-october-1882.html ................................................................................ 27

Tlingit & Haida, *Tribal Enrollment Report* (Sept. 7, 2023),
https://www.ccthita.org/services/enrollment/TribalEnrollmentReport.pdf. .................... 5

U.S. Bureau of Ed., *Work of the Bureau of Education for the Natives of
Alaska* (1925) ...................................................................................................... 24

U.S. Dep't of Interior, Solic.'s Op. M-26915, *Status of Alaska Natives*,
*reproduced in* I OP. SOLICITOR 303 (1932) ...................................................... 29

U.S. Dep't of Interior, Solic.'s Op. M-36795, *Governmental Jurisdiction of
Alaska Native Villages Over Land and Nonmembers* (Jan. 11, 1993) .................. 6, 7, 8

U.S. Dep't of Interior, Solic.'s Op. M-37029, *The Meaning of "Under
Federal Jurisdiction" for Purposes of the IRA* (Mar. 12, 2014) ............................. 23, 24

U.S. Dep't of Interior, Solic.'s Op. M-37070, *Withdrawal of Certain
Solicitor M-Opinions, Reinstatement of Sol. Op. M-37029* The Meaning
of 'Under Federal Jurisdiction' for Purposes of the Indian Reorganization
Act, *and Announcement Regarding Consultation on "Under Federal
Jurisdiction" Determinations* (Apr. 27, 2021) .......................................................... 23

U.S. Dep't of Interior, Solic.'s Op. M-37076, *The Secretary's Land into
Trust Authority for Alaska Natives and Alaska Tribes Under the Indian
Reorganization Act and the Alaska Indian Reorganization Act* (Nov. 16,
2022) .............................................................................................................. 16, 20, 21

U.S. Dep't of Interior, Solic.'s Op., *Leasing of Lands within Reservations
in Alaska*, 49 L.D. 592 (1923), *reproduced in* II OPINIONS OF THE
SOLICITOR OF THE DEPARTMENT OF THE INTERIOR RELATING TO INDIAN

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

AFFAIRS 1917-1974, at 2076 ("OP. SOLICITOR"), *available at*
https://thorpe.law.ou.edu/solicitor.html (last visited Oct. 15, 2023) ............................ 29

U.S. Gov't Accountability Off., GAO-22-104627, *Native American
Veterans: Improvements to VA Management Could Help Increase
Mortgage Loan Program Participation* (2022) ............................................................. 8

Wright, Charles Alan, & Miller, Arthur R., FEDERAL PRACTICE AND
PROCEDURE § 3533.10.3 (3d ed. 2008) ......................................................................... 18

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

## INTRODUCTION

Section 5 of the Indian Reorganization Act of 1934 (IRA)[1] and Section 1 of the Alaska Indian Reorganization Act Amendments of 1936 (Alaska IRA)[2] expressly authorize the Secretary of the Interior to take land into trust for the benefit of Alaska Native Tribes. These IRA sections have never been repealed, including by the 1971 Alaska Native Claims Settlement Act (ANCSA),[3] the 1976 Federal Land Policy Management Act (FLPMA),[4] or any other provision of law. Nowhere does the State argue otherwise.

As such, it is impossible to credit the State's principal argument that the Secretary's trust acquisition for the Tlingit & Haida Indian Tribes is incompatible with some master plan developed by Congress in 1971 to address Alaska Native land tenures in one way, and one way only. There never was such a plan. Instead, history has witnessed a succession of different congressional approaches to Alaska Native land tenure, almost all of which survive today, each addressing different perceived needs and changing policies, and all compatible with the continued presence and addition of new trust or restricted lands. The Secretary's action on review here falls comfortably within that long, rich, and diverse tradition.

---

[1] Pub. L. No. 73-383, ch. 576, §5, 48 Stat. 984, 985 (1934) (codified as amended at 25 U.S.C. § 5108).

[2] Pub. L. No. 74-538, ch. 254, §1, 49 Stat. 1250 (1936) (codified as amended at 25 U.S.C. § 5119).

[3] Pub. L. No. 92-203, 85 Stat. 688 (1971) (codified as amended at 43 U.S.C. §§ 1601–1629h).

[4] Pub. L. No. 94-579, 90 Stat. 2744 (1976) (codified in part at 43 U.S.C. §§ 1701-1703).

1

Tlingit & Haida fully supports the arguments presented in the Secretary's opening brief.  As the Secretary explains, this Court is confronted with a simple legal question:  Did Congress in ANCSA implicitly repeal Section 1 of the Alaska IRA?  The answer turns not on competing visions of Alaska Native policy, but on a disciplined application of settled law that controls whether a later statute will be found to have silently but implicitly repealed an earlier one.  As the Secretary explains well (and as discussed below), ANCSA does not satisfy the rigorous standard for an implicit repeal; the "major questions doctrine" cannot fill the gap left by the State's decision not to argue implicit repeal; and the State's alternative theory about Section 19 of the IRA is at odds both with the plain language of that section and the historical facts.

This Court should therefore deny the State's motion for summary judgment and grant summary judgment in favor of the federal defendants and intervenor-defendant Tlingit & Haida.  In this memorandum, we provide the Court with background regarding the Juneau trust land at issue and Tlingit & Haida, and then address the merits of the State's principal arguments.[5]

---

[5]  Tlingit & Haida adopts the standard of review presented in the Secretary's brief, Dkt. 19 ("Secretary's brief").

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 10 of 39

# BACKGROUND

## I. Tlingit & Haida's Connection to the Trust Land

Tlingit & Haida is a State-recognized[6] and federally-recognized[7] Tribe comprised of the two indigenous peoples of Southeast Alaska, the Lingít and the Haida. The Lingít have a vast history in the region, stretching back over 11,000 years, and were long established throughout Southeast Alaska when European explorers and traders first arrived during the 1700s.[8] The Haida have lived in the Haida Gwaii for at least 12,500 years and came to Southeast Alaska's southern reaches in ancient times.[9] As President Richard

---

[6] *See* Alaska Tribal Recognition Act, AS 01.15.100 ("The state recognizes the special and unique relationship between the United States government and federally recognized tribes in the state. The state recognizes all tribes in the state that are federally recognized under 25 U.S.C. 5130 and 5131.").

[7] *See* Tlingit and Haida Claims Authorization Act, Pub. L. 74-152, § 8, 49 Stat. 388, 390 (1935), *as amended by* Pub. L. 89-130, 79 Stat. 543, 544 (1965); Tlingit & Haida Status Clarification Act, Pub. L. No. 103-454, tit. II, § 203, 108 Stat. 4792 (1994) ("The Congress reaffirms and acknowledges that the Central Council of Tlingit and Haida Indian Tribes of Alaska is a federally recognized Indian tribe."); *see also* Federally Recognized Indian Tribe List Act of 1994, Pub. L. 103-454, tit. I, § 104, 108 Stat. 4791, 4792 (codified at 25 U.S.C. §§ 5130, 5131); Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 88 Fed. Reg. 2112, 2115 (Jan. 12, 2023) (listing Tlingit & Haida).

[8] *See* Decl. of Richard Chalyee Eesh Peterson ¶ 5, Dkt. 6-1 ("Peterson Decl.") ("This was once all ours.").

[9] HAIDA GWAII: HUMAN HISTORY AND ENVIRONMENT FROM THE TIME OF THE LOON TO THE TIME OF THE IRON PEOPLE (Daryl W. Fedje & Rolf W. Mathewes eds., 2005). For many years, maps referred to the islands as the Queen Charlotte Islands. The Haida name— Haida Gwaii—was officially restored in 2010.

3

Peterson testified, "We have been here since the beginning of time, and we will be here until the end of time."[10]

The trust land at issue is squarely within the Lingít Aaní, the traditional Lingít territory, which stretches from north of Yakutat to south of Ketchikan and encompasses all of the City and Borough of Juneau.[11] More particularly, it is in the historic "Juneau Indian Village," now known as the Áak'w Village, a roughly four-acre stretch of former beachfront and tidelands.[12] This area was traditionally used seasonally by the Lingít Áak'w Ḵwáan for fishing and other subsistence activities,[13] and called Dzántik'i Héeni, or "precious water for the starry flounder."[14] During the Gold Rush era, the Village grew into

---

[10] Peterson Decl. ¶ 8.

[11] AR0000011 (Notice of Decision) ("The Tribe's ancestors used areas in and around Southeast Alaska, including the area now known as Juneau, as their traditional and cultural homeland since time immemorial. [Lot 15] is situated within the traditional Juneau Indian Village, or Ling[í]t Aan[í] as it is known by the Tribe."); *see generally* Peterson Decl. ¶¶ 4, 6–7.

[12] Dkt. 6-5 at 2–3 (maps of Juneau Indian Village and Southeast Alaska); *Our History*, Central Council Tlingit & Haida Indian Tribes of Alaska, http://www.ccthita.org/about/history/index.html (last visited Oct. 11, 2023); *see also* Aurel Krause, THE TLINGIT INDIANS 50-52 (1956) ("Krause"). The Áak'w Village is within the traditional territory of the Lingít Áak'w Ḵwáan, and near the traditional territory of their neighbors, the T'aaku Ḵwáan. Peterson Decl. ¶ 4.

[13] Peterson Decl. ¶¶ 4, 6–7.

[14] *Elder reveals the history, knowledge embedded in Tlingit place names*, Sealaska Heritage Foundation: Blog, https://www.sealaskaheritage.org/node/438 (last visited Oct. 11, 2023) (quoting David Katzeek).

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

a permanent settlement of Lingít, Haida, and other indigenous peoples attracted by the economic and educational opportunities of the growing Juneau community.[15]

The Áak'w Village history is detailed in Tlingit & Haida's *Motion to Intervene* and is incorporated herein by reference.[16]  Over the years, Tlingit & Haida has reacquired by purchase and consolidated much of the historic Áak'w Village, including the trust land at issue here.  Tlingit & Haida's center of operation is located in the Village, in the Andrew Hope Building, which is "a symbol of [the] Tribe's strength and resilience" for Tlingit & Haida's more than 36,000 Tribal citizens.[17]  President Peterson testified to the importance of this land being held in trust:

> The Tribe has consistently and steadfastly sought to protect our traditional tribal lands for future generations. Our Tribal Assembly specifically resolved many years ago to buy back the land in the Áak'w Village, to preserve and protect it for our people.  As the saying goes, we look ahead seven generations when making important decisions. In seven generations, we hope our descendants will talk about how their ancestors — our generation — protected this land for them.[18]

---

[15] Peterson Decl. ¶ 6; *see also id.*, Ex. D, Dkt. 6-6 (Áak'w Village photographs); Walter R. Goldschmidt & Theodore H. Haas, HAA AANÍ / OUR LAND: TLINGIT AND HAIDA LAND RIGHTS AND USE 37 (1998) ("The main village of the Auk was on Auke Bay.  The Auk people moved in large numbers from their village to Juneau after gold was discovered there."); Krause at 69 ("The Taku [Kwáan] have, like the Auks [Áak'w Kwáan], settled in large numbers near the prospectors' town on Juneau . . . known to the Tlingit as Tsenta-ka-hini [Dzántik'i Héeni].").

[16] *See also* AR0000263 (PDC Map of Juneau Indian Village); Peterson Decl. ¶¶ 2–6, 9–11.

[17] Peterson Decl. ¶ 9; *see* Tlingit & Haida, *Tribal Enrollment Report* (Sept. 7, 2023), https://www.ccthita.org/services/enrollment/TribalEnrollmentReport.pdf.

[18] *Id.* ¶ 8.

## II.    Native Land Tenure in Alaska

The State's single-minded focus on ANCSA obscures the long and complex history of Alaska Native land tenure.    The State's presentation boils down to a non-legal mythology—the myth that ANCSA comprehensively, exhaustively, and preemptively reordered Alaska Native land and other rights around Alaska Native Corporations (ANCs). Like many myths, the myth nicely suits the State's worldview, but it is unfounded and counterfactual.

For one thing, the State's telling ignores the many forms of Native land tenure in Alaska—including trust lands held by the Department of the Interior, restricted fee parcels issued under the Alaska Native Allotment Act,[19] and restricted fee parcels issued under the Alaska Native Townsite Act[20]—all of which remain today in Alaska Native trust or restricted fee status.

---

[19] Pub. L. No. 59-171, ch. 2469, 34 Stat. 197 (1906).  Although ANCSA repealed the Allotment Act, it left in place thousands of then-pending Alaska Native allotment applications.  *See* 43 U.S.C. § 1617(a); *see also*, Pub. L. No. 96-487, § 905, 94 Stat. 2371, 2435 (1980) (codified at 43 U.S.C. § 1634); Pub. L. No. 102-415, 106 Stat. 2112 (1992); Pub. L. No. 108-337, 118 Stat. 1357 (2004); Pub. L. No. 108-452, tit. III, §§ 302–304, 118 Stat. 3575, 3588–90 (2004) (all addressing the processing of Alaska Native allotments after ANCSA).  The State is simply wrong in asserting that "Congress [in ANCSA] discontinued individual allotments."  State of Alaska's Mot. for Summ. J. & Mem. in Supp. 46, Dkt. 16 ("State MSJ").

[20] Pub. L. No. 69-280, ch. 379, 44 Stat. 629 (1926) (formerly codified at 43 U.S.C. §§ 732–36).  The Townsite Act was repealed, not by ANCSA in 1971, but by sections 701 and 703 of FLPMA in 1976, *see* 90 Stat. at 2789–90.  Even then, occupants continued to receive restricted fee title to their lots if their occupancy predated FLPMA.  *See* AR0001055 (U.S. Dep't of Interior, Solic.'s Op. M-36795, *Governmental Jurisdiction of Alaska Native Villages Over Land and Nonmembers* (Solicitor Sansonetti), at 129 & n.306 (Jan. 11, 1993) ("Sansonetti")).  Remaining vacant lands within the townsites were conveyed to Alaska

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

While ANCSA revoked the reservations that had been set aside for some Tribes,[21] it left in place all tribal trust land titles existing outside those reservations. For instance, prior to ANCSA, the Department of the Interior held non-reservation parcels in trust for the Organized Village of Kake, Klawock Cooperative Association, and Angoon Community Association.[22] In January 2017, the Department took a one-acre parcel into trust for the Craig Tribal Association.[23] Further reflecting the congressional understanding that tribal trust lands in Alaska continued after ANCSA, Congress expressly legislated with respect to such lands in the ensuing years.[24]

As a consequence of these actions, ANCSA not only left in place thousands of acres of restricted fee Alaska Native lands within townsites organized under the Alaska Native Townsite Act, hundreds of thousands of restricted fee title lands issued under the Alaska Native Allotment Act, and tribal trust lands; it also left in place continuing land dispositions

---

Native Tribes. *See Aleknagik Natives Ltd. v. United States*, 886 F.2d 237, 240 (9th Cir. 1989). With respect to the tribal lands, "these townsite lands have been conveyed, pursuant to federal law, directly to Native villages in the capacity of local governments." AR0001049 (Sansonetti at 123 (discussing 27 Tribes that received townsite lands)); *see also* AR0001055–56 (Sansonetti at 129–30 (discussing the "Indian country" status of townsite lots for purposes of tribal jurisdiction)).

[21] 43 U.S.C. § 1618(a).

[22] AR0001038 (Sansonetti at 112 n.277) (noting trust holdings for the Tribes at Kake, Angoon and Klawock).

[23] AR0000398 –(Land Acquisitions; Craig Tribal Association, Craig, Alaska, 82 Fed. Reg. 4915 (Jan. 17, 2017)).

[24] *See*, *e.g.*, Pub. L. No. 95-487, 92 Stat. 1635 (1978) (authorizing Secretary, "upon request" of the Tribe, to convey Kake tribal "trust" lands in "fee simple").

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 15 of 39

under the Allotment and Townsite Acts.[25]  These lands today total an estimated 1.2 million

acres, including allotments held by over 17,000 individual allotees.[26]

In other words, Congress both during and after ANCSA repeatedly looked at this

issue and specifically chose to retain restricted fee and trust land status in Alaska alongside

Alaska Native Corporation land holdings conveyed pursuant to that Act. And with

restricted fee allotments identical to trust lands for purposes of legal and jurisdictional

analyses,[27] including classification as Indian country under 18 U.S.C. 1151(c), the State

cannot credibly argue that no Indian country exists in Alaska today[28]—which explains why

---

[25] *See supra* nn.19–20.

[26] *See* Alaska Native Allotment Act Entitlements, Bureau of Land Mgmt., https://www.blm.gov/programs/lands-and-realty/regional-information/alaska/land_transfer/ak-native-allotment-act (last visited Oct. 11, 2023); U.S. Gov't Accountability Off., GAO-22-104627, *Native American Veterans: Improvements to VA Management Could Help Increase Mortgage Loan Program Participation* 35 (2022), https://www.gao.gov/assets/gao-22-104627.pdf.  Lands held in restricted status also include:  3,850 Alaska Native Townsite lots, *see* GAO-22-104627, at 36; 27 Alaska Native Village Townsites, *see* AR0001049 (Sansonetti at 123); 196 Alaska Native Townsites, *see* AR0001055 (Sansonetti at 129); and hundreds of Alaska Native Vietnam Veterans Act Allotments covering several thousand more acres, *see generally* John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. No. 116-9, § 1119, 133 Stat. 580, 630–34 (2019) (codified at 43 U.S.C. § 1629g–1).

[27] *United States v. Ramsay*, 271 U.S. 467, 471-72 (1926); *see also People of South Naknek v. Bristol Bay Borough*, 466 F. Supp. 870, 874-75 (D. Alaska 1979) (holding that, for purposes of federal court jurisdiction, the restricted Native townsite lots have the same status as allotments); *see also* Newton, Nell Jessup, ed., COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 16.03[1] at 1039-40 (2005 ed.).

[28] *See Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.2 (1988) ("As noted, only one Indian reservation, the Annette Island Reserve, survived ANCSA. *Other Indian country exists in Alaska post-ANCSA only if the land in question* meets the requirements of a 'dependent Indian communit[y]' under our interpretation of § 1151(b), or if it *constitutes 'allotments' under § 1151(c)*." (emphasis added)).  The Court in *Venetie*

the State is left complaining only that the Secretary "create[d] *additional* Indian country"[29] or "*additional* 'trust lands.'"[30]

The State ignores that Congress left in place the federal-tribal trust relationship in Alaska as the foundation for federal Indian programs in Alaska.[31] And it both mischaracterizes and understates the importance of Congress remaining assiduously neutral about the impact ANCSA was to have on the presence of "Indian country" in Alaska.[32] All this further erodes the myth of a Congress committed in ANCSA to ending tribal trust land ownership. And it ignores altogether Congress's affirmative decision to "recognize[] and affirm[]" the existence of tribal territorial jurisdiction in Alaska.[33]

---

expressly established a test for *Alaska* "Indian country." Contrary to the State's view, nowhere did the Court view ANCSA as categorically foreclosing Alaska Indian country either pre-ANCSA or post-ANCSA.

The State grossly mischaracterizes *Venetie* as holding that "ANCSA also ended federal agencies' authority to take land into trust for individual Indians." State MSJ at 47. In fact, the *Venetie* decision neither speaks generally nor otherwise to "federal agencies' authority" to acquire trust lands in Alaska for anyone. What *Venetie* actually held on the cited page was that the specific ANCSA fee lands Congress identified for selection by ANCs did not meet the "federal set aside requirement" that lands must meet in order to qualify as "Indian country" lands. 522 U.S. at 532. As the State well knows, the Tlingit & Haida trust land was never ANCSA fee land, and *Venetie* is therefore irrelevant to the matter before this Court.

[29] State MSJ at 12 (emphasis added).

[30] *Id.* at 16 (emphasis added).

[31] *See* 43 U.S.C. § 1626(d).

[32] *See* State MSJ at 31 (discussing Pub. L. No. 100-241, §17(a), 101 Stat. 1788, 1814 (1988) (43 U.S.C. § 1601 note)).

[33] 25 U.S.C. § 1305(a) ("Congress recognizes and affirms the inherent authority of any Indian tribe occupying a Village in the State to exercise criminal and civil jurisdiction over all Indians present in the Village."); *see generally* Alaska Tribal Public Safety

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 17 of 39

## ARGUMENT

The truth—not the myth—is that ANCSA was laser-focused on (1) settling aboriginal land claims that interfered with State land selections and the corresponding development of North Slope oil deposits and the related construction of the trans-Alaska pipeline, all on state-selected lands; (2) payment of nearly $1 billion in partial compensation for the extinguishment of aboriginal titles to those and other lands; and (3) the terms and conditions upon which 44 million acres would be transferred in fee to Alaska Native Corporations in further settlement of those aboriginal claims.[34]  The truth, not the myth, is that Alaska Tribes retain considerable personal and territorial jurisdiction across Alaska.  And the truth, not the myth, is that a wide array of Native land holdings exists today in Alaska, including thousands of trust and restricted fee lands comprising well over 1.2 million acres.  Viewed in its proper context, the Secretary's decision to take a small parcel of land into trust for Tlingit & Hada is both lawful and unremarkable.

---

Empowerment Act, Pub. L. No. 117-103, subtit. B, §§ 811–13, 136 Stat. 49, 904–10 (2022) (codified in part at 25 U.S.C. § 1305); *see also id.* § 812(1)(B) (directing, with respect to certain definitions applicable to "Indian country," that the Attorney General "shall modify any reference to 'Indian country' to mean the [Alaska Native] Village of a participating Tribe").  As for tribal territorial jurisdiction in Alaska, *see generally John v. Baker*, 982 P.2d 738 (Alaska 1999); *State of Alaska v. Central Council of Tlingit and Haida Indian Tribes of Alaska,* 371 P.3d 255 (Alaska 2016).

[34] "It is important to remember that Alaska Native land and history did not commence with ANCSA, and that ANCSA did not terminate Alaska Native tribal governments."  Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76888, 76890 (Dec. 23, 2014). *See generally* Robert B. Arnold, ALASKA NATIVE LAND CLAIMS 93-144 (1978).

## I.    This Case Does Not Implicate the Major Questions Doctrine.

The State's attempt to stretch this case into the "major questions" realm distorts the doctrine beyond recognition.   The major questions doctrine applies in "'extraordinary cases'" like those involving "assertions of 'extravagant statutory power over the national economy.'"[35]   The primary cases relied on by the State involved a novel approach to greenhouse gas emissions that would have "substantially restructure[d] the American energy market"[36] and a loan forgiveness program that would have "canceled roughly $430 billion of federal student loan balances" held by 43 million borrowers, the "economic and political significance" of which was "staggering by any measure."[37]   Another case relied on by the State—though not, in fact, a major questions case—addressed the scope of federal authority over wetlands across the country.[38]   Try as it might, the State cannot credibly compare the Secretary's exercise of her land-into-trust authority here with the scale of the actions at issue in those cases.

To begin with, the impacts of the Secretary's decision here—while significant for the Tribe—come nowhere near the sweeping national economic impacts that were central

---

[35] *West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2609 (2022) (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014)).

[36] *Id.* at 2610.

[37] *Biden v. Nebraska*, 143 S. Ct. 2355, 2362, 2373 (2023) (quotation omitted).

[38] *See Sackett v. E.P.A.*, 598 U.S. 651, 713–14 (2023) (Kagan, J., concurring) (distinguishing the major questions doctrine from the different clear-statement rule applied in the case).

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 19 of 39

to the application of the major questions doctrine in those cases. The Secretary has taken into trust a driveway-sized parcel in Juneau. Even if the Secretary were to grant the Tribe's other pending trust applications, the result would be a mere handful of acres of trust land added to the 1.2 million acres that are already in trust or restricted status in Alaska.[39] At the risk of stating the obvious, this is not an "assertion[] of extravagant statutory power over the national economy."[40]

Nor is this the type of "transformative expansion [of] regulatory authority" that triggers the major questions doctrine.[41] Rather, the Secretary's action here is a routine exercise of authority under the Department's existing land-into-trust regulations.[42] The Secretary has enjoyed the authority to take land into trust for Indian tribes in the lower 48

---

[39] Any argument that the court should look at the implications of the Department's land-into-trust authority more broadly, *see* State MSJ at 44–45, are purely speculative and amount to a facial challenge rather than an as-applied challenge to the Department's regulations. Alaska chose not to challenge the Department's removal of the Alaska Exception when the Final Rule was issued in 2014, and the 6-year statute of limitations bars it from doing so now. 28 U.S.C. § 2401.

[40] *West Virginia*, 142 S. Ct. at 2609 (quotation omitted).

[41] *Id.* at 2610 (quotation omitted); *see also Alaska Indus. Dev. & Exp. Auth. v. Biden*, No. 3:21-CV-00245-SLG, 2023 WL 5021555, at *11 (D. Alaska Aug. 7, 2023) ("This is not a case involving an agency's assertion of 'sweeping authority.'") (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2486 (2021)).

[42] *See* 25 C.F.R. pt. 151.

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 20 of 39

since the IRA was enacted nearly a century ago,[43] and (as laid out in detail below) the Alaska IRA expressly extended that authority to Alaska.[44]

And, again, the Department already holds other land in trust or restricted fee status across Alaska. By taking the Capitol Avenue parcel into trust, the Secretary is not claiming new or different authority; she is simply exercising authority expressly granted by statute. The Secretary has exercised this authority all around the country since 1934. By no stretch can the Department's decision be considered a "fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind," such that the major questions doctrine would apply.[45]

The State's attempts to recharacterize the Secretary's actions cannot bridge this gap. Nothing in the Secretary's decision purports to "rebalance territorial jurisdiction in Alaska."[46] As noted above, the Secretary already holds thousands of other parcels in Alaska in trust or restricted fee for other Tribes and individuals. Adding an additional tiny parcel of trust land does not work a seismic shift in this system.

Nor does the Secretary's action "resurrect . . . aboriginal title."[47] Aboriginal title refers to a Tribe's right of use and occupancy on lands that the Tribe has "inhabited from

---

[43] *See* 25 U.S.C. § 5108.

[44] *Id.* § 5119 ("Sections 5101, 5108, 5110, 5111, 5121, 5124, and 5129 of this title shall after May 1, 1936, apply to the Territory of Alaska.").

[45] *West Virginia*, 142 S. Ct. at 2596 (internal alterations and quotation omitted).

[46] State MSJ at 43.

[47] *Id.*

time immemorial"; it is distinct from fee title.[48]  Here, the Tribe purchased the Capitol Avenue parcel *in fee* and then transferred title to the United States, to be held in trust for the Tribe.[49]  It was appropriate for the Secretary to consider the Lingít people's connection to the Juneau area in determining whether to take the parcel into trust, but that does not somehow mean that the Department is resurrecting aboriginal title.[50]

The State's obscure reliance on *Hynes v. Grimes Packing Co.* fares no better.[51] *Hynes* was a fishing rights case, addressing whether the Secretary, invoking the since-repealed Alaska IRA Section 2, could create a reservation for the Karluk Tribe out of the public domain that included "permanent title or right" to adjacent fishing grounds.[52]  The Court sought a clear statement because the case involved "permanent disposition of *federal property*"[53]—and indeed, it is logical to think that Congress would need to speak clearly if it intended to divest federal lands or rights from the public domain.  But this matter does not involve the transfer of federal lands or waters to a tribe, either permanently or

---

[48] *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234 (1985).

[49] *See* AR0000001 (Notice of Decision).

[50] *See* AR0000011 (Notice of Decision).

[51] *See* State MSJ at 42 (discussing *Hynes v. Grimes Packing Co.*, 337 U.S. 86 (1949)).

[52] 337 U.S. at 102.  As the Secretary noted in her brief, the reservation in *Hynes* was created under *Section 2* of the Alaska IRA—which is not at issue in this matter—making *Hynes* irrelevant for that reason alone.  *See* Secretary's brief at 39 n.20.

[53] *Hynes*, 337 U.S. at 104 (emphasis added).

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

temporarily, nor the granting of fishing rights. *Hynes* is entirely unhelpful to the matter at hand.[54]

Finally, "the major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation."[55] As such, like other clear-statement rules, it "operate[s] . . . to resolve problems of ambiguity and vagueness."[56] As discussed in detail below, no such ambiguity is present here. The major questions doctrine therefore has no role to play.

## II. Even If a Clear Statement Were Needed, the IRA Clearly Gives the Secretary this Authority.

Even if a clear statement were required, the State's argument nonetheless fails because the Alaska IRA provides the requisite clarity: it *expressly* incorporates the land-into-trust provision of the IRA and applies it to Alaska. The State fails to find a clear statement not because Congress failed to speak clearly but because the State is looking in the wrong place: the State is searching for a clear statement in ANCSA when it should be looking in the IRA. That it comes up empty-handed is both unsurprising and unhelpful in discerning Congress's intent.

In assessing whether there is "a clear congressional statement authorizing an agency's action," "courts must look to the legislative provisions on which the agency seeks

---

[54] As noted above, *supra* at 14 & n.49, Tlingit & Haida purchased this land in fee, on the private market, and then asked the Secretary to hold the parcel in trust on its behalf.

[55] *Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring).

[56] *Sackett*, 598 U.S. at 713 (Kagan, J. concurring).

to rely."[57]  Here, the Secretary was clear about the authority on which she relied:  "The Secretary's authority to place Alaska lands in trust derives from Section 5 of the IRA, as made applicable by the Alaska IRA."[58]  If a clear statement is needed, this Court's task is to determine whether Congress spoke clearly in the IRA, as incorporated into the Alaska IRA.  The answer to that question is yes.

## A.     The Grant of Authority in the IRA and the Alaska IRA is Exceptionally Clear.

IRA Section 5, 25 U.S.C. § 5108, grants the Secretary of the Interior broad authority "in [her] discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations . . . for the purpose of providing land for Indians."  Section 5 specifically provides that "[t]itle to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired."[59]

---

[57] *W. Virginia*, 142 S. Ct. at 2622 (Gorsuch, J., concurring); *see also id.* at 2607-08 (majority op.) ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted." (citation omitted)).

[58] AR0000067 (U.S. Dep't of Interior, Solic.'s Op. M-37076, *The Secretary's Land into Trust Authority for Alaska Natives and Alaska Tribes Under the Indian Reorganization Act and the Alaska Indian Reorganization Act* (Nov. 16, 2022), at 37) (citing 25 U.S.C. §§ 5108, 5119).

[59] 25 U.S.C. § 5108.

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Section 1 of the Alaska IRA expressly applies this authority to Alaska, providing: "Sections 5101, *5108*, 5110, 5111, 5121, 5124, and 5129 of this title shall after May 1, 1936, apply to the Territory of Alaska."[60] It is hard to imagine more specific language.[61] And while the FLPMA repealed Section 2 of the Alaska IRA, Congress left Section 1 intact.[62] That Congress specifically revisited the Alaska IRA and left Section 1 in place is a particularly strong indication that Congress intended the Secretary to retain land-into-trust authority in Alaska.[63]

Despite the State's overwhelming focus on ANCSA, that Act does not alter this analysis. Since the IRA and the Alaska IRA expressly grant the Secretary authority to take land into trust in Alaska, the only relevant question is whether ANCSA repealed that authority. But the State does not argue that ANCSA did so—and the State is correct to concede the point. ANCSA certainly did not repeal the relevant IRA provisions expressly. And repeal by implication is a "rarity" that occurs only when there is "an 'irreconcilable conflict'" between two statutes.[64]

---

[60] 25 U.S.C. § 5119 (emphasis added).

[61] The State mentions Section 1 in its historical context but does not cite its codified form, 25 U.S.C. § 5108, perhaps eliding that Section 1 is still the law of the land.

[62] Pub. L. No. 94-579, § 704(a), 90 Stat. 2743 (1976) (repealing § 2 of the Alaska IRA).

[63] *Cf. Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 n.3 (2009) (noting that when Congress amends one provision but not another, courts "must give effect to Congress' choice").

[64] *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381 (1996) (citation omitted).

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

That high bar is not met here. As the U.S. District Court for the District of Columbia correctly concluded in *Akiachak Native Community v. Salazar*, the IRA is not irreconcilable with ANCSA because "[i]t is perfectly possible for land claims to be settled by transferring land and money to tribal corporations, while the Secretary retains the discretion . . . to take additional lands . . . into trust."[65]

To the extent the State is suggesting that ANCSA impliedly repealed the IRA because it "covers the whole subject,"[66] that argument similarly fails. When Congress enacted FLPMA in 1976, five years *after* ANCSA, it amended the Alaska IRA by repealing Section 2 while leaving Section 1 in place.[67] If ANCSA had occupied the whole field such that the Alaska IRA was implicitly repealed, it would not have been necessary for Congress to expressly repeal Section 2 in FLPMA (nor would it have made sense to repeal only

---

[65] 935 F. Supp. 2d 195, 207 (D.D.C.), *vacated as moot sub nom. Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100 (D.C. Cir. 2016). Because the District Court's opinion was vacated only due to mootness and was not reversed or otherwise criticized by the D.C. Circuit, *see* 827 F.3d at 115, the District Court's reasoning remains persuasive authority. *See Weisberg v. Webster*, 749 F.2d 864, 870 (D.C. Cir. 1984) (where case "ha[d] been vacated on mootness grounds" and thus was not binding, court could choose to consider it as "enlightening authoritative commentary"); *see also* Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3533.10.3 (3d ed. 2008) (noting that even in courts that ascribe no precedential value to opinions that have been mooted, those opinions are still treated as "persuasive arguments"). The case was found moot because, of course, the Department itself repealed the Alaska Exception, determining that ANCSA had not impacted the Department's authority to take land into trust for tribes in Alaska. Land Acquisitions in the State of Alaska, 79 Fed. Reg. 76,888, 76,890 (Dec. 23, 2014); *see Akiachak*, 827 F.3d at 104–06.

[66] *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936).

[67] Pub. L. No. 94-579, § 704(a), 90 Stat. 2473, 2792 (1976).

18

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 26 of 39

Section 2 while leaving Section 1 on the books). At the time FLPMA was passed, Congress necessarily believed the Alaska IRA was still in effect. With respect to Section 1, which was not repealed, that remains true today.

**B.     By Definition, Alaska Tribes are "Indians" Pursuant to Section 19.**

Seeking a way around the clear statutory language, the State attempts to manufacture ambiguity by arguing that one of the four definitions of "Indian" in IRA Section 19 bars the Secretary from taking land into trust for Alaska Native Tribes, despite the Alaska IRA's express incorporation of Section 5.[68]

This argument has no merit. IRA Section 5 authorizes the Secretary of the Interior to acquire lands in trust for Indian tribes,[69] and Congress in the 1936 Alaska IRA *expressly* extended this trust acquisition authority to Alaska Tribes.[70] The State's argument that Section 19 stands in the way of the Secretary's 1936 authority to acquire lands in trust for Alaska Tribes would render Congress's express extension of Section 5 to Alaska Tribes a nullity.[71]

---

[68] State MSJ at 58-59.

[69] 25 U.S.C. § 5108.

[70] *See Carcieri v. Salazar*, 555 U.S. 379, 392 n.6 (2009) ("Sections . . . 465 . . . and 479 of this title shall after May l, 1936, apply to the Territory of Alaska" (alteration in original) (quoting 25 U.S.C. § 473a (now 25 U.S.C. § 5119))); *see also Akiachak Native Cmty.*, 827 F.3d at 102 (recounting this history).

[71] *See, e.g.*, *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985) (rejecting an interpretation under which one statutory provision "would be a nullity," based on "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative" (citation omitted)).

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Section 1 of the Alaska IRA makes crystal clear that "groups of Indians in Alaska not recognized prior to May 1, 1936, as bands or tribes, but having a common bond . . . may organize to adopt constitutions and bylaws [etc.]" under the IRA.[72]  As the Solicitor noted, Section 1 "brought the Indians and Eskimos 'fully within the terms' of the IRA."[73]  As he explained:

> [*Carcieri*] acknowledged that "[i]n other statutory provisions, Congress chose to expand the Secretary's authority to particular Indian tribes not necessarily encompassed within the definitions of "Indian" set forth in § [5129]," and cited to numerous statutes as examples in which Sections 5 and 19 apply to tribes regardless of whether they were under federal jurisdiction in 1934.[74]

The *Carcieri* Court specifically pointed to the Alaska IRA as an example of such statutes.[75]  Accordingly, the Secretary has authority to acquire land in trust for Alaska Natives pursuant to the Alaska IRA, Alaska Native Tribes need not *also* fit within one of the other definitions of "Indian" in Section 19.

---

[72] 25 U.S.C. § 5119.

[73] AR000065 (Solic.'s Op. M-37076, at 35).

[74] AR000065 (Solic.'s Op. M-37076, at 35) (second and third alterations in original) (quoting *Carcieri*, 555 U.S. at 392); *see also id.* at 35-36 ("In footnote 6 of the *Carcieri* decision, the Supreme Court cited to the Alaska IRA as an example of one of those statutes where Congress chose to expand application of the IRA independent of the IRA Section 19 definition of Indian."); *accord Akiachak Native Cmty.*, 935 F. Supp. 2d at 203 ("Alaska land-into-trust authority was conferred in [Section 1 of the Alaska IRA]."). Incredibly, the State mentions *Carcieri* three separate times without ever acknowledging that *Carcieri* cites and discusses the very statute at issue in this case.

[75] *Carcieri*, 555 U.S. at 392 n.6.

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 28 of 39

But even putting aside the Alaska IRA, the State's argument has no merit. The State points out that the first sentence of Section 19 defines "Indian" in pertinent part as "all persons of Indian descent who are members of any recognized Indian tribe now under federal jurisdiction."[76]   That is beside the point.   Section 19's second sentence is specifically directed to Alaska and is dispositive: it *expressly* provides that "[f]or the purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians."[77]   This sentence applies to Tlingit & Haida and all other "aboriginal peoples of Alaska," bringing them squarely within the ambit of the IRA. The remaining two sentences in Section 19 address, respectively, Indians or Tribes occupying a single reservation, and the meaning of the term "adult Indians."   Each of this section's four sentences is independent of the others and addresses distinct, albeit related, issues.   Contrary to the State's reading (and as the Solicitor concluded), the first sentence of Section 19 does not override the second.[78]

The Record of Decision shows the Secretary considered the State's comments on the proposed acquisition, and independently agreed with the Solicitor's conclusion:

> After carefully examining the language of the IRA and the 1936 Amendment to the IRA (Alaska IRA), as well as both statutes' purposes and legislative histories, I conclude, consistent with Solicitor's Opinion M-37076, that

---

[76] State MSJ at 50 (quoting 25 U.S.C. § 5129).

[77] 25 U.S.C. § 5129.

[78] AR000033 (Solic.'s Op. M-37076, at 3) ("Section 19 of the IRA provides a stand-alone definition of 'Indian' applicable to tribes in Alaska, obviating the need to make a [Section 19] *Carcieri* 'under Federal jurisdiction' determination for [Alaska land into trust] acquisitions").

Congress's express application of IRA Section 5 to Alaska in 1936 provides specific statutory authority for the Secretary to accept land into trust for Alaska Natives and federally recognized tribes in Alaska.[79]

The Secretary's conclusion is correct. The Court need go no further to uphold the Record of Decision in this matter.

### C. Even if the State's Section 19 *Carcieri* Test Applied, Tlingit & Haida Satisfies It.

The State's *Carcieri* argument is not properly before this Court because the Secretary did not address it given the inapplicability of the first sentence of Section 19 to Alaska Tribes. But even if that sentence somehow applied and this argument could be considered, its application here leads to the same result. This is because the State confuses two very different terms in Section 19's first sentence: "recognized Indian tribe" and "under federal jurisdiction." Worse yet, the State fails to cite controlling Ninth Circuit precedent concerning those terms.[80]

1.    **Recognition**. First, it is well-established that Section 19's term "recognition" simply requires that a Tribe must be recognized *at the time the land is taken into trust*—not in 1934, 1936, or at any other time. In *County of Amador v. United States Department of the Interior* (which the State fails to cite), the Ninth Circuit held:

> The phrase "recognized Indian tribe now under Federal jurisdiction," when read most naturally, includes all tribes that are currently—that is, at the

---

[79]  AR0000005 (Notice of Decision, at 5).

[80]  *Cf. State of Alaska v. United States*, 2016 WL 1948801 at *7-8 (May 3, 2016) ("The Court finds that counsel's refusal to follow binding [Ninth Circuit] precedent . . . was frivolous," and that when the United States "asserted that it need not follow binding precedent in this litigation . . . it acted in bad faith.").

moment of the relevant decision—"recognized" and that were "under Federal jurisdiction" at the time the IRA was passed.[81]

As the Solicitor stated, "[p]ut another way, the concepts of 'recognized' and 'under federal jurisdiction' in Section 19 are distinct . . . . [T]he IRA does not require that the agency determine whether a tribe was a 'recognized Indian tribe' in 1934; a tribe need only be 'recognized' at the time the statute is applied (e.g., at the time the Secretary decides to take land into trust)."[82] Tlingit & Haida was unquestionably a "federally-recognized tribe" on November 17, 2022, when the Secretary took the Capital Avenue parcel into trust.[83] Thus, contrary to the State's argument, Tlingit & Haida would meet any "recognition" requirement that might apply under the first sentence of Section 19 (although, again, that sentence is not controlling as to Alaska tribes[84]).

---

[81] 872 F.3d 1012, 1026 (9th Cir. 2017).

[82] AR0000703, AR0000725 (U.S. Dep't of Interior, Solic.'s Op. M-37029, *The Meaning of "Under Federal Jurisdiction" for Purposes of the IRA* (Mar. 12, 2014), at 3, 25); *see* U.S. Dep't of Interior, Solic.'s Op. M-37070, *Withdrawal of Certain Solicitor M-Opinions, Reinstatement of Sol. Op. M-37029* The Meaning of 'Under Federal Jurisdiction' for Purposes of the Indian Reorganization Act, *and Announcement Regarding Consultation on "Under Federal Jurisdiction" Determinations* (Apr. 27, 2021) (reinstating Solic.'s Op. M-37029); *Littlefield v. U.S. Dep't of the Interior*, ___ F. Supp. 3d ___, 2023 WL 1878470 *3-4 (D. Mass. Feb. 10, 2023) (appeal filed) (citing Solic.'s Op. M-37029).

[83] *See* AR0000001 (Notice of Decision, at 1). Even if the State's mistaken view on the timing of recognition were used, Tlingit & Haida was also indisputably recognized as a Tribe by Congress in the Tlingit and Haida Claims Authorization Act, which predated the Alaska IRA by a year. *See* AR0003320 (Tlingit and Haida Claims Authorization Act, at § 8).

[84] *Supra* at 20-21.

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

**2. "Under the Jurisdiction of the United States."** The State also errs in asserting that Tlingit & Haida was not "under the jurisdiction of the United States" in 1936. Although the procedural posture of this case would generally foreclose this inquiry (since the Secretary correctly did not consider the issue relevant), we respond because the State goes to such lengths to prove its assertion.

The Ninth Circuit in *County of Amador* agreed with the Solicitor's view that the appropriate interpretation of "[t]he phrase 'under Federal jurisdiction'" is "whether the United States had . . . taken an action or series of actions . . . sufficient to establish or that generally reflect[ed] Federal obligations, duties, responsibility for *or authority over the tribe* by the Federal Government."[85]

The administrative record in this matter is deep and contains a wealth of historical information on the Government's exercise of "authority over" Tlingit and Haida, going back to the 1867 Treaty of Cession with Russia.[86] Borrowing from *Amador*, the United States consistently took significant and deliberate "actions . . . sufficient to establish or that generally reflect[ed] Federal obligations, duties, responsibility for or authority over" Tlingit & Haida (and over Alaska Tribes generally) from 1867 through the present.[87]

---

[85] *Cnty. of Amador*, 872 F.3d at 1026-27 (emphasis added); *see also* AR0000723-26 (Solic.'s Op. M-37029, at 23-26).

[86] *See* AR00003295-4418 (identifying many areas, including health care, education, and economic development); *see also, e.g.*, AR0004417-18 (U.S. Bureau of Ed., *Work of the Bureau of Education for the Natives of Alaska* (1925), at 1-2) (same).

[87] *See Tlingit & Haida Indians of Alaska v. United States*, 177 F. Supp. 452, 464 (Ct. Cl. 1959) ("*Tlingit & Haida*") ("When the [Lingít and Haida] first learned that Alaska had

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 32 of 39

First, and conclusively, the Treaty of Cession itself expressly brought all Alaska tribes under the jurisdiction and authority of the United States by making them subject to federal Indian laws and regulations: "[t]he uncivilized [Alaska] tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to aboriginal tribes of that country."[88]

Second, the United States then took a series of actions to enforce its authority over Alaska tribes and, in particular, the Lingít and Haida. When the Treaty was signed, the Russians had a trading settlement and military garrison at Sitka, but otherwise the Lingít and Haida had "intensive and exclusive use" of Southeast Alaska, "to the exclusion of other Indians and of white explorers, traders, miners and settlers."[89] That soon changed under the United States. The Government's initial step was to identify and locate the Alaska tribes mentioned in the Treaty who came under its authority.[90] In 1868, an Army officer dispatched to Southeast Alaska listed the "Hydahs" [Haida, Prince of Wales Island], "Tongaas" [Taant'á Ḵwáan, Ketchikan], "Stikeens" [Shtax'héen Ḵwáan, Wrangell],

---

been sold to the United States they objected and advised the United States officials that the Russians had lived in Alaska territory only with the permission of the natives."); *see also* Jones, Z., Search For and Destroy: U.S. Army Relations with Alaska's Tlingit Indians and the Kake War of 1869, ETHNOHISTORY 60:1, at 7 (Winter 2013) ("Jones") ("[T]he Tlingit did not recognize Russia as owner of their lands or Russia's right to sell southeast Alaska").

[88] AR0004404 (Treaty Concerning the Cession of Russian Possessions in North America, Russ.-U.S., Art. III, Mar. 30, 1867).

[89] *Tlingit & Haida*, 177 F. Supp. at 457.

[90] AR0004385-95 (*Annual Report of the Commissioner of Indian Affairs for the Year 1868*, *Alaska Territory* (Sept. 3, 1867), at 308-17).

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 33 of 39

"Kakes" [Ḵeex' Ḵwáan, Kake], "Hoidxnous" [Xutsnoowú Ḵwáan, Angoon], "Awks" [Áak'w Ḵwáan, Juneau], "Hoone-ahs" [Xunaa Ḵwáan, Hoonah], "Chilcahs" [Jilḵaat Ḵwáan, Klukwan], and "Tacos" [T'aaḵu Ḵwáan, Douglas]."[91]  All of these are part of Tlingit & Haida today.

Third, between 1867 and 1877, the U.S. Army established military bases in Ketchikan, Wrangell, and Sitka and considerably expanded federal authority over the Lingít and Haida,[92] often by force.  In 1869, when traditional customs of retributive justice collided with "white" law, the United States Navy bombarded and destroyed by fire three villages of the Ḵeex' Ḵwáan [Kake].[93]  Later that year, the killing of a young Shtax'héen (Stikine) Ḵwáan man by Army soldiers and the subsequent retribution killing of a Fort Wrangell officer by his father resulted in the United States Army bombarding the village of Ḵaachxaana.áak'w for two days, until the Tribe surrendered the father—who the Army promptly court-martialed and publicly hanged.[94]  Thirteen years later, after "the United

---

[91] *Id*., AR0004390-92 (original spelling in quotations; modern clan orthography and location in brackets); *see* *Traditional Tlingit Country, Tlingit Tribes, Clans and Clan Houses*," University of Alaska, Alaska Native Knowledge Network, http://www.ankn.uaf.edu/ancr/southeast/tlingitmap/TlingitMap.pdf (last visited Oct. 11, 2023).  Similarly, in 1875 the Commissioner of Indian Affairs identified  the "T'linkets" Tribe in his report to the Secretary. AR0004167 (*Annual Report of the Commissioner of Indian Affairs to the Secretary of the Interior for the Year 1875* (1875), at 205) (including the "Yakutats," "Chilkahts," "Sitkans," "Stahkines" and "Haidahs (Kygahni)" as part of the Tlingit Tribe).

[92] *Tlingit & Haida*, 177 F. Supp. at 464.

[93] Jones, *supra* n.87, at 1–3.

[94] Nat'l Park Serv. Am. Battlefield Prot. Program, *The 1869 Bombardment of Ḵaachxan.áak'w from Fort Wrangell: The U.S. Army Response to Tlingit Law, Wrangell,*

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 34 of 39

States Navy took over the civil and military government of southeastern Alaska,"[95] another similar incident resulted in the Navy's revenue cutter *Corwin* and the U.S.S. *Adams* "shell[ing] and burn[ing] the [Lingít] village of Angoon on the southwestern side of Admiralty Island at Kootznahoo Inlet."[96]

Fourth, in 1880, "gold was discovered in considerable quantities at . . . Juneau, in Tlingit territory."[97] The subsequent Juneau gold rush accelerated in-migration from the United States and—as noted above—led to the growth of the Juneau Indian Village, site of the trust parcel now at issue.[98] The Government established a land office in Sitka, paving the way for patented mining claims and transfer of Lingít and Haida land to non-Natives.[99] In 1884, in a striking parallel with the later impetus for ANCSA, because "settlers and miners . . . were unable to secure legal title" to mining claims and land, Congress passed

---

*Alaska* (July 2015), at 46; *see also Annual Report of the Department of the Interior, "Origin of the Kake War"* (1870), at 1031.

[95] *Tlingit & Haida*, 177 F. Supp. at 464.

[96] *Shelling of the Alaskan Native American Village of Angoon, October 1882*, U.S. Naval History and Heritage Command (Oct. 30, 2017), https://www.history.navy.mil/research/library/online-reading-room/title-list-alphabetically/s/shelling-of-the-alaskan-native-american-village-of-angoon-october-1882.html.

[97] *Tlingit & Haida*, 177 F. Supp. at 464.

[98] Peterson Decl. ¶ 6.

[99] AR0004067 (Act of May 17, 1884 § 8, 23 Stat. 24 (1884); (*see also Tlingit and Haida*, 177 F. Supp. at 464-65)).

the Alaska Organic Act, which permitted claims to be patented "in areas which the Tlingits and Haida Indians had aboriginally used and occupied."[100]

The Organic Act extended federal authority even further than before, and "made it possible for white settlers, miners, traders and businessmen, to legally deprive the Tlingit and Haida Indians of their use of the fishing areas, their hunting and gathering grounds and their timber lands and that is precisely what was done. These Indians protested to the Government and their protests went unheeded. They had no weapons with which to combat Navy gunboats which had burned their villages when they attempted to take the law into their own hands."[101]

Fifth, between 1906 and 1909 the United States unilaterally took "some 16,000,000 acres of Tlingit and Haida lands" for the Tongass National Forest, and then took another "approximately 2,297,598 acres of Tlingit land" for the Glacier Bay National Monument, all "without compensation and without consent of the Indians, through Presidential proclamations issued pursuant to [federal] law."[102]   The Lingít and Haida, through the Alaska Native Brotherhood and the Alaska Native Sisterhood, organized in opposition to this exercise of federal authority and, in 1935, a year before the Alaska IRA was enacted,

---

[100] *Tlingit & Haida*, 177 F. Supp. at 464-65.

[101] *Id.* at 467.

[102] *Id*. at 466-68.

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 36 of 39

Congress specifically authorized Tlingit & Haida to sue for compensation for loss of the Tongass—thus confirming, beyond doubt, that the Tribe was under federal jurisdiction.[103]

Reviewing these any many other congressional and judicial developments, the Solicitor in 1926 concluded that "[Alaska] natives are now unquestionably considered and treated as being under the guardianship and protection of the Federal Government, at least to such an extent as to bring them within the spirit, if not within the exact letter, of the laws relative to American Indians."[104]

Applying the Ninth Circuit's Section 19 test in *County of Amador*—"whether the United States had . . . taken an action or series of actions . . . sufficient to establish or that generally reflect[ed] Federal obligations, duties, responsibility for or authority over the tribe by the Federal Government," Tlingit & Haida was indisputably "under Federal

---

[103] *See* AR0003318 (Tlingit and Haida Claims Authorization Act, at § 2).

[104] U.S. Dep't of Interior, Solic.'s Op., *Leasing of Lands within Reservations in Alaska*, 49 L.D. 592 (1923), *reproduced in* II OPINIONS OF THE SOLICITOR OF THE DEPARTMENT OF THE INTERIOR RELATING TO INDIAN AFFAIRS 1917-1974, at 2076 ("OP. SOLICITOR"), *available at* https://thorpe.law.ou.edu/solicitor.html (last visited Oct. 15, 2023); *see also* U.S. Dep't of Interior, Solic.'s Op. M-26915, *Status of Alaska Natives*, *reproduced in* I OP. SOLICITOR 303, 303-04 (quoting same); *id.* at 304 ("natives of Alaska . . . are all wards of the Nation and are treated in material respects the same as are the aboriginal tribes of the United States"), 310 ("it is clear that no distinction has been or can be made between the Indians and other natives of Alaska so far as the laws and relations of the United States are concerned whether the Eskimos and other natives are of Indian origin or not as they are all wards of the Nation, and their status is in material respects similar to that of the Indians of the United States. It follows that the natives of Alaska, as referred to in the treaty of March 30, 1867, between the United States and Russia, are entitled to the benefits of and are subject to the general laws and regulations governing the Indians of the United States.").

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

jurisdiction" at the time the Alaska IRA was enacted. The State's argument to the contrary is incorrect.

## CONCLUSION

In the Alaska IRA Congress conferred upon the Secretary the authority to acquire land in trust for Tlingit & Haida. That authority has never been repealed, and it was properly exercised in this matter. For the foregoing reasons and those set forth in the Secretary's brief, the State's motion should be denied and this cross-motion should be granted.

Respectfully submitted this 16th day of October, 2023 at Anchorage, Alaska.

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP


By: _/s/ Lloyd B. Miller_
Richard D. Monkman
Alaska Bar No. 8011101
Lloyd B. Miller
Alaska Bar No. 7906040
Whitney A. Leonard
Alaska Bar No. 1711064

*Attorneys for Intervenor-Defendant*

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

## Certificate of Service

I certify that on October 16, 2023, a copy of the foregoing document was served via ECF on:

Jessica Moats Alloway
jessie.alloway@alaska.gov

Christopher F. Orman
christopher.orman@alaska.gov

Charmayne Staloff
Charmayne.staloff@usdoj.gov

*/s/ Lloyd B. Miller*
Lloyd B. Miller

31

Tlingit & Haida Opening Summ. Judg. Brief
*SOA v. Newland et al.*, Case No. 3:23-CV-00007-SLG

Case 3:23-cv-00007-SLG   Document 21   Filed 10/16/23   Page 39 of 39