TREG TAYLOR
ATTORNEY GENERAL

Jessie M. Alloway
Christopher Orman
Assistant Attorneys General
Department of Law
1031 West 4th Avenue, Suite 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: jessie.alloway@alaska.gov
        christopher.orman@alaska.gov

Attorneys for the State of Alaska

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>    Plaintiff,<br><br>v.<br><br>BRYAN NEWLAND, in his official capacity as Assistant Secretary, Indian Affairs, U.S. Department of the Interior; and U.S. DEPARTMENT OF THE INTERIOR,<br><br>    Defendants, and<br><br>CENTRAL COUNCIL OF THE TLINGIT & HAIDA INDIAN TRIBES OF ALASKA,<br><br>    Intervenor-Defendant. | Civil Action No.: 3:23-cv-00007-SLG<br><br><br>**STATE OF ALASKA'S COMBINED OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 8

ARGUMENT .................................................................................................... 11

I.  Granting Alaska tribes territorial jurisdiction is a major question. ........................ 11

    A.  The State is making a major question doctrine argument, not an implied repeal argument. ................................................................................ 12

    B.  The circumstances of this case are like those in *Brown & Williamson* and *Captain Gaston*. ................................................................................ 16

    C.  FLPMA did not disrupt Congress' distinct regulatory scheme. ...................... 23

    D.  The major question doctrine applies to Alaska-specific issues. ..................... 24

    E.  Granting tribes territorial jurisdiction is a decision with significant economic and political consequences. ............................................................. 27

II.  ANCSA is unique and cannot be compared to other settlement acts. ..................... 33

III.  Congress' clarification that indigenous peoples of Alaska are "Indian" is not a standalone definition. ................................................................................ 37

    CONCLUSION ................................................................................................ 43

# TABLE OF AUTHORITIES

**Cases**

*Akiachak Native Community v. Salazar*,
    935 F. Supp. 2d 195 (D.D.C. 2013) ...................................................................... 11

*Akiachak Native Cmty. v. U.S. Dep't of the Interior*,
    827 F.3d 100 (D.C. Cir. 2016) ........................................................................... 11

*Alaska v. Native Vill. of Venetie Tribal Gov't*,
    522 U.S. 520 (1998) ...................................................................................... 8, 17

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ...................................................................................... 13

*Carcieri v. Kempthorne*,
    497 F.3d 15 (1st Cir. 2007) ............................................................................... 34

*Carcieri v. Salazar*,
    555 U.S. 379 (2009) ................................................................... 16, 34, 41, 42

*Christensen v. Harris Cnty.*,
    529 U.S. 576 (2000) .......................................................................................... 42

*Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*,
    228 F.3d 82 (2d. Cir. 2000) ............................................................................... 36

*County of Amador v. U.S. Dep't of the Interior*,
    872 F.3d 1012 (9th Cir. 2017) ........................................................................... 40

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................ 12, 13, 15, 16, 23

*FTC v. Bunte Bros., Inc.*,
    312 U.S. 349 (1941) .......................................................................................... 26

*John v. Baker*,
    982 P.2d 738 (Alaska 1999) ........................................................... 9, 18, 29

*Kahawaiolaa v. Norton*,
    386 F.3d 1271 (9th Cir. 2004) ........................................................................... 38

*Loper Bright Enters. v. Raimondo*,
    No. 22-451 .......................................................................................................... 42

*McDowell v. Alaska*,
    785 P.2d 1 (Alaska 1989) .................................................................................. 25

*Metlakatla Indian Community v. Egan*,
    369 U.S. 45 (1962) ............................................................................................ 39

*Native Vill. of Eklutna v. U.S. Dep't of the Interior*,
2021 WL 4306110 (D.D.C. Sept. 22, 2021) .................................. 9, 27, 28, 29, 30

*Nat'l Cotton Council of Am. v. E.P.A.,*
553 F.3d 927 (6th Cir. 2009)............................................................... 15

*Nat'l Wildlife Fed'n v. Consumers Power Co.,*
862 F.2d 580 (6th Cir. 1988)............................................................... 15

*North Carolina Coastal Fisheries Reform Group v. Captain Gaston LLC*,
76 F.4th 291 (4th Cir. 2023) ....................................... 12, 14, 15, 16, 26

*People of S. Naknek v. Bristol Bay Borough*,
466 F. Supp. 870 (D. Alaska 1979) ...................................................... 9

*South Carolina v. Catawba Indian Tribe, Inc.*,
476 U.S. 498 (1986) ........................................................................... 42

*South Dakota v. U.S. Dep't of Interior*,
423 F.3d 790 (8th Cir. 2005)............................................................... 35

*State of Alaska, Fish & Game v. Federal Subsistence Board*, No. 3:20-cv-00195-SLG,
2023 WL 7282538 (D. Alaska Nov. 3, 2023)................................. 24, 25

*Sturgeon vs. Frost*,
577 U.S. 424 (2016) (*Sturgeon I*) ..................................................... 26

*Sturgeon vs. Frost*,
139 S. Ct. 1066 (2019) (*Sturgeon II*) ................................................. 26

*United States v. Atlantic Richfield Co*,
612 F.2d 1132 (9th Cir. 1980).............................................................. 35

*United States v. Booth*,
161 F. Supp. 269 (D. Alaska 1958)....................................................... 9

*United States v. Fausto*,
484 U.S. 439 (1988) ........................................................................... 13

*United States. v. Lara*,
541 U.S. 193 (2004) ........................................................................... 10

*United States v. Pelican*,
232 U.S. 442 (1914) ............................................................................. 9

*W. Virginia v. EPA*,
142 S. Ct. 2587 (2022) ...................................................... 10, 11, 12, 15, 26

*Yellen v. Confederated Tribes of the Chehalis Rsrv.*,
141 S. Ct. 2434 (2021) .................................................................. 26, 39

## Federal Statutes

5 U.S.C. § 706(2) ........................................................................................... 10

16 U.S.C. § 1601(a) ........................................................................................ 34

16 U.S.C. § 1856(a) ........................................................................................ 15

18 U.S.C. § 1151 ................................................................................... 9, 20, 21

18 U.S.C. § 2265 note ..................................................................................... 21

25 U.S.C. § 465 (now 25 U.S.C. § 5108) .............................................. 19, 41

25 U.S.C. §§ 1701-16 ..................................................................................... 33

25 U.S.C. § 1705(a)(2) .................................................................................... 34

25 U.S.C. § 1712(a)(2) .................................................................................... 34

25 U.S.C. §§ 1751-60 ..................................................................................... 36

25 U.S.C. § 2701 *et seq.* ................................................................................. 28

25 U.S.C. § 2703(4) ........................................................................................ 28

25 U.S.C. § 5105 ............................................................................................. 35

25 U.S.C. § 5108 ..................................................................................... 19, 41

25 U.S.C. § 5129 ............................................................................................. 37

33 U.S.C. § 1331(a) ........................................................................................ 15

33 U.S.C. § 1362(6) ........................................................................................ 15

42 U.S.C. § 300j-11 ........................................................................................ 27

42 U.S.C. § 7601(d) ........................................................................................ 27

43 U.S.C. § 1601(b) .................................................................................... 8, 17

43 U.S.C. § 1603 ................................................................................. 17, 34, 36

43 U.S.C. § 1618 ......................................................................................... 8, 17

43 U.S.C. § 1629e ........................................................................................... 20

## Federal Regulation

25 C.F.R. § 502.12(b) ..................................................................................... 28

## Other Authorities

Administration for Native Americans, "American Indians and Alaska Natives – By the
    Numbers," available at: https://www.acf.hhs.gov/ana/fact-sheet/american-indians-
    and-alaska-natives-numbers .................................................................... 32

*State of Alaska v. Newland, et al.*         Civil Action No.: 3:23-cv-00007-SLG
Combined Opposition and Reply         Page 5 of 44

Alaska Native Claims Settlement Act Amendments of 1987, Sen. Rpt. 100-201, 1987 U.S.C.C.A.N. 3269, 3291 (October 20, 1987) ....................................................... 20

Alaska Tribal Public Safety Empowerment Act, Pub. L. No. 117-103, subtit. B., §§ 811-13, 136 Stat. 49, 904-10 (2022) ................................... 10, 17, 21

BIA.gov, "What is a federal Indian reservation?;" available at: https://www.bia.gov/faqs/what-federal-indian-reservation#:~:text=There%20are%20approximately%20326%20Indian,%2C%20communities%2C%20etc ...................................................................... 32

Final Rule, Land Acquisitions, 45 Fed. Reg. 62-34 (Sept. 18, 1980) .............................. 18

Hearing before Committee on Interior and Insular Affairs, House of Representatives, Ninety-Ninth Congress, H.R. 4162, April 17, 1986, Serial No. 99-76, p. 216 (U.S. Gov. Printing Ofc. 1987), available at https://www.google.com/books/edition/Alaska_Native_Claims_Settlement_Act/R9h1cE_Jb2MC?hl=en&gbpv=0 ............................................................... 18, 19, 20

House Explanatory Statement to P.L. 100-241, 1987 U.S.C.C.A.N. 3299, 3307, 1987 WL 61520 (December 21, 1987) ............. 20

In the Matter of: Appeal of Chairman's August 19, 2020 Disapproval of Amendment to Gaming Ordinance of the Central Council of Tlingit and Haida Indian Tribes of Alaska, Final Decision and Order, February 25, 2021 (NIGC Decision), available at: https://www.nigc.gov/images/uploads/final-decisions/NIGCCommissionDecisionCCTHITA2252021.pdf ............. 9, 28, 29, 30

Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 2115-16 (January 12, 2023) ................... 32

LEGISLATIVE HISTORY OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 (PUBLIC LAW 94-579), Senate Committee on Energy and Natural Resources, Memorandum of the Chairman, Senator Henry Jackson, vi (1978) ... 23

Mashantucket Pequot Indian Claims Settlement Act, 97 Stat. 851 (Oct. 18, 1983) ........ 36

Pub. L. No. 100–241 § 17(a)(2), 101 Stat. 1788, 1814 (Feb. 3, 1988) ............................ 20

Pub. L. No. 100-497, 102 Stat. 2467 (1988) ..................................................................... 28

Rhode Island Indian Claims Settlement Act, 92 Stat. 813 (Sept. 30, 1978) .................... 33

S. Rep. 1080, 73d Cong. 2d Sess. (May 10, 1934) .......................................................... 40

S. 1474 Repeal of Special Rule for State of Alaska, Section 910 of the Violence Against Women Reauthorization Act of 2013 ........ 21

Scherer, K., Alaska's Tribal Trust Lands: A Forgotten History, 38 Alaska L. Rev. 37 (2021) ................................................................................. 31

State of Montana, "The Seven Indian Reservations of Montana," available at:
https://opi.mt.gov/Portals/182/Page%20Files/Indian%20Education/Social%20Stu
dies/3-5/Seven%20Reservations%20-%20G3.pdf ................................................. 32

State of Washington, "Washington Tribes," available at:
https://www.ltgov.wa.gov/washington-
tribes#:~:text=Washington%20counts%2029%20federally%20recognized,on%20
reservations%20throughout%20the%20state. ....................................................... 32

Violence Against Women Reauthorization Act of 2013 (VAWA 2013),
Pub. L. No. 113-4, 127 Stat. 54 (2013) .............................................. 16, 20, 21, 22

Violence Against Women Act Reauthorization Act of 2022 (VAWA 2022),
Pub. L. No. 117-103, 136 Stat. 49 (2022) .......................................... 16, 17, 21, 33

# INTRODUCTION

For over a century, the Federal government left unresolved Alaska Native land claims and Alaska tribes' claims for territorial jurisdiction. When circumstances forced action, it took years of negotiations, public debate, and congressional hearings before Congress ultimately reached a resolution. Once the dust settled, Congress had preserved Alaska tribes as sovereign entities, but left them with no territorial reach.[1]

Now frustrated by Congress' resolution of these issues, Interior and the Tribe seek to redraw Alaska's jurisdictional map. They claim that, despite having just enacted one of the most complicated pieces of legislation,[2] Congress left the Secretary of the Interior with unfettered authority to grant Alaska tribes territorial jurisdiction by taking lands into trust and to declare those lands as reservations. If they are correct, the day after Congress revoked all but one reservation in Alaska and declared that it wanted to move forward "without creating a reservation system or lengthy wardship or trusteeship," the Secretary could have done the exact opposite and relied on the Alaska IRA to create more reservations.[3] This defies logic.

In any state, the authority to create territorial jurisdiction where none exists would be a major question. Even more so in Alaska, considering its history. [*See* State's Br. at

---

[1]     *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 526 (1998).

[2]     As Congressman Udall reflected after ANCSA's passage: "[i]f we serve here another 20 years, I do not think we will ever deal with a more complicated piece of legislation." [AR 1002 n.209]

[3]     *See* 43 U.S.C. § 1601(b); 43 U.S.C. § 1618.

13-33][4] Attempts by Interior and the Tribe to downplay the significance of the agency's action are inaccurate at best and misleading at worst. Although there are 4 to 6 million acres of restricted allotments and Native townsites in Alaska that individuals (not tribes) hold, it is unlikely those could be considered "Indian country" for federal criminal jurisdiction purposes (18 U.S.C. § 1151(c)) because Alaskan tribes do not have territorial jurisdiction over these lands.[5] [*See* Interior's Br., at 17] And even if these allotments could be considered Indian country for certain purposes, they do not create territorial jurisdiction for tribes. This is why Congress recently took action to *grant* Alaska tribes special domestic violence criminal jurisdiction; it did not superfluously

---

[4] When referencing the pleadings, the State cites the page number of the pleading itself, not the page number provided by ECF.

[5] The definition of "Indian country" in the Major Crimes Act is based on a case about allotments formed from reservations. *See United States v. Pelican*, 232 U.S. 442 (1914). Allotments under Alaska's Native Allotment Act were not formed from reservations. It is therefore questionable whether these allotments could be considered "Indian country" under 18 U.S.C. § 1151(c). *See Native Vill. of Eklutna v. U.S. Dep't of the Interior*, 2021 WL 4306110, at *1 (D.D.C. Sept. 22, 2021); In the Matter of: Appeal of Chairman's August 19, 2020 Disapproval of Amendment to Gaming Ordinance of the Central Council of Tlingit and Haida Indian Tribes of Alaska, Final Decision and Order, February 25, 2021 (NIGC Decision), available at: https://www.nigc.gov/images/uploads/final-decisions/NIGCCommissionDecisionCCTHITA2252021.pdf (accessed on November 20, 2023); *John v. Baker*, 982 P.2d 738, 750 (Alaska 1999) ("Unlike most other tribes, Alaska Native villages occupy no reservations and for the most part possess no Indian country."); *People of S. Naknek v. Bristol Bay Borough*, 466 F. Supp. 870, 876 (D. Alaska 1979) (discussing "conflicting decisions relating to what is 'Indian country' in Alaska, the historical differences present in Federal policy toward Alaskan Natives, and the doctrinal confusion caused by one of the principal Indian jurisdictional cases that has emerged from Alaska"); *United States v. Booth*, 161 F. Supp. 269, 273 (D. Alaska 1958) ("Subsection (c) pertains to allotments, which is a word of art, applying to the General Allotment Act.").

affirm tribal territorial jurisdiction that *already* exists.[6] [*See* Tribe's Br. at 9 & n.33] This demonstrates that Congress knows Alaska tribes lack territorial jurisdiction and has acted to expand that jurisdiction when it deems fit using something it is not willing to call "Indian country." The Assistant Secretary does not have this Congressional authority.

Redrawing Alaska's jurisdictional map is a major question that requires clear congressional authority.[7] The Tribe claims that "history has witnessed a success of different congressional approaches to Alaska Native land tenure" and that "the Secretary's action on review here falls comfortably within that long, rich, and diverse tradition." [Tribe's Br., at 1] But the Secretary is not Congress, and it is Congress that must react to "perceived needs and changing policies."[8] [*See id.*] What's more, even prior to ANCSA, the Secretary's authority under the IRA was much more limited than she now claims. Because the Secretary does not have clear authority to redraw jurisdictional maps, the Assistant Secretary acted outside the scope of his authority and abused his discretion.[9]

---

[6] Alaska Tribal Public Safety Empowerment Act, Pub. L. No. 117-103, subtit. B., §§ 811-13, 136 Stat. 49, 904-10 (2022).

[7] *See W. Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022).

[8] *See United States. v. Lara*, 541 U.S. 193, 200 (2004).

[9] 5 U.S.C. § 706(2).

## ARGUMENT

### I. Granting Alaska tribes territorial jurisdiction is a major question.

The major question doctrine applies to those cases "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."[10] The doctrine is not new; cases raising major questions "have arisen from all corners of the administrative state."[11] Yet only recently has the Supreme Court recognized it to be a "distinct" doctrine; one that exists outside of the routine statutory interpretation analysis.[12]

Interior and the Tribe argue against the major question doctrine in two ways. First, they attempt to turn back the clock to relitigate the parties' arguments in *Akiachak Native Community v. Salazar* as if the major question doctrine does not exist.[13] Interior goes so far as to reference the State's argument from *Akiachak* as if the State is making the same argument again here. [*See* Interior Br., at 10-11] It is not. Second, Interior and the Tribe argue the major question doctrine does not apply because the agency's

---

[10]   *W. Virginia*, 142 S. Ct. at 2608 (cleaned up).

[11]   *Id.*

[12]   *Id.*

[13]   935 F. Supp. 2d 195 (D.D.C. March 31, 2013). The district court concluded that ANCSA did not impliedly repeal the IRA, but the D.C. Circuit vacated the district court's decision because it became moot on appeal when Interior changed its regulation. *Akiachak Native Cmty. v. U.S. Dep't of the Interior*, 827 F.3d 100, 115 (D.C. Cir. 2016). Notably, the D.C. Circuit explained that it was without jurisdiction to provide an advisory opinion, but that the State could raise its claims "if and when Interior attempts to take any land into trust in Alaska." *Id.* at 113.

decision, although "undeniably important to the parties," is not important enough economically or politically. [Interior's Br., at 42-43] They are wrong.

### A. The State is making a major question doctrine argument, not an implied repeal argument.

Implied repeal is not the only doctrine courts apply when later enacted statutes create tension with earlier granted delegations. Another consideration is the major question doctrine. Two cases illustrate this: the Supreme Court's decision in *FDA v. Brown & Williamson Tobacco Corp.*[14] and the Fourth Circuit's decision in *North Carolina Coastal Fisheries Reform Group v. Captain Gaston LLC*.[15]

In *Brown & Williamson*, the Supreme Court reaffirmed the need to consider context when interpreting statutes. Context includes reading a provision with a view of its place in the overall statutory structure.[16] And the overall statutory structure includes the Act at issue and any legislative action taken after the initial enactment, "particularly where Congress has spoken subsequently and more specifically to the topic at hand."[17] "[T]he 'classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a

---

[14]    529 U.S. 120 (2000).

[15]    76 F.4th 291 (4th Cir. 2023).

[16]    *Brown & Williamson*, 529 U.S. at 133.

[17]    *Id.*; *see also W. Virginia*, 142 S. Ct. at 2607-08 ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be 'shaped, at least in some measure, by the nature of the question presented'—whether Congress in fact meant to confer the power the agency has asserted" (quoting *Brown & Williamson*, 529 U.S. at 159)).

statute may be altered by the implications of a later statute.' "[18] "Making sense" of a statute also requires the court to apply its own common sense.[19] Courts cannot forget that "a specific policy embodied in a later federal statute should control over [its] construction of the earlier statute, even though it has not been expressly amended."[20]

Applying these principles, the Supreme Court in *Brown & Williamson* concluded that the Food, Drug, and Cosmetic Act did not grant the Food and Drug Administration (FDA) the authority to regulate tobacco products, although that was a "plausible meaning" of the statute when it was first enacted.[21] Among the circumstances it considered, the Court found it significant that from 1965—after the Surgeon General documented the health effects of smoking—until 1996—when the agency issued its new regulations—the FDA had claimed it did not have jurisdiction over tobacco.[22] The Court also found it significant that during that 30-year stretch, Congress had enacted six separate pieces of legislation that addressed the problem of tobacco use and human

---

[18]    *Brown & Williamson* 529 U.S. at 143 (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)).

[19]    *Id.* at 133 ("[W]e must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."); *see also W. Virginia*, 142 S. Ct. at 2609 (relying on cases where, "given the various circumstances, common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue made it very unlikely that Congress had actually done so" (cleaned up)); *Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring) ("Context also includes common sense, which is another thing that 'goes without saying.' ").

[20]    *Id.* at 143 (cleaned up) (alteration added).

[21]    *Id.*

[22]    *Id.*

health.[23] And Congress had also considered and rejected bills that would have granted the FDA the jurisdiction it later claimed existed all along.[24]

Of note for this case, the issue in *Brown & Williamson* was not whether those six pieces of legislation implicitly repealed the statutory grant of authority in the Food, Drug, and Cosmetic Act. Instead, in analyzing the authority granted by the statutory provision, the Court looked at the agency's original position regarding its authority and the later enacted legislation. "Under th[e] circumstances, it [wa]s evident that Congress' tobacco-specific statutes [] effectively ratified the FDA's long-held position that it lack[ed] jurisdiction under the FDCA to regulate tobacco products."[25] Congress had, the Court held, "created a distinct regulatory scheme to address the problem of tobacco and health, and that scheme, as presently constructed, preclude[d] any role for the FDA."[26]

The Fourth Circuit's decision in *Captain Gaston* follows a similar analysis and does not discuss the implied repeal doctrine. Relevant here, a Fisheries Reform Group argued that shrimp trawlers were violating the Clean Water Act by throwing bycatch back into the Pamlico Sound.[27] The group claimed that the trawlers must obtain a permit from the EPA to discharge a "pollutant"—the bycatch—into a water of the United States—the Pamlico Sound because the Act defines "pollutant" to include "biological

---

[23]     *Id.*

[24]     *Id.* at 143-44.

[25]     *Id.* at 144.

[26]     *Id.*

[27]     76 F.4th at 295.

materials."[28] Although the Fourth Circuit believed the argument was plausible—and even supported by out of circuit precedent—it still concluded that regulating bycatch was outside of the EPA's authority.[29]

A significant factor in the court's contextual analysis was legislative actions Congress took *after* it had enacted the Clean Water Act.[30] Four years after it passed the Act, Congress enacted the Magnuson-Stevens Act of 1976. "Under th[e] Act, Congress maintained the *states'* primary authority over *state* waters like Pamlico Sound."[31] And even in federal waters, Congress delegated the job of managing fisheries to the National Marine Fisheries Service and Regional Fishery Management Councils, not the EPA.[32] Relying on *Brown & Williamson*, the court concluded that the Magnuson-Stevens Act was a "distinct regulatory scheme" with a policy goal of protecting the state-federal balance.[33] As such, the Fourth Circuit held that it "should expect clear authorization from Congress before finding that [the Magnuson-Stevens Act] was effectively displaced by the Clean Water Act."[34]

---

[28]     33 U.S.C. § 1331(a) & 33 U.S.C. § 1362(6).

[29]     *Capt. Gaston LLC*, 76 F.4th at 295-96 & n.4 (citing *Nat'l Cotton Council of Am. v. E.P.A.,* 553 F.3d 927, 937-38 (6th Cir. 2009); *Nat'l Wildlife Fed'n v. Consumers Power Co.,* 862 F.2d 580, 583 (6th Cir. 1988)).

[30]     *Id.* at 297 (citing *Brown & Williamson*, 529 U.S. at 143-46).

[31]     *Id.* (discussing 16 U.S.C. § 1856(a)).

[32]     *Id.* at 298.

[33]     *Id.*

[34]     *Id.* (citing *W. Virginia*, 142 S. Ct. at 2612-13; *Brown & Williamson*, 529 U.S. at 144).

*State of Alaska v. Newland, et al.*     Civil Action No.:  3:23-cv-00007-SLG
Combined Opposition and Reply           Page 15 of 44

Case 3:23-cv-00007-SLG   Document 25   Filed 12/01/23   Page 15 of 44

The second factor the court considered significant was the EPA's longstanding belief that it lacked this authority.[35] Citing the Supreme Court's decision in *West Virginia v. EPA*, the Fourth Circuit found that "[t]he EPA's own lack of confidence that it ha[d] this authority also suggest[ed] that this is a major-questions case."[36]

The State is not arguing that Congress implicitly repealed the Alaska IRA. It is arguing that context matters, and the Court must view the Secretary's authority under section 5 in light of Congress' subsequent actions, which, but for ANCSA, were taken against the backdrop of the agency saying it lacked this authority.

**B.** **The circumstances of this case are like those in *Brown & Williamson* and *Captain Gaston*.**

Assume for the moment that the Alaska IRA, when originally enacted, granted Interior the authority to take the Tribe's land into trust.[37] Like the statutes at issue in *Brown & Williamson* and *Captain Gaston*, Congress passed multiple bills after that shape how we interpret the Alaska IRA. Congress addressed Alaska Native land claims and/or Alaska tribes' territorial jurisdiction in ANCSA, the 1991 ANCSA amendments, the Violence Against Women Reauthorization Act of 2013 (VAWA 2013),[38] and the

---

[35]     *Id.* at 299 ("Given this balance under the existing regulatory scheme, it is unsurprising that the EPA has never sought the authority to regulate bycatch in the fifty years since the Clean Water Act passed.").

[36]     *Id.*

[37]     This also assumes that the Court disagrees with the State's interpretation of "Indian" found in the IRA or its argument that the Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009) applies to Alaska tribes.

[38]     Pub. L. No. 113-4, 127 Stat. 54 (2013).

Violence Against Women Act Reauthorization Act of 2022 (VAWA 2022).[39] And while each of these actions were pending, Interior either claimed it did not have section 5 authority in Alaska (except as it applied to Metlakatla) or it seriously questioned whether that authority existed.[40]

Through each of these post-Alaska IRA enactments, Congress created a "distinct regulatory scheme" to address territorial jurisdiction in Alaska. The most impactful of the bills was ANCSA. Through this legislation, "Congress sought to end the sort of federal supervision over Indian affairs that had previously marked federal Indian policy."[41] It declared a policy to avoid "'creating a reservation system or lengthy wardship or trusteeship.'"[42] "To this end, ANCSA revoked 'the various reserves set aside . . . for Native use' by legislative or Executive action, except for the Annette Island Reserve inhabited by the Metlakatla Indians, and completely extinguished all aboriginal claims to Alaska land."[43] And since ANCSA's passage, the consensus among the courts,

---

[39]     Pub. L. No. 117-103, 136 Stat. 49 (2022).

[40]     Congress signed the Consolidated Appropriation Act of 2022, which included VAWA 2022, into law on March 15, 2022. Solicitor Anderson issued the latest Solicitor Opinion addressing the Secretary's lands into trust authority on November 16, 2022. [AR 32]

[41]     *Venetie*, 522 U.S. at 523-24.

[42]     *Id.* (quoting 43 U.S.C. § 1601(b)).

[43]     *Id.* (quoting 43 U.S.C. §§ 1603, 1618(a)). Interior argues that the State has failed to identify any "substantive provision" of ANCSA that conflicts with the lands into trust authority granted by the Alaska IRA. That is simply not true; these provisions are "substantive provisions." *See* 43 U.S.C. § 1618 (revoking all reservations and discontinuing individual allotments); *see also id.* (allowing Alaska tribes to take

---

*State of Alaska v. Newland, et al.*
Combined Opposition and Reply

Civil Action No.:  3:23-cv-00007-SLG
Page 17 of 44

the State, and the federal government—although perhaps not the tribes—was that Congress had preserved Alaska tribes as sovereigns, but "sovereigns *without* territorial reach."[44]

The next time Congress considered restoring Alaska tribes' territorial jurisdiction was during hearings on the 1991 Amendments. Congress considered these amendments knowing that Interior took the position that it *did not* have the authority to take lands into trust and had adopted a regulation mirroring that understanding.[45]

Alaska Native leaders asked Congress to amend ANCSA.[46] Of relevance here, Willie Kasayulie, the Chairman of the Alaska Native Coalition, offered a series of amendments to H.R. 4162, one of the early bills considered by Congress.[47] Those amendments were drafted in 1985 by a working group of attorneys "familiar with the

---

reservation land in fee *but* not giving tribes a choice to keep their reservation land as a reservation).

[44]     *Id.* (internal quotations omitted) (emphasis added); *see also John v. Baker*, 982 P.2d 738, 750 (Alaska 1999) ("Unlike most other tribes, Alaska Native villages occupy no reservations and for the most part possess no Indian country.").

[45]     Final Rule, Land Acquisitions, 45 Fed. Reg. 62-34 (Sept. 18, 1980) (saying that the land-into-trust regulations prohibited consideration of any trust acquisitions in Alaska, "except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its Members").

[46]     Hearing before Committee on Interior and Insular Affairs, House of Representatives, Ninety-Ninth Congress, H.R. 4162, April 17, 1986, Serial No. 99-76, p. 216 (U.S. Gov. Printing Ofc. 1987), available at https://www.google.com/books/edition/Alaska_Native_Claims_Settlement_Act/R9h1cE _Jb2MC?hl=en&gbpv=0

[47]     *Id.* at 157-78.

Alaska Native Claims Settlement Act and Indian Law issues."[48] Among the attorneys appointed to that working group were Robert Anderson—the current Solicitor for Interior and author of the Solicitor Opinion on which the Assistant Secretary relies [*See* AR 32-67]—and Lloyd Miller—counsel for the Tribe and author of the Tribe's consolidated cross-motion and opposition. [*See* Dkt. 21]

If passed, the amendments authored by Mr. Anderson and Mr. Miller would have granted Interior the same authority that Interior and the Tribe now claim the agency has had all along. For instance, the legislation sought to address the State's argument that "the passage of ANCSA somehow terminated or at least greatly reduced the Governmental power of Alaska Native Tribes."[49] To fix ANCSA's extinguishment of territorial jurisdiction, they proposed adding a provision that provided ANSCA "was not intended to enlarge, diminish or in any way affect the scope of any government power of Alaska Native Tribes.[50] They also sought to address Interior's position "that ANCSA revoked the Secretary's authority to accept Alaska Native Land into trust."[51] To accomplish this, they proposed amendments to section 5 of the IRA.[52] The amendment

---

[48]    *Id.* at 212. Compare the amendments offered by Mr. Kasayulie, *id.* at 159-78, with the draft legislation prepared by the working group, *id.* at 214-29.

[49]    *Id.* at 216.

[50]    *Id.* at 215-16.

[51]    *Id.*

[52]    *Id.*

to section 5 would extend the Secretary's authority to "any state."[53] Specifically, the proposal would have amended 25 U.S.C. § 465 (now 25 U.S.C. § 5108) so it read:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange or assignment, any interest in lands, water rights or surface rights to lands, within or without existing reservations, including *any lands or such rights within any state and any* trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.[54]

As explained in the State's opening brief, Congress did not pass the legislation drafted by Mr. Anderson and Mr. Miller; instead it amended ANCSA to allow Native corporations to place land into trust under state law.[55] [*See* State's Br., at 30-32] Regarding the territorial jurisdiction issues, the bill included a disclaimer that nothing within the Act was to validate or invalidate "[a]ny assertion that Indian country (as defined by 18 U.S.C. § 1151 or any other authority) exists or does not exist within the boundaries of the State of Alaska."[56]

After the 1991 Amendments, the next significant legislative action taken on territorial jurisdiction in Alaska occurred during the reauthorization of the Violence Against Women Act in 2013 and 2022. VAWA 2013 included a historic provision that

---

[53]     *Id.*

[54]     *Id.* at 217.

[55]     43 U.S.C. § 1629e; House Explanatory Statement to P.L. 100-241, 1987 U.S.C.C.A.N. 3299, 3307, 1987 WL 61520 (December 21, 1987).

[56]     Pub. L. No. 100–241 § 17(a)(2), 101 Stat. 1788, 1814 (Feb. 3, 1988); *see also* Alaska Native Claims Settlement Act Amendments of 1987, Sen. Rpt. 100-201, 1987 U.S.C.C.A.N. 3269, 3291 (October 20, 1987).

recognized the inherent authority of "participating Tribes" to exercise "special domestic violence criminal jurisdiction" over certain defendants, regardless of their Indian status, who commit acts of domestic violence or dating violence in *Indian country*.[57] As originally passed, VAWA 2013 contained a "Special Rule for the State of Alaska" providing that the special tribal jurisdiction would "only apply to the Indian country (as defined in section 1151 of title 18, United States Code) of the Metlakatla Indian Community, Annette Island Reserve."[58] The special rule was subsequently repealed,[59] but that repeal had little impact in Alaska because VAWA applied only in Indian country and Alaska has almost no Indian country.

When Congress passed VAWA 2022, it passed the Alaska Tribal Public Safety Empowerment Act to grant Alaska tribes' the benefits of the 2013 legislation.[60] One of the purposes of this Act was to "empower Tribes" to effectively respond to cases of domestic violence and other related crimes "through the exercise of special Tribal criminal jurisdiction."[61] The amendment recognized and affirmed Alaskan tribes' inherent authority over *Indians* in the village.[62] It also granted and extended tribal

---

[57]    Pub. L. No. 113-4, § 904 127 Stat. 54 (2013).

[58]    *Id.* § 910.

[59]    S. 1474 Repeal of Special Rule for State of Alaska, Section 910 of the Violence Against Women Reauthorization Act of 2013 (18 U.S.C. 2265 note; Public Law 113-4).

[60]    Alaska Tribal Public Safety Empowerment Act, Pub. L. No. 117-103, subtit. B., §§ 811-13, 136 Stat. 49, 904-10 (2022).

[61]    *Id.* § 811(b)(2).

[62]    *Id.* § 813(a).

authority over non-Indians in two ways. First, it granted tribes civil jurisdiction to issue and enforce protection orders against any person in matters arising within the Village or otherwise within the authority of the Indian tribe.[63] Second, it created a limited criminal jurisdiction for some tribes, based on the theory that tribes have authority over an Indian victim or an Indian perpetrator.[64] Congress did not use the term "Indian country" in creating this new tribal jurisdiction because of the lack of Indian country and territorial jurisdiction in Alaska. Rather, it granted tribes territorial jurisdiction coterminous with their villages.[65]

Context matters, and this Court must not leave its common sense at the courtroom door. Even assuming the Secretary may have had the authority to take lands into trust, create reservations, and give tribes territorial jurisdiction in 1936 when Congress first passed the Alaska IRA—which the State disputes—it does not have that authority now. The Court must consider how the Secretary initially used this authority, Congress' legislative acts since the Alaska IRA's enactment, and the agency's long-held position that it lacked the authority it now claims to have. When it adopted the 1991 ANCSA amendments, Congress acted against the backdrop of Interior's consistent position that it lacked authority to take lands into trust in Alaska. When it passed VAWA 2013 and

---

[63]     *Id.* § 813(b).

[64]     *Id.* § 813(d).

[65]     A "Village" is defined to mean the "Alaska Native Village Statistical Area covering all or any portion of a Native village" (as defined in [ANCSA]), and depicted on the applicable Tribal Statistical Area Program Verification map of the Bureau of the Census." *Id.* § 812(7).

VAWA 2022, Congress understood Interior's longstanding position and the controversy that the agency's new position was creating. Congress enacted legislation that granted Alaska tribes limited forms of jurisdiction while recognizing that Alaska tribes have something different than the "Indian country" that currently exists in the Lower 48.

The answer is not to ignore this history. As the Supreme Court held in *Brown & Williamson* under similar circumstances, this context compels a finding that Congress has "effectively ratified" Interior's long-held position that it lacks authority to take lands into trust for tribes in Alaska. Through its post-Alaska IRA enactments, Congress has created a "distinct regulatory scheme" to address territorial jurisdiction, and that scheme, as presently constructed, precludes the Secretary from exercising her lands into trust authority for any Alaska tribe other than Metlakatla.[66]

## C.    FLPMA did not disrupt Congress' distinct regulatory scheme.

Interior and the Tribe argue that FLPMA's partial repeal of the Alaska IRA evinces Congress' intent to leave the lands into trust authority intact. [Interior's Br., at 14; Tribe's Br., at 17] This misreads FLPMA's purpose and misunderstands the major question's clear statement rule.

Congress enacted FLPMA to consolidate the executive's authority to withdraw and manage *public lands*. It has nothing to do with the Secretary's authority to dispose of *private lands*. FLPMA was a "landmark achievement" because, in "one law," it

---

[66]    The three parcels of land held in trust by the Federal government in Southeast Alaska—totaling approximately 32 acres—and the extent to which tribes hold territorial jurisdiction over those parcels are not at issue in this litigation.

provide[d] comprehensive authority and guidelines for the administration and protection of [] Federal lands."[67] Congress "repeal[ed] many obsolete *public land* laws" that hindered effective land management.[68] Section 704(a) of FLPMA specifically repealed "the implied authority" of the President to withdraw lands and create reservations, and also repealed "all identified withdrawal authority granted to the President or the Secretary of the Interior." [AR 1540] This repeal included section 2 of the Alaska IRA. [AR 1540]

The repeal of section 2 of the Alaska IRA had no bearing on whether the Secretary had the authority to take privately held fee land into trust. It was included in a list of many other statutes relating to *federal public* lands that were repealed. The fact that Congress did not mention the Secretary's authority to take *private* land into trust in a bill entirely focused on *federal public land* is hardly a clear statement from Congress that the Secretary's authority to place Alaska tribes' lands into trust and declare reservations survived ANCSA. After all, when fee lands are taken into trust, they do *not* become public lands.

D. **The major question doctrine applies to Alaska-specific issues.**

Interior and the Tribe attempt to dissuade the Court from applying the major question doctrine by suggesting that it applies only to issues of nationwide importance.

---

67 LEGISLATIVE HISTORY OF THE FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 (PUBLIC LAW 94-579), Senate Committee on Energy and Natural Resources, Memorandum of the Chairman, Senator Henry Jackson, vi (1978).

68 *Id.*

Case 3:23-cv-00007-SLG   Document 25   Filed 12/01/23   Page 24 of 44

[*See* Interior's Br., at 36-37; Tribe's Br., at 12-13] The State acknowledges this Court's holding in *State of Alaska, Fish & Game v. Federal Subsistence Board*, where it rejected the State's argument that the doctrine applied to the Federal Subsistence Board's claim of authority to open an emergency hunt on federal land for rural subsistence users because the regulations did not "impact[] millions of people nationwide" and because the Board "has no authority in any other state besides Alaska."[69]

The circumstances here are distinguishable. There, the State sought to challenge the Board's authority to open, on federal land, emergency rural subsistence hunts.[70] The State acknowledged that Congress, through Title VIII of the Alaska National Interest Lands Conservation Act, had granted a subsistence priority, but it argued that the priority applied only to *restrict* a taking and that the Board did not have the authority to *open* a hunt for rural residents.[71] Complicating the issue was the fact that Congress had anticipated that the State would assume management of the subsistence program—and the State clearly has the authority to open hunts—but the Alaska Supreme Court's decision in *McDowell v. Alaska*[72] has so far prevented the State from assuming that role.[73]

---

[69]     No. 3:20-cv-00195-SLG, 2023 WL 7282538, at *8 (D. Alaska Nov. 3, 2023).

[70]     *Id.* at *5.

[71]     *Id.* at *8.

[72]     785 P.2d 1 (Alaska 1989).

[73]     *Federal Subsistence Board*, 2023 WL 7282538, at *2–3.

Unlike in that case, many (if not all) of the factors requiring application of the major question doctrine are satisfied here. First, as discussed below, the creation of tribal territorial jurisdiction is of vast economic and political significance to the State. The Secretary claims authority to redraw Alaska's jurisdictional map, creating territorial jurisdiction for Alaska tribes where none currently exists. Second, the agency itself has long questioned its authority. As the Fourth Circuit recognized in *Captain Gaston*, the "[agency's] own lack of confidence that it has this authority . . . suggests that this is a major-questions case."[74] Third, Congress has developed a "distinct regulatory scheme" through subsequent legislative acts that all conflict with the system the Secretary now seeks to create.

A holding that limits the major question doctrine to nationwide issues ignores the consensus that Alaska is "often the exception, not the rule."[75] Let's assume for the sake of argument that the system created by ANCSA applied nationwide. So over 50 years ago Congress revoked all reservations throughout the country, except for one, and

---

[74]     76 F.4th at 299 (citing *W. Virginia*, 142 S. Ct. at 2610 (" '[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.' " (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 353 (1941)).

[75]     *See Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 141 S. Ct. 2434, 2439 (2021) ("The 'simple truth' reflected in those prior cases is that 'Alaska is often the exception, not the rule.'" (quoting *Sturgeon vs. Frost*, 577 U.S. 424, 440 (2016) (*Sturgeon I*) ("All those Alaska-specific provisions reflect the simple truth that Alaska is often the exception, not the rule.")); *see also Sturgeon vs. Frost*, 139 S. Ct. 1066, 1078-79 (2019) (*Sturgeon II*) (same).

created a system of regional native corporations and village native corporations. And then 50 years later—after years of claiming that it did not have this authority and numerous subsequent congressional enactments occurring with that representation looming in the background—Interior made the same move as it does here and started granting tribes territorial jurisdiction throughout the United States. That undoubtedly would be a major question. And if an action is a major question if it happened nationwide, then it is a major question if it happens within only one state. Otherwise, courts would undermine the importance of Congress—in states such as Alaska—creating exceptions to the general rule.

The major question doctrine can apply to state-specific rules, and it applies in this case.

### E.    Granting tribes territorial jurisdiction is a decision with significant economic and political consequences.

The Secretary's decision is economically and politically significant in Alaska because the Secretary purports to have the legal authority to grant each of Alaska's 227 federally recognized tribes Indian country *with* territorial jurisdiction. That emphasis on territorial jurisdiction is important.[76]

---

[76]    Interior suggests the State has failed to clearly articulate any concerns it has about the impacts of territorial jurisdiction. [Interior's Br., at 37] Those concerns go without saying; the basic point is that Interior (not Congress) is granting Alaska tribes jurisdiction when none currently exists. An example of the consequences of this can be found in environmental regulations, where several statutes allow federal agencies to treat tribes with territorial jurisdiction as if they are states. *See, e.g.*, 42 U.S.C. § 7601(d) (providing that, in the Clean Air context, the EPA may treat Indian tribes like they are

Prior to the Secretary's action here, the only tribe with territorial jurisdiction was Metlakatla Indian Community.[77] While the State acknowledged that Interior's creation of *tribal* trust land and a reservation here likely qualifies as "Indian country," it did not concede that the estimated 4 to 6 million acres of Native allotments and Native townsites to individuals in Alaska are "Indian country." [*See* State's Br., at 16; Interior Br., at 17] And it certainly never conceded that tribes have territorial jurisdiction over those allotments. The Tribe and Interior know the State's position—and the limitations of their own argument—having recently litigated this very issue in the District Court for the District of Columbia and the National Indian Gaming Commission respectfully.[78]

The question in each of those two cases were the same—the Native Village of Eklutna in the federal court case and Tlingit and Haida in the administrative matter— both sought an "Indian lands" determination under the Indian Gaming Regulatory Act (IGRA).[79] The Tribes each sought approval to engage in gambling on Native allotments owned by their respective members and the question was whether Alaska Native

---

states if, among other things, the functions to be exercised pertain to management of air resources within the exterior boundaries "of the reservation or other areas within the tribe's jurisdiction"); 42 U.S.C. § 300j-11 (allowing tribes to be treated as states under the Safe Drinking Water Act if, among other things, "the functions to be exercised by the Indian Tribe are within the area of the Tribal Government's jurisdiction").

[77]     *Eklutna*, 2021 WL 4306110, at *5.

[78]     *See id.*; *see also* NIGC Decision, available at:
https://www.nigc.gov/images/uploads/final-decisions/NIGCCommissionDecisionCCTHITA2252021.pdf

[79]     Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified at 25 U.S.C. § 2701 *et seq.*).

allotments qualify as "Indian lands" under IGRA.[80] Because the Native allotments were not located within a reservation, the Tribes had to show that they "exercise[] governmental power" over the parcel.[81]

Both the district court and the National Indian Gaming Commission reached the same conclusion—Alaska tribes do not exercise territorial jurisdiction over Native allotments.[82] Although they recognized the general rule regarding tribes' authority in Indian country, they also acknowledged that they must consider the "specific facts and law applicable to the particular situation to determine whether Congress has acted to alter" that general rule.[83] And "[i]n the case of Alaska Native Allotments . . . , Congress created 'an exception to the general rule that the territorial basis for tribal authority coincides with the federal Indian country status of the lands."[84] Indeed, the Alaska Supreme Court has similarly concluded that Alaska tribes are "unlike most other tribes" and "for the most part possess no Indian country," such that while tribes have jurisdiction over their members, that jurisdiction is "non-territorial."[85]

---

[80]    *Eklutna*, 2021 WL 4306110, at *1; NIGC Decision, at 3.

[81]    *Eklutna*, 2021 WL 4306110, at *4 (discussing 25 U.S.C. § 2703(4)); NIGC Decision, at 3 (discussing 25 C.F.R. § 502.12(b)).

[82]    *Eklutna*, 2021 WL 4306110, at *5-6; NIGC Decision, at 7-10.

[83]    *Id.*; *see also* NIGC Decision, at 8 ("While Indian Country status provides the statutory basis for the exercise of federal jurisdiction it does not necessarily follow that all Indian allotments are subject to tribal jurisdiction. . . . The analysis for tribal jurisdiction rests on Congressional intent.").

[84]    *Eklutna*, 2021 WL 4306110, at *6 (quoting Sansonetti Opinion, at 124 [AR 1050]).

[85]    *John v. Baker*, 982 P.2d 738, 748, 750, 755 (Alaska 1999).

To determine Congress's intent, the district court and the Commission reviewed the Alaska Native Allotment Act, ANCSA, and the 1993 Solicitor Opinion authored by Thomas Sansonetti. [*See* AR 927-1062] They both concluded that Sansonetti "correctly" relied on the differences between Alaska Native Allotments and Lower 48 Native Allotments to conclude tribes lack jurisdiction—those differences being (1) tribal membership was not required to receive an allotment in Alaska, (2) allotments in Alaska were not carved out of reservations, and (3) Congress expressly referred to Alaska allotments as "homesteads."[86]

The district court also relied heavily on ANCSA, agreeing with Sansonetti that ANCSA "'largely controls in determining whether'" Alaska Native tribes exercise jurisdiction over Alaska lands.[87] The court acknowledged that the "Act's text does not explicitly address tribal government authority," but it held that "its distribution of land in particular tenure to particular parties has legal significance in determining the scope of tribal governmental authority."[88] The court also rejected the argument that the Tribe makes here—that ANCSA was merely a land claims settlement. [*See* Tribe's Br. at 10]

---

[86]     *Eklutna*, 2021 WL 4306110, at *6 (discussing Sansonetti Opinion, at 128-29 [AS 1054-55]); *see* NIGC Decision, at 9-10; *see also id*. at 17 (noting that the Sansonetti Opinion has not been repealed and is controlling on Interior). The same reasoning applies to Native townsites in Alaska. Like Native Allotments, townsite lots were deeded to the occupant, conveying full title, and post-ANCSA, tribes did not exercise territorial jurisdiction within their boundaries. [*See* AR 1055-56]

[87]     *Eklutna*, 2021 WL 4306110, at *6 (quoting Sansonetti Opinion, at 132 [AR 1058]).

[88]     *Id.*

The court concluded that it was "incorrect" to say "that [ANCSA] simply resolved 'disputed aboriginal land claims' and played no role in defining the extent of territorial jurisdiction" in Alaska.[89]

These cases demonstrate the significance of the Secretary's decision here and disprove any claim that this case is "unremarkable" because millions of acres of restricted fee lands—most of it owned by individuals—already exist in Alaska. [*See* Tribe's Br., at 10; Interior's Br., at 17] To use the Tribe's words, the truth—not the myth—is that excluding the Annette Islands Reserve, at most there are only 33 acres of Alaska tribes' lands held in trust by the United States.[90] The acreage comprises three parcels (a total of 32 acres) over which the Secretary purported to exercise his section 5 authority prior to ANCSA—Angoon (13.4 acres), Kake (15.9 acres), and Klawock (1.91 acres).[91] [AR 1039 n.277]. The last acre is owned by the Craig Tribal Association and was placed into trust in 2017.[92] Thirty-three acres of arguable tribal territorial jurisdiction is a far cry from the millions of acres of tribal territorial jurisdiction that Interior and the Tribe claim already exists.

---

[89]   *Id.*

[90]   By "territorial jurisdiction," the State is not referring to the special jurisdiction granted by Congress in VAWA 2022.

[91]   Sansonetti Opinion, p. 112, fn. 277 [AR 1038]. Tribal jurisdiction over these parcels is arguable because Congress simply neglected to consider them when it passed ANCSA. *See* Scherer, K., Alaska's Tribal Trust Lands: A Forgotten History, 38 Alaska L. Rev. 37, 27 (2021).

[92]   The State's decision not to challenge the trust acquisition of the Craig parcel in no way undermines its legal arguments. One state administration's policy decision does not ratify and forever bless a federal agency's decision to exceed its statutory authority.

The absence of Alaska tribes holding territorial jurisdiction is one of the reasons why the Assistant Secretary approved the Tribe's application. He reasoned that, by placing these lands into trust (and then creating a reservation), the Tribe "can exercise tribal authority over such land consistent with how Indian tribes exercise authority over trust lands in the Lower 48 states." [AR 8]

The consequences of the Secretary's claim of authority extend beyond the 787 square foot parcel at issue in this case. There are 227 federally recognized tribes in Alaska.[93] Nearly all of them lack territorial jurisdiction. The Secretary now claims authority to create territorial jurisdiction for each of these Tribes; thus 227 separate and distinct jurisdictional enclaves. Even with a state the size of Alaska, the idea of 227 distinct jurisdictional areas in a single state is staggering. There are 574 federally recognized tribes in the entire United States; 39.5 percent of all federally recognized tribes are in Alaska.[94] There are 326 reservations in the entire United States.[95] In comparison, the State of Montana has seven Indian reservations.[96] The State of

---

[93]   Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 2115-16 (January 12, 2023).

[94]   *Id*; *see also* Administration for Native Americans, "American Indians and Alaska Natives – By the Numbers," available at: https://www.acf.hhs.gov/ana/fact-sheet/american-indians-and-alaska-natives-numbers (accessed on November 22, 2023).

[95]   BIA.gov, "What is a federal Indian reservation?;" available at: https://www.bia.gov/faqs/what-federal-indian-reservation#:~:text=There%20are%20approximately%20326%20Indian,%2C%20comm unities%2C%20etc. (accessed on November 22, 2023).

[96]   State of Montana, "The Seven Indian Reservations of Montana," available at: https://opi.mt.gov/Portals/182/Page%20Files/Indian%20Education/Social%20Studies/3-5/Seven%20Reservations%20-%20G3.pdf. (accessed on November 22, 2023).

Washington has 29 federally recognized tribes and 29 reservations.[97] If the Secretary is correct, she has authority to, despite ANCSA, create 227 territorial jurisdictions (and thus reservations) in Alaska. And the Secretary asserts the agency could have taken this action the day after President Nixon signed ANCSA into law.

Administering such a sweeping change of territorial jurisdiction is a major question that requires Congressional action. As evidenced by the special jurisdiction granted Alaska tribes by VAWA 2022, Congress is aware of the territorial limitations of Alaskan tribes and addresses those issues in ways that are unique to the circumstances in Alaska.

## II.    ANCSA is unique and cannot be compared to other settlement acts.

No other settlement act is like ANCSA. It is unique because of: (1) the history that led Congress to enact ANCSA; (2) the clear statements from Congress that it wanted to avoid creating a reservation system or lengthy wardship or trusteeship; (3) the congressional action to revoke all but one reservation in the state; (4) the clear statements from Interior post-settlement that it lacked section 5 lands-into-trust-authority; and (5) post-settlement congressional actions that ratified the agency's original position. Interior's reliance on the settlement acts in Rhode Island and

---

[97]    State of Washington, "Washington Tribes," available at: https://www.ltgov.wa.gov/washington-tribes#:~:text=Washington%20counts%2029%20federally%20recognized,on%20reservations%20throughout%20the%20state. (accessed on November 22, 2023).

Connecticut, and the cases interpreting them, is therefore misplaced. [Interior Br., at 21-22]

This Court should not, as Interior urges, apply the First Circuit's interpretation of the Rhode Island Indian Claims Settlement Act to ANCSA.[98] The First Circuit held that although that settlement act extinguished aboriginal title, it did not preclude a tribe from later acquiring territorial jurisdiction by placing lands into trust.[99] [*See* Interior Br., at 28 (citing 25 U.S.C. §§ 1705(a)(2), 1712(a)(2))] The comparison fails because the language of the acts is different, evincing Congress's different intent in different circumstances.

ANCSA's extinguishment of aboriginal claims was much broader than the Rhode Island settlement, and Congress in ANCSA expressly stated an intent to *not* maintain a lengthy wardship like it had in the Lower 48 and revoked all reservations (save for one). The provisions in the Rhode Island settlement provide that, to the extent that any transfer of land or natural resources may involve land or natural resources to which Indian tribes had aboriginal title, then that transfer "shall be regarded as an extinguishment of aboriginal title as of the date of said transfer."[100] That does not compare to the broad extinguishment language in ANCSA, where sections 4(b) and 4(c) extinguish (1) all aboriginal titles; (2) all claims of aboriginal title based on use and occupancy, and (3) all

---

[98]    *See* Rhode Island Settlement Act, 92 Stat. 813 (Sept. 30, 1978) (codified at 25 U.S.C. §§ 1701-16).

[99]    *Carcieri v. Kempthorne*, 497 F.3d 15, 35-36 (1st Cir. 2007), rev'd sub nom. on other grounds, *Carcieri v. Salazar*, 555 U.S. 379 (2009).

[100]    25 U.S.C. § 1705(a)(2); 25 U.S.C. § 1712(a)(2).

claims against the United States, the State, and all other persons based on aboriginal title.[101] Those provisions, coupled with 16 U.S.C. § 1601(a)—a declaration from Congress that it wanted a fair and just settlement of "all claims by Natives and Native groups of Alaska, based on aboriginal land claims"—has led the Ninth Circuit to hold that ANCSA "extinguished not only the aboriginal titles of all Alaska Natives, but also every claim 'based on' aboriginal title in the sense that the past or present existence of aboriginal title is an element of the claim."[102]

Interior suggests that ANCSA's extinguishment clause does not apply because the Tribe has not made a "claim" based on aboriginal title. [Interior's Br., at 26 ("A petition to have land taken into trust is not a 'claim.'")] But Interior takes too narrow of a view. True, when the Secretary has authority to take lands into trust, she has a certain amount of discretion to act. But that discretion is not unbounded.

Section 5 allows the Secretary to take lands into trust "for the purpose of providing land for Indians." [AR 3306 (now codified at 25 U.S.C. § 5105)] The Eighth Circuit has held that the Secretary's discretion must be guided by this principle, which is meant to "provid[e] lands sufficient to enable Indians to achieve self-support and ameliorat[e] the damage resulting from the prior allotment policy."[103] Here, the Assistant Secretary exercised his discretion because he believed he needed to restore the Tribe's

---

[101]    43 U.S.C. § 1603(b) & (c).

[102]    *United States v. Atlantic Richfield Co*, 612 F.2d 1132, 1135 (9th Cir. 1980).

[103]    *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 799 (8th Cir. 2005).

"traditional homelands"—i.e., "their traditional and cultural homeland since time immemorial." [AR 11; *see also* AR 6 ("The Tribe states that the Property is uniquely situated to meet its need to regain land that it previously lost and to consolidate existing tribal landholdings.")] In other words, the Tribe's "claim"—the reason for granting this application—is based on the need to regain, and restore its sovereign authority over, the land to which it had once claimed aboriginal title. [*See* AR 6] Such claims were expressly extinguished by ANCSA.[104]

Similarly, the Connecticut Settlement Act—also known as the Mashantucket Pequot Indian Claims Settlement Act—had provisions that make it incomparable to ANCSA. This Act specifically contemplated the continued existence of reservations *and* the Secretary having authority to take additional lands into trust to expand those reservations.[105] When considering the Secretary's authority to take non-settlement lands into trust, the Second Circuit relied on legislative history that supported the Secretary exercising her authority in that context.[106] Here, however, the legislative history of ANCSA supports the opposite. [*See* State's Br., at 17-20, 24-28 (discussing testimony of Alaska Natives opposing reservation model)]

---

[104]    43 U.S.C. § 1603.

[105]    Mashantucket Pequot Indian Claims Settlement Act, 97 Stat. 851 (Oct. 18, 1983) (codified at 25 U.S.C. §§ 1751-60); *see also Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior*, 228 F.3d 82, 87 (2d. Cir. 2000) (explaining that Congress defined the reservation and provided a mechanism whereby the tribe could add property to its reservation).

[106]    *Blumenthal*, 228 F.3d at 85-94.

For those reasons, neither the Connecticut Settlement Act nor the Rhode Island Settlement Act, or the cases interpreting those acts, are relevant to this Court's interpretation of ANCSA or the post-ANCSA amendments.

III.    **Congress' clarification that indigenous peoples of Alaska are "Indian" is not a standalone definition.**

Section 19 defines "Indian" as falling into one of three categories and then goes on to clarify that indigenous people in Alaska are ethnographically "Indian." After that, the section defines "tribe" and "adult Indian." To understand how Congress meant to define Indian, it is helpful to read the section in full:

> The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. For purposes of this Act, Eskimos and other aboriginal peoples of Alaska shall be considered Indians. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words "adult Indians" wherever used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years. [AR 3325][107]

The State does not, as Interior asserts, concede that all people with Alaska Native ancestry are "Indian" for the purpose of the IRA. [Interior Br., at 25-26] Rather, the State recognizes the practical reality that it is very unlikely that any tribe or Alaska Native could meet the first two categories of "Indian" in section 19. The third category, however, applies to individual people of indigenous descent depending on blood

---

[107]    25 U.S.C. § 5129.

*State of Alaska v. Newland, et al.*                     Civil Action No.: 3:23-cv-00007-SLG
Combined Opposition and Reply                            Page 37 of 44

quantum. [State's Br., at 50-55] As Felix Cohen put it, the first category is about "tribal affiliation" (of a tribe recognized and under federal jurisdiction in 1934), the second category pertains to "tribal descent plus residence on a reservation" (e.g., a child of a tribal member who is living on a reservation but who is not herself a member), and the third category is the "half-blood test." [AR 4427]

The State's point is that the sentence about Alaska in section 19 was inserted for the purpose of clarifying that indigenous peoples in Alaska, like indigenous peoples in the Lower 48 are ethnographically "Indian." This is unlike, for instance, indigenous peoples of Hawaii who are not considered "Indian" for the purpose of the IRA and other federal Indian laws.[108] Understanding the ethnographical context—that there was still debate in the early 20th century about whether all, some, or none of the different indigenous groups of Alaska were ethnographically "Indian"—is helpful to understanding why Congress felt it needed to add this clarifying sentence and why it is not surplusage. [State's Br., at 54-55; Interior Br., at 30] This is what Felix Cohen believed at the time. [AR 4427; *see also* State's Br., at 53] This is also what Secretary Ickes believed at the time too—that this clarification brought Alaska Indians and Eskimos "fully within the terms of the Act." (i.e., so they were on the same footing as Lower 48 Indians). [Interior Br., at 30 (citing AR 64–65)] The contextual understanding

---

[108] *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1274, 1280-83 (9th Cir. 2004) (discussing how Congress treats indigenous peoples of Hawaii differently than those in Alaska and the Lower 48).

is helpful, but it is not critical. The textual definition itself is clear and simply cannot bear Interior and the Tribe's interpretation.

Under Interior and the Tribe's interpretation, any person of indigenous descent in Alaska, no matter the percentage of "Indian blood," is entitled to the benefits of the IRA. [Interior Br., at 28-31; Tribe Br., at 21-22] They take this position even though the Act disentitles benefits for people in the Lower 48 who have less than one-half "Indian blood." [AR 3325] Let's say that there is an individual in Alaska whose grandmother was Inupiaq, whose other grandparents are not of indigenous heritage, and who is not a member of a tribe in Alaska. Under Interior's interpretation, that person is an "Indian" under the IRA and is entitled to any benefit the IRA affords individual Indians, such as Interior's hiring preference. But, a person whose grandmother was Chippewa, whose other grandparents are not of indigenous roots, and who is not a member of any tribe is not entitled to such benefits. This makes no sense, especially when considering why the IRA was passed.

The State agrees with Interior that the IRA was remedial in nature [Interior Br., at 30], but that does not help its argument because the Act was not remedial as applied in Alaska.[109] In Alaska, there was not an allotment policy to remediate. Interior points out that the Indian boarding school era did not escape Alaska. [Interior Br., at 3] But the IRA was not passed in response to boarding schools, a shameful legacy that did not end

---

[109]    *Yellen*, 141 S.Ct. at 2438; *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 50-51 (1962) (noting that Alaska tribes differed from Lower 48 tribes as far as reservations and various allotment issues).

until decades after the passage of the IRA and a legacy the federal government has only recently been grappling with. Rather, the Act's land provisions were passed to undo breaking up reservations in the Lower 48—which did not happen in Alaska—and to "provide for the acquisition, through purchase, of land for Indians, now landless."[110] The trust land provisions apply in Alaska on the same terms they apply in the Lower 48. Interior asks this Court to adopt a reading of the statute that gives more benefits to Indians in Alaska than in the Lower 48.

Interior is also correct when it asserts that if the sentence clarifying that indigenous Alaskans are considered Indians in the same way Lower 48 Indians are, then "a tribe in Alaska must also meet one of the first three definitions." [Interior Br., at 30] That is precisely the point. And Interior did not analyze whether the Tribe met any of the three independent criteria.

If the Court rules in the State's favor, the Tribe could seek a determination from Interior that it meets the first of the three definitions because it is recognized now and was under federal jurisdiction in 1934. But that is not a question for this Court. That

---

[110]     S. Rep. 1080, 73d Cong. 2d Sess. (May 10, 1934).

involves both legal[111] and factual[112] disputes and would be a question for Interior in the first instance.

Assuming most tribes in Alaska could not meet the definition of "tribe" in the IRA, that does not make Section 5 a nullity. [Interior Br., at 19] Section 5 still permits the Secretary to take land into trust for individual "Indians." Congress created this provision "for the purpose of providing land for Indians."[113] It does not say for the purpose of providing lands for *Indian tribes*. Rather, it says for "Indians," and Congress provided that land could be taken into trust "for the Indian tribe *or* individual Indian for which the land is acquired."[114]

In addition to making section 5 trust land's provision applicable to individual Indians in Alaska, the 1936 Congress extended three provisions of the IRA—the authority to create constitutions (section 16), incorporate as businesses (section 17), and receive federal funding (section 10)—to groups of Indians not yet recognized in 1936 as

---

[111]  One legal dispute, which the State alluded to in a footnote in its motion for summary judgment, is whether the term "now" applies to both "recognized" and "under federal jurisdiction." [State's Br., at 51 n.162] Notwithstanding the Ninth Circuit's ruling that "now" applies only to "under federal jurisdiction," and not also "recognized," *County of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1022 (9th Cir. 2017), the State may make this argument to Interior on remand. Interior has offered conflicting opinions on this issue within the past eight years. [State's Br., at 51 n.162] Another legal dispute is whether "now" refers to when the IRA was passed in 1934 or when the Alaska IRA was passed in 1936.

[112]  The factual dispute is whether the Central Council was under federal jurisdiction at the relevant time.

[113]  25 U.S.C. § 5108.

[114]  *Id.* (emphasis added).

tribes. [AR 3306] But, contrary to the Tribe's argument otherwise [Interior Br., at 20], Congress did not make all the other newly incorporated IRA provisions applicable to these not yet recognized groups. And the Supreme Court's brief citation to the Alaska IRA in a footnote in *Carcieri*, as an example of how Congress sometimes expanded the definition of Indian tribe for certain purposes, is dicta and does not resolve the arguments presented here anyway.[115] [*See* Tribe's Br., at 20].

The sentence clarifying that indigenous peoples of Alaska, whether they are of Eskimo or other ethnographical descent, are "Indian" in the same way Lower 48 indigenous peoples are Indian, is not a standalone definition. Because there is no ambiguity, neither the Indian canon nor deference to the agency applies.[116] Plus, *Chevron* deference does not apply to Solicitor Opinions.[117] And *Skidmore* deference is similarly misplaced for the same reasons discussed in the states' amici briefs asking the U.S. Supreme Court to overrule the *Chevron* doctrine.[118] The reasons for overruling the *Chevron* doctrine are particularly evident here, where the agency's interpretation is based on a Solicitor's Opinion that was drafted by someone who once advocated on

---

[115]     *See also* AR 184.

[116]     *See Carcieri v. Salazar*, 555 U.S. 379 (2009) (declining to apply the Indian canons having concluded the IRA was unambiguous); *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist; nor does it permit disregard of the clearly expressed intent of Congress.").

[117]     *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

[118]     *See* Brief of *Amici Curiae* State of West Virginia and 26 other States in Support of Petitioners, *Loper Bright Enters. v. Raimondo*, No. 22-451.

behalf of Alaska tribes on this very issue. Statutory interpretation is not a question of what the current executive branch wants a statute to mean, depending on current politics, but rather what the legislating Congress intending the law to mean. The Tribe must therefore satisfy the entire definition of "Indian" found in section 19 of the IRA.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that the Court grant its motion for summary judgment and deny the cross-motions filed by Interior and the Tribe.

DATED: December 1, 2023.

TREG TAYLOR
ATTORNEY GENERAL

By: */s/ Jessie M. Alloway*
Jessica M. Alloway
Assistant Attorney General
Alaska Bar No. 1205045
Email: jessie.alloway@alaska.gov

By: */s/ Christopher F. Orman*
Christopher F. Orman
Assistant Attorney General
Alaska Bar No. 1011099
Email: christopher.orman@alaska.gov

*Attorneys for the State of Alaska*

**CERTIFICATE OF SERVICE**
I hereby certify that on December 1, 2023, I electronically filed the foregoing by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Angela Hobbs
Angela Hobbs
Law Office Assistant III

*State of Alaska v. Newland, et al.*  Civil Action No.: 3:23-cv-00007-SLG
Combined Opposition and Reply  Page 43 of 44

Case 3:23-cv-00007-SLG Document 25 Filed 12/01/23 Page 43 of 44

## CERTIFICATE OF WORD COUNT

I certify that this document complies with Local Rule 7.4(a)(1) because it contains 9,549 words.